UNITED STATES BANKRUPTCY COURT
CENTRAL DIVISION OF MASSACHUSETTS


_____

IN RE:
                                    Civil Action

WILLIAM JOHNSON              15-42445-CJP


_____

          DEPOSITION OF KEVIN RILEY, called as

a witness by and on behalf of the Creditor, taken

pursuant to the applicable provisions of the

Massachusetts Rules of Civil Procedure, before

Melissa R. McKenzie, Certified Shorthand

Reporter, No. 1445F97, and Notary Public within

and for the Commonwealth of Massachusetts, at the

offices of Mirick, O'Connell, DeMallie & Lougee,

100 Front Street, Worcester, Massachusetts, on

October 21, 2020.


          **BAY STATE REPORTING AGENCY**
            **8 VINELAND STREET**
          **WORCESTER, MA 01604**
            **(508) 753-4131**

1    **APPEARANCES:**

2    JAMES EHRHARD, ESQUIRE
     EHRHARD & ASSOCIATES, P.C.
3    250 Commercial Street, Suite 410
     Worcester, MA  01608
4    (508) 791-8411
     Ehrhard@ehrhardlaw.com
5    Counsel for the Creditor

6    SCOTT D. CARMAN, ESQUIRE
     KREMS, JACKOWITZ & CARMAN, LLP
7    141 Tremont Street
     Boston, MA  02111
8    scarman@kjcllp.com
     Counsel for Kevin and Kristen Riley
9
     JOSEPH H. BALDIGA, ESQUIRE (Via Zoom)
10   MIRICK, O'CONNELL, DEMALLIE & LOUGEE, LLP
     1800 West Park Drive, Suite 400
11   Westborough, MA  01581
     (508) 860-1448
12   Counsel for the Bankruptcy Trustee

13   LISA TINGUE, ESQUIRE (Via Zoom)
     U.S. TRUSTEES OFFICE
14   446 Main Street, 14th Floor
     Worcester, MA  01608
15

16

17   Also Present:  Jim Lyons

18                  Chris Phaneuf

19

20

21

22

23

24

<u>**I N D E X**</u>

TESTIMONY OF:          DIRECT CROSS REDIRECT RECROSS

Kevin Riley

(By Mr. Ehrhard)      4            118

(By Mr. Baldiga)            99              113

(By Ms. Tingue)             100             147


<u>**E X H I B I T S**</u>

EXHIBITS          DESCRIPTION          PAGE

1                 Documents            149

```
 1                    S T I P U L A T I O N S

 2                    It is agreed by and between counsel

 3         for the respective parties that the deponent

 4         shall waive the reading and signing of the

 5         deposition transcript.

 6                    It is further agreed that all

 7         objections, except as to form, and motions to

 8         strike are reserved for the time of trial.

 9                    KEVIN RILEY, having been

10         satisfactorily identified and duly sworn by the

11         Notary Public, was examined and testified as

12         follows to direct interrogatories

13         BY MR. EHRHARD:

14    Q.   Mr. Riley, my name is James Ehrhard.  How are

15         you?

16    A.   Good.  How are you?

17    Q.   Thank you for coming here today for this

18         deposition.

19                    MR. EHRHARD:  Off the record.

20                    (Discussion off the record.)

21                    MR. EHRHARD:  Back on.

22    Q.   On the screen is Lisa Tingue with the beautiful

23         woods in the background there.  She is the

24         Assistant U.S. Trustee.  She's a trial attorney
```

1        for the U.S. Trustees office, which oversees the

2        bankruptcy code.   That's Joseph Baldiga with not

3        a nice background.   He's the Chapter 7 trustee,

4        who is the trustee in William Johnson's

5        bankruptcy case.   I do appreciate you coming here

6        today.

7                    Have you ever been to a deposition

8        before?

9    A.  No.

10   Q.  This is your first one?

11   A.  Yes.

12   Q.  I do talk fast and I slur my words.  So if you

13       don't understand what I'm saying, please don't

14       hesitate to slow me down.  If you don't

15       understand the question, just ask me to clarify

16       it.

17   A.  Okay.

18   Q.  Can you please provide your full name for the

19       record.

20   A.  Kevin Francis Riley.

21   Q.  And where do you currently live?

22   A.  113 Arcadia Ave in Reading, Massachusetts.

23   Q.  And what is your educational background?

24   A.  I have a college degree from Bryant University.

1   Q.   Where did you go to high school?

2   A.   Wilmington High School.

3   Q.   That's Wilmington, Mass?

4   A.   Yes.

5   Q.   And you got your college degree from Bryant?

6   A.   Correct.

7   Q.   And what was the major you had at Bryant?

8   A.   Accounting.

9   Q.   When did you graduate from Bryant?

10  A.   2003.

11  Q.   I know your wife answered this, but you have

12       three children below the age of 18?

13  A.   Yes.

14  Q.   Where do you work?

15  A.   I work for Energy North, Incorporated.

16            MR. EHRHARD:  What did she call it,

17       Haffner's?

18  A.   Haffner's is a brand of Energy North.  It's a

19       piece of Energy North, but it's not -- the name

20       is not the legal entity.

21  Q.   So you work for a subsidiary?

22  A.   It's not a subsidiary.  It's just a brand.  We

23       have Mobil gas stations.  We have Gulf gas

24       stations, and we have Haffner's gas stations.

1            It's all rolled into the Energy North.

2     Q.    And what do you do?

3     A.    I'm the CFO.

4     Q.    Chief financial officer?

5     A.    Correct.

6     Q.    Now, where do you live currently?

7     A.    Reading, Massachusetts.

8     Q.    What's the exact address?

9     A.    113 Arcadia Ave.

10    Q.    How long have you lived in that house?

11    A.    A little over a year.

12    Q.    Do you remember what month you moved into the

13          house?

14    A.    I believe it was June.

15    Q.    Of 2019?

16    A.    Yes.

17    Q.    When did you actually get the permit to move into

18          the house?  I think it's called occupancy permit.

19    A.    Technically, I think I got it at a Reading town

20          committee meeting for conservation.  We still had

21          ropes to get through.  So at the suggestion of

22          the head of the conservation committee, they

23          suggested I come and show up in person and ask to

24          have a little bit more time, and let my family

1              move into the house as our lease had expired.

2       Q.    Do you remember when that occurred?

3       A.    Like I said, it was either late May or early,

4              early June.  Somewhere in that time frame.

5       Q.    Now, you built the house on vacant land; correct?

6       A.    Correct.

7       Q.    How big is the house?

8       A.    3,300 square feet.

9       Q.    How many bedrooms?

10      A.    Four.

11      Q.    How many acres?

12      A.    Oh, it's like four acres.

13      Q.    Four acres?

14      A.    Yeah.  Most of it is unusable.  Most of it is

15             conservation land.

16      Q.    So four acres owned on the deed?

17      A.    Correct.

18      Q.    And when did you purchase the land?  When did you

19             take title to the land on which the house is

20             built on?

21      A.    I believe it was in April or so of 2018.

22      Q.    So the land, the four acres, was deeded to you in

23             April-ish of 2018?

24      A.    Sure.

1    Q.    And the house was ready for occupation about a

2          year later?

3    A.    M-hum.

4    Q.    And who was on the deed for the land, you and

5          your wife?

6    A.    Correct.

7    Q.    How much did you pay for the land?

8    A.    Not exactly for the land.  I don't know exact

9          numbers on the land.  It wasn't exactly organized

10         that way.

11   Q.    So when the deed was transferred over to you,

12         what was paid, what did you pay to get the deed

13         to that land?

14   A.    I believe there was multiple closings.  I believe

15         one of them was somewhere in a hundred thousand

16         dollar range.  There was another one in the

17         $30,000 range or so.  There was two different

18         lots.  They had to be joined, but it was two

19         separate transactions.

20   Q.    And who did you give money to to purchase that

21         land?  When I say that land, the land upon which

22         your house was built.

23   A.    Yeah, the two lots, correct.  I believe it went

24         through John Gallant's office.  But the exact

```
 1              people, I know one was a Joan Hooper, and I'm not

 2              sure I can remember the other parties.

 3      Q.      How much did you pay to Joan Hooper?

 4      A.      I'm going to get screwed up on which one was

 5              which, small and big.  Like I said, one of them

 6              110 and one was 35.

 7      Q.      So you paid 110,000 for the big one.  That would

 8              be Joan Hooper.

 9      A.      I'm using estimates.

10      Q.      I appreciate that.  Approximately 110 to Joan

11              Hooper for the big one, and 35 for the smaller

12              lot?

13      A.      Correct.

14      Q.      How did you come about getting the legal ability

15              to purchase those two lots?

16                      MR. CARMAN:  Objection.

17      A.      I guess I'm not sure.

18      Q.      How did you acquire the legal ability to purchase

19              those lots?  What I mean is you generally buy it

20              directly from a seller goes to the buyer.  In

21              this case, there was a purchase and sale

22              agreement, I was made to understand, which was

23              assigned down to other people, and your purchase

24              occurred through that assignment.
```

1    A.    Sure.

2    Q.    Please tell me how this purchase for the land,

3          how you began the deal, and how you got to having

4          deed ownership of it?   In essence, tell me your

5          story?

6    A.    Sure.  So Jim Patierno made me aware of the

7          land/building opportunity I guess sometime in

8          early 2017 would be my guess.  He knew I was

9          looking in Reading.  We had been looking for

10         years.  I was in the Metrowest and was looking to

11         relocate to get closer to work.  And so housing

12         competitive market, so it was tough to find a

13         house that we liked.  He knew we were interested

14         in building if we could make the numbers work.

15         And he said, Kevin, I have something that's

16         potentially going to fit your price range.  Are

17         you interested?

18                    And I said, Yeah, absolutely.

19   Q.    What was your price range?

20   A.    850, 900 at the time.

21   Q.    So a lot of these questions I asked your wife,

22         and so I just want to get the full story.

23                    MR. CARMAN:  I want to clarify.

24         You're asking price range for everything, for the

```
 1              land and the house.

 2                      MR. EHRHARD:  What did he expect.

 3      A.     The expectation when Jim and I spoke, we had

 4              talked about it for a year or two, I know Jim

 5              through business dealings, was that the land, the

 6              house, everything all in, would be in the 850,

 7              $900,000 range.  Those were the parameters we

 8              were working with.

 9      Q.     So before you moved to your Arcadia household

10              where did you live?

11      A.     Natick, Massachusetts.

12      Q.     And where did you live in Natick?

13      A.     103 Bacon Street.

14      Q.     And how big was that house?

15      A.     1,800 square feet.

16      Q.     How many bedrooms?

17      A.     Three bedrooms.

18      Q.     How many acres?

19      A.     Quarter of an acre.

20      Q.     When did you live there, from when to when?

21      A.     Oh, man.  I would say 2010 through, you know, at

22              some point in 2017.  I would guess it was May or

23              so by the time we closed.  Actually, no.  I think

24              we sold in May.  We probably didn't move out
```

1        until August or September of 2017.

2   Q.   Where did you move to after that?

3   A.   We went to Reading Commons.

4   Q.   Which is an apartment complex?

5   A.   Correct.

6   Q.   And so that would have been August of --

7   A.   We wanted to get the kids into the right school

8        system, that was a lot of our decision on

9        selling, and being in limbo, we wanted to make

10       sure we were getting the kids in the school

11       system that they would be a part of hopefully

12       indefinitely.

13  Q.   So August of 2018, you moved to an apartment?

14  A.   Correct.

15  Q.   How many bedrooms was the apartment?

16  A.   Two bedrooms.

17  Q.   What was the square footage approximately?

18  A.   1,100 square feet.

19  Q.   And then you lived in that apartment until --

20  A.   We ended up changing apartments inside the

21       complex.  That place was relatively pricey.  So

22       we had to bounce around an extra step, but we

23       were there until we moved into the house in June

24       of 2019.

1    Q.    Okay.  So you were in that apartment for

2          approximately nine months?

3    A.    No.  More than --

4    Q.    Oh, 2017 until -- okay.  Now, why would you sell

5          your house in Natick without having another house

6          to move into?

7    A.    It was a little bit of a gamble.  I was working

8          with Jim to say, Hey, listen, this is where I

9          want to be.  We were committed to Reading no

10         matter what happened.  If everything fell apart,

11         we were okay with that, and we would find a

12         house.  We were committed to getting the kids

13         into the right school system.

14   Q.    So in August of 2017, is it fair to say that --

15         in August of 2017, did you have a strong belief

16         that you would be able to buy that house that Jim

17         Patierno --

18   A.    In August of 2017?

19   Q.    When you sold the house in Natick and moved to

20         Reading, did you move with the belief that Jimmy

21         was going to be able to get that deal done and

22         build a house?

23   A.    We were never sure.  I mean, it was, you know,

24         everything with this house so.  I'm not sure we

```
 1           were ever sure or ever had a strong belief.

 2           Right.  I don't know if that answers the question

 3           the way you see, but we were hopeful or

 4           optimistic.  I would have put a higher percentage

 5           odds on it than my wife would.  So there was no

 6           certainty at that time if that's what you're

 7           getting at.

 8      Q.   The reason I'm asking is because when you have

 9           young kids, and you're moving from a house in

10           Natick, which is not a bad school system.

11      A.   It's a great school system.

12      Q.   And then you move to an apartment with kids,

13           that's, I think we can all say, that's a really

14           big thing to do.  It's very disruptive, and --

15      A.   It wasn't in hindsight.

16      Q.   You moved to Reading with expectations that you

17           would be able to build a house on the lot that

18           Jim Patierno had brought to your attention?

19      A.   Or buy a house in Reading.  It was not -- there

20           was no 100 percent in anything at that stage.

21      Q.   When you sold the house in Natick, what did you

22           expect to pay for a new house in Reading?

23      A.   850, 900.

24      Q.   And how much land did you expect to buy with that
```

```
 1          house?

 2    A.    No expectation on acreage or anything like that.

 3    Q.    Was size more important or was the land itself

 4          more important?

 5    A.    No.  It was the neighborhood.  Jim let us see the

 6          lot.  It was exactly what we were looking for.

 7          It was a beautiful broad street in Reading.

 8          There's not a lot of those streets.  Great

 9          neighborhood, elementary school was walkable.  It

10          was, you know, picture perfect for what we were

11          looking for?

12    Q.    And so what did you expect to pay for a lot that

13          size?

14    A.    I didn't have expectations on a lot.  A lot of it

15          was on the total price tag.

16    Q.    And when you sold the house in Natick, how much

17          did you sell it for again?

18    A.    575, I believe.

19    Q.    What was the mortgages on it?

20    A.    Mortgages?

21    Q.    Mortgage, in Natick?

22    A.    Somewhere shy of 300.

23    Q.    When you took -- you took out a mortgage in 2012?

24    A.    That seems late.  I would have guessed 2010,
```

```
 1          2011.

 2     Q.   The payoff on the mortgage when you sold the

 3          house --

 4     A.   Was less than 300, I would guess.

 5     Q.   And so how much did you take out of the house in

 6          profit on Natick?

 7     A.   I mean, 250 plus, whatever the -- like I said, I

 8          don't know what the exact mortgage came to.

 9     Q.   About 275 approximately?

10     A.   Sure.

11     Q.   And where did you put that money?

12     A.   In the bank.

13     Q.   Which bank?

14     A.   I believe it went to -- I have a Capitol One

15          account.  I believe it went to Capitol One.

16     Q.   And so from the sale of the Natick property, the

17          majority of the sale proceeds, equity, went into

18          an account at Capitol One?

19     A.   Correct.

20     Q.   Was that a joint account with you and your wife?

21     A.   Yes.

22     Q.   What did you use the money for from the Capitol

23          One account from the sale?

24     A.   We sat on it knowing we were attempting to buy or
```

```
 1          we need to put a 20 percent deposit if we bought

 2          a house.  So it was in limbo at that point.

 3    Q.    So now, you paid you believe 100,000 for the

 4          large lot, Mrs. Hooper?

 5    A.    Sure.

 6    Q.    And about 35.

 7    A.    Yup.

 8    Q.    And when you were procuring the lots, who were

 9          you working with to negotiate and finalize the

10          deal to buy the lots, what names?

11    A.    I mean, I guess I wasn't negotiating myself, per

12          se, Jim had, you know, found the lot.  And

13          everything I dealt with would go through -- I

14          would have John Gallant as kind of support for

15          anything on the legal side.

16    Q.    So John Gallant was your attorney --

17    A.    Yup.

18    Q.    -- for the real estate deal?

19    A.    Yes.

20    Q.    Was he Stonehill Property, LLC's attorney also to

21          you knowledge?

22    A.    I don't know that.

23    Q.    Where did you get Mr. Gallant's name to be

24          counsel?
```

1   A.   He's done some work for Energy North as well.

2   Q.   So it was Jim Patierno who walked this deal

3        through for you, is that the right phrase?

4   A.   Sure.

5   Q.   How do you know Jim Patierno?

6   A.   He does business with Energy North as well.

7   Q.   What did he do for Energy North?

8   A.   He helps with different construction projects.

9   Q.   Is he the main contractor that your company uses

10       to construct these gas --

11  A.   Recently he has been.  It hasn't always been that

12       way, but recently.

13  Q.   When you say recently, how many years would that

14       be?

15  A.   Well, I've only been with Energy North for a

16       little over five years.

17  Q.   During your five-year period of time, he's been

18       the --

19  A.   I would say the prime.  Sure.  He's done our

20       biggest projects.  Yup.

21  Q.   Is it fair to say -- do you feel you had a close

22       relationship with Jim Patierno even outside of a

23       business context?

24  A.   Yes.

```
 1    Q.    So he was a personal friend?

 2    A.    I don't know if I'd go that far.  I'm certainly

 3          friendly with Jimmy.

 4    Q.    Was he someone you invite to your dinner parties

 5          or --

 6    A.    No, we didn't get together at that level.

 7    Q.    Did you and your wife ever socialize with him

 8          outside of --

 9    A.    Maybe at a wedding.

10    Q.    Now, do you know Ken Black?

11    A.    Yes, he's my uncle.

12    Q.    And he's your mother's brother or your father's

13          brother?

14    A.    He's my mother's sister's husband.

15    Q.    So he's an uncle in-law?

16    A.    Correct.

17    Q.    And he owns the company you work for?

18    A.    I guess -- the family owns the company.

19    Q.    So it's a privately held company?

20    A.    Yes.

21    Q.    And he's --

22    A.    He has a piece of the ownership.  All family

23          members do.  It's a trust.

24    Q.    But he runs it?
```

```
 1    A.   I wouldn't say he runs it at this stage, no.

 2    Q.   Who's the CEO?

 3    A.   I guess he's the CEO.  He's in Arizona more or

 4         less full time.

 5    Q.   When did he move to Arizona to your knowledge?

 6    A.   He's had a vacation home there for years now.

 7    Q.   Would you say you're second in command as CFO?

 8    A.   Sure.  Well, no, not to Ken, I guess, sorry.  The

 9         way I'm looking at it now, Jeff runs the

10         business.  He's the COO, and I would be the

11         second in command to Jeff.  So by that logic, I

12         would be third.

13    Q.   And to your knowledge, did Ken Black and Jim

14         Patierno have a long-standing personal

15         relationship?

16    A.   Yup.

17    Q.   Did Ken Black help you interface with Jim

18         Patierno to procure this lot?

19    A.   Not really.

20    Q.   Did you ever speak to Ken Black regarding these

21         lots?

22    A.   Sure.

23    Q.   Please tell me about those conversations, and if

24         you can, to the extent you remember when they
```

1          occurred and how?

2     A.   The dates are going to be really tough.  But I

3          mean, he's my uncle, I trust him, I wanted his

4          opinion to know, Hey, what do you think.  Is this

5          a good idea or a bad idea, and a lot of his

6          dealings with Jimmy, it was a great idea.  This

7          is the lot you need, and you should go for it.

8     Q.   And did you ever discuss with Mr. Black the

9          details of the purchase, such as assign a P and

10         S?

11    A.   No.  No.  No.  It would have been over his head.

12         He would have said talk to attorneys.

13    Q.   Did Ken Black provide money to buy the lot?

14    A.   Through Energy North, he gave a short loan

15         through Energy North.  So Ken not directly.

16    Q.   But Ken would have to sign off on those loans;

17         correct?

18    A.   Yes.

19    Q.   So in order for Energy North to give a loan --

20         like, if Ehrhard Associates, my firm, gave a loan

21         to my secretary, I would have to sign off.  So he

22         had to sign off on the loans to you and your

23         wife; correct?

24    A.   Sure.

```
1    Q.   And how much did Energy North provide to you to
2         purchase the lots?
3    A.   I would have to pull up the spread sheet, but I
4         believe it was in the $650,000 range.
5    Q.   Do you remember when approximately those funds
6         were given to you and your wife?
7    A.   They were actually paid directly to Jim
8         Patierno's firm, A.J. and Sons, through wires.
9    Q.   So, and I understand it's Energy North, but
10        Energy North with the approval and consent of Ken
11        Black --
12   A.   Correct.
13   Q.   -- provided over $600,000 to Jim Patierno
14        directly, Stonehill Properties, to help you
15        purchase and build?
16   A.   Yes.
17   Q.   Now, at some point -- do you know a man named
18        Bill Johnson?
19   A.   I don't know him personally.
20   Q.   Do you know a man named Mark Lanza?
21   A.   No.
22   Q.   You don't know Attorney Lanza?
23   A.   I've never met him.
24   Q.   Do you know David Haskell?
```

```
 1    A.    I don't believe so.

 2    Q.    When did you first meet Mr. Gallant?

 3    A.    Ten years ago.

 4    Q.    Who paid Mr. Gallant's fees, you or Ken Black and

 5          Energy North?

 6    A.    Both.  Well, I mean, I would pay as much I could.

 7          There was a point where I was just not going to

 8          front anymore money.  So I'm sure there was a

 9          couple wires paid to John for fees from Energy

10          North that went into what I owed to pay back.

11    Q.    Let's talk about Bill Johnson.  No surprise why

12          we're here.

13    A.    Yup.

14    Q.    Just to give you the context, Bill Johnson filed

15          bankruptcy, involuntary 2015, ordered in 2017.

16          He's been denied a discharge of his debt.  And we

17          took -- he was questioned under oath by Mr.

18          Baldiga and me at trustee's meetings which

19          occurred in February of 2017 and June of 2018.

20          We also took the deposition of Mr. Patierno,

21          Mr. Lanza.  And so we have questions about

22          Mr. Johnson.

23    A.    Sure.

24    Q.    So let's talk about Mr. Johnson.  When did you
```

Case 15-42445   Doc 434-3   Filed 03/23/21   Entered 03/23/21 20:38:02   Desc Exhibit
Kevin Riley 10/21/2020 depo transcript   Page 25 of 169

25

```
 1            first -- have you ever met Bill Johnson?

 2    A.   No.

 3    Q.   You've never physically been in the same room as

 4         Mr. Johnson?

 5    A.   No.

 6    Q.   Have you ever spoken with him orally?

 7    A.   No.

 8    Q.   Telephonically, orally or in person?

 9    A.   I don't believe so, no.

10    Q.   Have you ever communicated with Bill Johnson --

11    A.   No.

12    Q.   -- through written communication?

13    A.   I don't believe so.

14    Q.   You've never e-mailed Bill Johnson?

15    A.   No.

16    Q.   Have you ever been on an e-mail chain with Bill

17         Johnson?

18    A.   Sure.

19    Q.   To your knowledge, you never directly e-mailed

20         Bill Johnson?

21    A.   No.

22    Q.   To your knowledge, what was Bill Johnson's role

23         in your purchase of this property?  Meaning, the

24         lot and the construction of the house.  Please
```

1            explain to me Bill Johnson and your house?

2    A.      I know that's who Jimmy dealt with to try to

3            figure out how to put the lots together, whatever

4            permit restrictions they had, the assignments

5            that he had, that seemed like Bill knew how to

6            help the project move forward and that's the

7            extent I knew.

8    Q.      And so that knowledge you gave, your

9            understanding you just gave, where did you gain

10           that knowledge specifically that Mr. Patierno was

11           working with Bill Johnson to allow the sale to go

12           through, where did you learn that information?

13   A.      I mean, probably mostly probably through e-mails.

14   Q.      E-mails from who?

15   A.      Jimmy would give us occasional updates as we were

16           curious as to, you know, status of, Hey, when do

17           we think we can start construction, secure the

18           land, et cetera, et cetera.  So Bill Johnson's

19           name would come up mostly on those, and off and

20           on for months.

21   Q.      And did you believe that you were buying these

22           lots through a purchase and sale -- well, explain

23           to me how did you believe that you were -- who

24           did you believe your purchase and sale was with

```
 1            to buy the property and how did you believe you

 2            procured the legal authority over that purchase

 3            and sale?

 4                      MR. CARMAN:  Objection.

 5      Q.    You can answer.

 6      A.    That I bought it from Joan Hooper and the other

 7            person that I closed on the land with.

 8      Q.    Now, do you ever remember signing a purchase and

 9            sale agreement with Joan Hooper, large lot, and

10            the Gilbertsons, small lot?

11      A.    Yes.  That rings a bell.

12      Q.    Those names ring a bell?

13      A.    Yup.

14      Q.    But do you remember actually signing a purchase

15            and sale with Mrs. Hooper?

16      A.    I guess maybe not a purchase and sale, but some

17            assignments.  I mean, it was complicated to the

18            point where I'm not sure I understood fully how

19            it was all working.

20      Q.    So do you believe you signed a purchase and sale

21            agreement with Mrs. Hooper and the Gilbertsons or

22            do you believe you procured an assignment of a

23            purchase and sale agreement?

24      A.    The assignment.
```

```
 1    Q.    Who do you believe you procured the assignment of

 2          the purchase and sale agreement from?

 3    A.    I believe at one point it was Gail Johnson or

 4          Stonehill I know was involved at some same.

 5    Q.    So does the name Arch Land Development ring a

 6          bell to you?

 7    A.    Yup, I've seen that name.

 8    Q.    Where did you see that name?

 9    A.    In these documents I've seen every name.

10    Q.    Let me circle back here, and I know Lisa will

11          probably ask these questions better than I do at

12          the end of these things, but in preparation for

13          this deposition, not talking about discussions

14          with counsel, what documents did you look for --

15          did you look at in preparation for this

16          deposition?

17    A.    Look at or just pass along to my attorneys?

18    Q.    Both.

19    A.    I guess mostly e-mails.  I didn't go through the

20          assignments or the purchase and sales or

21          anything.  I haven't looked at that stuff in

22          years.

23    Q.    Do you remember seeing -- who else did you talk

24          to besides Mr. Carman in preparation for this
```

```
 1              deposition?

 2                      MR. CARMAN:  And aside from Attorney

 3              Gallant.

 4      Q.      Yeah, and aside from Mr. Gallant?

 5      A.      No one.

 6      Q.      You spoke with your wife?

 7      A.      Sure.

 8      Q.      Did you ever talk to Mr. Patierno in preparation

 9              for this deposition?

10      A.      No.

11      Q.      Have you spoken with Mr. Patierno since you

12              received through your counsel, previously

13              Mr. Gallant, the subpoena?

14      A.      I haven't talk to Jimmy maybe outside of a text.

15      Q.      And since when?

16      A.      I haven't talked to Jimmy in a month or two

17              probably.

18      Q.      Did you talk to Mr. Patierno regarding this

19              deposition?

20      A.      Nothing specific to the deposition.  I think the

21              text was more on the, Hey, I'm sorry you have to

22              deal with this.

23      Q.      Have you spoken with Mr. Black regarding this

24              deposition and the Johnson matter?
```

1    A.    No.

2    Q.    When was the last time you spoke with Mr. Black?

3    A.    This morning.

4    Q.    What did you talk to Mr. Black about this

5          morning?

6    A.    Business dealings that we're up to.

7    Q.    You didn't say, Hey, guess what, I have to go to

8          a deposition for that --

9    A.    No.

10   Q.    Why did you not tell him, why didn't you say

11         anything?

12               MR. CARMAN:  Objection.

13               MR. RILEY:  I don't mind answering,

14         Scott.

15               MR. CARMAN:  You can answer.  It's a

16         silly question.

17   A.    We have a pretty strictly business relationship

18         at this point.

19   Q.    You didn't say, by the way?

20   A.    Nope.  I did not.

21   Q.    So you purchased the lots, and fair to say you

22         knew you were buying them through an assignment

23         of a purchase and sale agreement?

24               MR. CARMAN:  Objection.

1    A.    I mean, the whole thing was extremely confusing.

2          There was assignments for the purchase and sales,

3          but yes, it was taking lots through various, you

4          know, financial instruments.

5    Q.    With that said, knowing that you were gaining the

6          property through an assignment, maybe you can --

7          what did you believe Bill Johnson's role was in

8          regard to that actual assignment and purchase?

9    A.    I guess I don't -- his role in the assignment?

10   Q.    Yes.

11   A.    His firm or his wife's firm had something to do

12         with getting the assignment ready.  So it was --

13   Q.    Did you ever pay any money to Bill Johnson?

14   A.    No.

15   Q.    Did you pay any money to Gail Johnson?

16   A.    No.   Well, I probably paid -- whatever I paid

17         Gail was, you know, through --

18   Q.    Did you ever pay money to Arch Land Development?

19   A.    No.

20   Q.    So you never gave any money directly to Bill

21         Johnson?

22   A.    Correct.

23   Q.    Did you ever give any money to any other person

24         with the intent of giving it to Bill Johnson?

1   A.   No.

2   Q.   So you never gave money to any person with

3        knowledge and intent of having it go to Bill

4        Johnson?

5   A.   No.

6   Q.   Do you remember taking out $250,000 in cash on

7        March 9th, 2018?

8   A.   I took out two pieces of cash.  250 did not come

9        out all at once.  I believe it was a couple

10       different dates.

11  Q.   You took out --

12  A.   I remember, yes.

13  Q.   How much did you take out altogether

14       approximately?

15  A.   It wasn't approximately.  It was exactly 250,000.

16  Q.   What bank did you take it out of?

17  A.   I took approximately $100,000 out of Sovereign.

18       My Santander/Sovereign account, and I took a

19       150,000 through an Energy North loan.

20  Q.   Okay.  So $100,000 came out, and tell me if I'm

21       wrong here, $100,000 came out of Santander?

22  A.   Yes.

23  Q.   What was the origin of the $100,000 in funds?

24  A.   Proceeds from my house.

1    Q.   So the 100,000 from Santander was directly from

2         the sale of the Natick property?

3    A.   Yeah.  I mean, I have one bucket.

4    Q.   And $250,000 came from the Capital One account?

5    A.   150,000 came from not Capitol -- well, the 250

6         from the sale of the house, you're saying?

7    Q.   No.

8    A.   Let's take a step back.

9    Q.   So of the $250,000 in cash you took out, in what

10        period of time did you take it out?  I can tell

11        you we have pictures of some of the cash stamped

12        March 9th.

13   A.   I believe it was March, April time frame 2018.

14   Q.   And how many times did you go to the bank and

15        pick up cash?

16   A.   Go to the bank and pick up cash, one time.

17   Q.   And explain to me where you went and what you

18        got?

19   A.   There's a Santander in downtown Andover,

20        Massachusetts.  I probably went a week or two

21        prior to that to get the money because they don't

22        have $100,000 that you can just --

23   Q.   So you went ahead of time --

24             MR. CARMAN:  Let's make sure the

```
1              transcript is clear.  This is an important line

2              of questions.  Don't interrupt each other.

3                        MR. BALDIGA:  Can I interrupt for one

4              second.  Hey, James?

5                        MR. EHRHARD:  Yeah.

6                        MR. BALDIGA:  For the sake of the

7              court reporter, you guys are talking over each

8              other a lot, and you're talking too fast.  So

9              she's too polite to say that.

10    Q.       Mr. Riley, explain the movement of that money.

11    A.       Sure.  Sometime in March, April time frame, I

12             went to Santander, and asked them what I needed

13             to do to put my hands on $100,000 in cash.  They

14             told me you put an order, fill out these forms,

15             you know, they have a process that they go

16             through.  I went through the process.  They were

17             still good.  They said, We will let you know when

18             the cash is available to be picked up.  They

19             called me to go pick it up.  I picked it up.

20    Q.       What day was that?

21    A.       I don't know the exact date on that.

22    Q.       Some of the cash in the picture, which you've

23             probably seen the picture, is dated March 9th.

24             Do you know why it would be dated March 9th?
```

1    A.    I would be guessing.

2    Q.    Now, when you got that $100,000 from Santander in

3          March sometime --

4                    MR. CARMAN:   Objection.

5    A.    March or April.

6    Q.    What did you do with that cash, where did it go?

7    A.    The trunk of my car.

8    Q.    What kind of car was that?

9    A.    Toyota Camry.

10   Q.    What year?

11   A.    2008.

12   Q.    Now, another $150,000, tell me that money story,

13         the story behind where you got that money.

14   A.    Sure.   Through the business we can order cash

15         because we have a cash component of our business

16         that we need to be able to order piles of cash to

17         be able to stock car washes, you name it or we

18         have a decent-sized cash portfolio, a part of our

19         business.   So through a secured Brinks delivery,

20         I can place an order from the bank website and

21         have it delivered directly to a safe at Energy

22         North.

23   Q.    So Energy North, which is a wholly-owned family

24         company of the Black family?

1   A.   Yup.

2   Q.   In which you are related to?

3   A.   Yup.

4   Q.   You received $150,000 in cash directly from the

5        company?

6   A.   Yes.

7   Q.   And it was put in a safe at the company's

8        headquarter?

9   A.   Yes.

10  Q.   Where is that headquarters located?

11  A.   Two International Way in Lawrence, Massachusetts.

12  Q.   In order to get that money, who did you need to

13       talk to at the company, and what kind of approval

14       did you need from the company to do that?  Does

15       that make sense?

16  A.   Sure.  Typically, any time I wire a transaction,

17       I would shoot an approval e-mail, and say, I know

18       we talked about this from a big picture

19       standpoint, but I'm doing this on such and such

20       date.  I try to leave my tracks extremely clear

21       and transparent particularly for other folks in

22       my office.  I don't do the accounting

23       necessarily, the controller.  So I want to make

24       sure my team knew and was comfortable with what

```
 1          was happening, why and that it would be paid

 2          back.

 3     Q.   And did Ken Black have to sign off on it?

 4     A.   Yeah.

 5     Q.   Did you call Mr. Black before you took that loan

 6          out?

 7     A.   I don't know if I called him or e-mailed.  It was

 8          some form of communication.

 9     Q.   And do you remember when you first reached out to

10          Mr. Black saying about the $150,000?

11     A.   First time, no.  Like I said, it was more of a

12          general conversation with Ken saying, I'm not

13          going to be able to front all of the money

14          needed.  Are you willing to have a short-term

15          loan for me, and he said, Absolutely.

16     Q.   And that communication you believe was an e-mail

17          or telephone?

18     A.   I couldn't tell you.

19     Q.   And was that in February of 2018, March or April?

20     A.   I would be guessing.

21     Q.   A broad range, it wasn't December of 2017, was

22          it?

23     A.   I don't know.  Specific one -- anything I did

24          that was going to happen the following day or
```

```
 1            that day, there was an e-mail or conversation for

 2            that specific one in general versus I don't know

 3            when the big picture conversation was.

 4       Q.   Did you produce those e-mails with Mr. Black to

 5            us?

 6       A.   No, I don't believe so.

 7       Q.   So if we want to get copies of those e-mails,

 8            would you be willing to give us those e-mails to

 9            Mr. Black?

10       A.   Yes, sure.

11                  MR. EHRHARD:  If we could, Scott, if

12            we could get those e-mails to Mr. Black forwarded

13            to us that would be great.

14                  MR. CARMAN:  To the extent he has

15            access to them, sure.  It sounds like he e-mailed

16            from his company e-mail.

17       Q.   Was this from your company e-mail?

18       A.   Yes.

19       Q.   So does your company archive its e-mails?

20       A.   They do to some degree, yeah.

21       Q.   So you would be able to --

22       A.   I can check with my IT department.

23                  MR. CARMAN:  To the extent we have

24            access to it, you'll get it.
```

1    Q.   Once the -- once the money hit the safe at Mr.

2         Black's company, where did the money go?

3    A.   Probably right back to my Camry and in the trunk

4         of my car.

5    Q.   So at some point in 2018 you had a quarter

6         million dollars in cash in the back of your

7         Camry?

8    A.   No.  I mean, whatever I did with Santander,

9         whatever date that was, I drove it directly to

10        Jim Patierno's office.  And the same thing for

11        the 150.  Same day I received it, same day I

12        drove it up.

13   Q.   So you drove from Santander right to Patierno's

14        office?

15   A.   Yes.

16   Q.   Same thing with --

17   A.   Two International Place right to Jim's office,

18        correct

19   Q.   Now, when you filled out the form with Santander,

20        obviously, banks need information.  What was your

21        explanation to Santander Bank, to the extent you

22        needed to give one --

23   A.   I did.

24   Q.   -- what you needed the money for?

Case 15-42445   Doc 434-3   Filed 03/23/21   Entered 03/23/21 20:38:02   Desc Exhibit
Kevin Riley 10/21/2020 depo transcript   Page 40 of 169

40

1   A.   Construction of my house.

2   Q.   Construction of your house?

3   A.   M-hum.

4   Q.   And when you -- so if we were to subpoena those

5        records, would it say anything about purchasing

6        property?

7   A.   Absolutely not.

8   Q.   Now, would it mention Bill Johnson's name?

9   A.   No.

10  Q.   Did they ask you who the money's going to?

11  A.   No.

12  Q.   Now, when you got the money from Mr. Black's

13       company, what documents did you need to fill out

14       to take possession of that money?

15  A.   It was a document that you fill out.  There's a

16       website secure portal through Brinks.  Whatever

17       the cash source is, we request it and they tell

18       you the delivery date and confirmed, and I had

19       the credentials obviously to do that.

20  Q.   Did you sign a promissory note with Mr. Black?

21  A.   No.

22  Q.   Did you sign a mortgage with Mr. Black?

23  A.   No.

24  Q.   Did you sign any documentation memorializing that

1           you owed that money back to the company?

2    A.    No, other than the e-mails that I asked when I

3           was going to wire money.

4    Q.    Which presumably we can get.

5    A.    M-hum.

6    Q.    So this company is -- what's it called again?

7    A.    Energy North.

8    Q.    Energy North gave you $150,000 with no written

9           documentation saying you have to pay it back?

10   A.    That's correct.

11   Q.    How long have you been working for Energy North?

12   A.    I believe I'm working into my sixth year.

13   Q.    To your knowledge, did Energy North ever give

14          $150,000 to an employee without any written

15          documentation memorializing they had to pay it

16          back?

17   A.    To my knowledge, no.

18   Q.    You're the CFO; correct?

19   A.    Yes.

20   Q.    That's chief financial officer; right?

21   A.    Yes.

22   Q.    If the COO authorized $150,000 cash payment to

23          his relative and did not require any written

24          documentation securing that debt, would you find

```
 1            that acceptable for the good of the company?
 2   A.   Not without checking with Ken Black or ownership.
 3        The fact that ownership signed off on everything
 4        made it all on the up and up.
 5   Q.   And you went to Bryant; correct?
 6   A.   Yes.
 7   Q.   And you got a degree in accounting?
 8   A.   Correct.
 9   Q.   Is it the standard of good financial practice to
10        give $150,000 cash loan from a company to an
11        employee without any written record of such
12        payment or that it has to be paid back?
13                 MR. CARMAN:   Objection.
14   Q.   You can answer.
15   A.   Well, I mean, there are records.  There's a wire,
16        there's a bank.  It's not like it's not
17        documented.  It is documented via the bank.  You
18        had pull a bank statement.  You can pull it up.
19        You can see where it went.  You can see it went
20        to A.J. and Sons.  So it's --
21   Q.   Does it say it went to you?
22   A.   The money, no.  It didn't go to me.  It went to
23        Jim.
24   Q.   So Energy North --
```

```
 1    A.   The 150,000 -- I'm sorry.  The 150,000 in cash,

 2         yes, went to me.  I'm speaking more broadly with

 3         other ones, right, because, again, I had to pay

 4         Jim at different stages of the construction

 5         process, and the wire would go from Energy North

 6         to Jim.  That's what I was referring to.

 7    Q.   So that's beyond the 150,000.  Energy North wired

 8         other money?

 9    A.   Correct.

10    Q.   How much money did Energy North give to Mr.

11         Patierno or provide for the construction of your

12         house, purchase and construction?

13    A.   Yeah, I'd pull up that sheet.  650,000, whatever

14         that --

15    Q.   Was there any written documentation evidencing

16         that you had to pay it back?

17    A.   No.

18    Q.   So the 600,000 from Energy North, there was not

19         one promissory note between you and the company?

20    A.   That's correct.

21    Q.   Not one mortgage?

22    A.   Correct.

23    Q.   And they were all wires?

24    A.   Wires and the cash transaction.
```

```
1    Q.    So why did you have to give -- why did you get

2          $150,000 cash, why didn't you wire it to Mr.

3          Patierno?

4    A.    He asked for it.

5    Q.    Explain.

6                    MR. CARMAN:  Can I use the bathroom

7          real quick.

8                    MR. EHRHARD:  Sure.  Absolutely.

9                    (Short recess.)

10   Q.    You said he asked for it.  What do you mean he

11         asked for it?  Please provide specifics as to

12         that story?

13   A.    Jim at some stage of the process said, I need

14         $250,000 cash.

15   Q.    When he asked you for $250,000, was this by

16         e-mail or by telephone?

17   A.    Phone.

18   Q.    What?

19   A.    Probably by phone.  I don't believe there's an

20         e-mail.

21   Q.    Did you usually communicate with Jim by phone or

22         e-mail?

23   A.    Little bit of both.

24   Q.    Do you remember when Mr. Patierno said, I need a
```

```
1              quarter million dollars in cash, what month was

2              that?

3    A.    I don't know what month.

4    Q.    Was it, let's start broadly, was it December of

5              2017 or was it closer to when you took the cash

6              out in March, April 2018?

7    A.    To be honest, I would be guessing.  I don't know.

8    Q.    How often in life have people asked you to get

9              $250,000 in cash?

10   A.    Zero other than this.

11   Q.    And you do not remember the month that was

12             requested?

13   A.    No.

14   Q.    When you prepared for this deposition, did you

15             think that was something to try and refresh your

16             memory about?

17   A.    No.

18   Q.    So when Mr. Patierno asked for $250,000 in cash,

19             did he state, once again, why it had to be cash?

20   A.    No.

21   Q.    Did you ask him why it had to be cash?

22   A.    No.

23   Q.    So it's your testimony that when Mr. Patierno

24             asked for a quarter million dollars in cash, you
```

1        never asked why cash?

2   A.   I mean, I guess -- I don't think so.

3   Q.   You never said, Well, a check is easier?

4   A.   No.

5   Q.   How about a wire?

6   A.   It was more of a, I need the cash.  It wasn't

7        really a question.  It wasn't negotiable.  I need

8        cash.  And there was probably an explanation that

9        this is what we need to get you a buildable lot.

10       So there's no question to ask at that point.

11  Q.   You can understand why we --

12  A.   Sure.  Sure.  No doubt it's unusual.

13  Q.   Did you say to Mr. Patierno, Wow, this is

14       unusual.  Why?

15  A.   I don't know exactly what I said to him.  I'm

16       sure I was surprised to some degree, but I trust

17       Jim.

18  Q.   Did you ask who the quarter million dollars was

19       supposed to go to?

20  A.   No.

21  Q.   You never asked who the cash was going to?

22  A.   No.

23  Q.   Were you concerned about paying a quarter million

24       dollars in cash?

1  A.   Sure.

2  Q.   Why were you concerned?

3  A.   Because I had never done it before.

4  Q.   And you said you had never done it before, but

5       there's a lot of things we don't do before.  I've

6       never driven a Tesla.  I don't get concerned

7       about that.  So why were you concerned about

8       this?

9               MR. CARMAN:  Objection.

10 A.   Yeah, I guess I never had that much cash before.

11 Q.   Why do you think people do, and I'm going to go

12      to the Lisa Tingue playbook here, why do you

13      think people pay in cash versus check?

14 A.   Which people?

15 Q.   Fair question.  Why do you think Mr. Patierno

16      wanted cash versus the check, why would you pay

17      in cash versus a check, why do you think that

18      happened?

19              MR. CARMAN:  Objection.

20 A.   I'd be guessing.

21 Q.   Guess.

22 A.   I think dealing with contractors, suppliers,

23      that's part of the construction industry.  I

24      think that's a part of the thought process.

1      Certain people request to be paid in cash, an

2      electrician requests, and says, I'll give a

3      hundred dollar discount if you pay me in cash

4      versus check.  They don't want to process it.

5  Q.  So you are the chief financial officer of this

6      company?

7  A.  Correct.

8  Q.  This company has a large construction aspect to

9      it; right?

10 A.  Not really.

11 Q.  What percentage of the business do you do is

12     construction?

13 A.  Very small.

14 Q.  So of the construction jobs that the company has

15     done, how many have you paid over $50,000 in

16     cash?  How many suppliers have you paid in cash?

17 A.  From Energy North, zero.

18 Q.  So Energy North has never paid a supplier $50,000

19     in cash or more than 50,000 in cash.  Has it ever

20     paid a builder $50,000 in cash?

21 A.  I don't believe so.

22 Q.  When Energy North buys real estate to build a

23     station, has it ever paid the buyer of that real

24     estate in cash?

1   A.   Physical cash, no.

2   Q.   When you bought the house in Natick, did you pay

3        in cash?

4   A.   No.

5   Q.   When you sold the house in Natick, was it paid in

6        cash?

7   A.   No.

8   Q.   Tell me today one instance that you can think of

9        where someone paid $50,000 in cash to buy a piece

10       of real estate?

11  A.   I don't know of a specific one.

12  Q.   Name an example of someone you know or can think

13       of who he paid $50,000 or more to a contractor?

14  A.   I mean, I've heard rumors, but I don't have any

15       specifics.  I think it's an industry-related

16       thing.  I think it's an expectation in the

17       construction industry that pieces of processes

18       are cash, and they give you a break on price.

19  Q.   Why has your company never paid in cash to get a

20       break on price?

21  A.   Best practice.

22  Q.   Why is it best practice not to pay in cash?

23  A.   It's our record keeping system.  We don't pay

24       people in cash.

1    Q.   Isn't it true that people pay in cash because

2         they don't want to be found out what it's being

3         used for?

4                   MR. CARMAN:   Objection.

5    A.   Depends on who.

6    Q.   When Mr. Patierno asked for $250,000 in cash, did

7         you feel he wanted it to be in cash so that

8         transaction could not be tracked?

9    A.   How did I feel?

10   Q.   Did you feel, were you concerned, that he wanted

11        it to be paid in cash so it could not be tracked?

12   A.   I mean, not because any specific reason.  I was

13        concerned because it was a large amount of money.

14   Q.   Why would a large amount of money concern you

15        versus it not being tracked?

16   A.   Because I hadn't done it before.

17   Q.   And why hadn't you done it before?

18   A.   Nobody had asked me before.

19   Q.   And why do you think no one ever asked you

20        before?

21   A.   It's an unusual transaction.

22   Q.   It's your testimony today that Mr. Patierno --

23        you never asked Mr. Patierno who the money was

24        going to?

1    A.    No.

2    Q.    You never asked Mr. Patierno why it had to be

3          cash?

4    A.    I'm sure he explained it.  I don't know if I

5          asked specifically and drilled in.  It was one of

6          those, Hey, I need this to get you a buildable

7          lot.

8    Q.    Do you know where the $250,000 in cash went?

9    A.    I do now.

10   Q.    Who did it go to?

11   A.    It looks like a large portion of it went to Bill

12         Johnson it looks like.  It did not all go to Bill

13         Johnson.

14   Q.    Where did the rest of it go?

15   A.    I don't know.  There was a picture of cash that

16         said 225,000 on it.

17   Q.    No.  That's all the cash.

18   A.    I'm sorry.

19   Q.    Yes, that picture is from Mr. Patierno and he

20         thought it was approximately.  His testimony was

21         it's approximately.

22   A.    I know I gave Jim $250,000.  I saw a picture that

23         went to Bill Johnson that was $225,000.  That's

24         the extent of what I know.

1    Q.   It was the picture that we provided.

2    A.   I got it mailed to my house, correct.

3    Q.   Who mailed it to you?

4    A.   I believe you did.

5              MR. CARMAN:  It's in your motion to

6         compel.  Exhibit to your motion to compel.

7    A.   I'm pretty sure it said 225,000 in your

8         paperwork.

9    Q.   I can just tell you for the record that

10        Mr. Patierno wasn't sure, but he thought it was

11        around.  He never counted it.

12   A.   Yup.

13   Q.   I'm going to read from Mr. Patierno's deposition.

14             "Did the Rileys own the real estate at

15        that point?"

16             This is the cash transfer.  This is

17        September 14, 2020.  Mr. Patierno's second

18        deposition, which we scheduled because we found

19        out about the cash.

20             "Did the Rileys own the real estate

21        at that point?"

22             That point being when the money

23        transferred, the cash.

24             "Answer, I don't know what the date

1    was.  No, I don't think so."

2              "Question, So the Rileys hadn't closed

3    on the property yet?"

4              "Answer, Correct."

5              "They didn't own the property yet?"

6              "I believe that's correct."

7              "Question, And yet you asked them to

8    give a quarter million dollars in cash for you to

9    give to Johnson; is that correct?"

10             "Yes."

11             "And what, assume we do have it --

12             "Question, Did they ask you why are we

13   giving a quarter million dollars to the

14   Johnsons?"

15             "They may have."

16             "Question, What did you say?"

17             "Answer, I told them it was the cost

18   for getting the permitting.  It was the cost of

19   doing business to get these lots and get

20   assignments."

21             "Did they ask why it had to be in

22   cash?"

23             "I never met Bill Johnson before,"

24   answer, "and I told them," Riley, "this is what

1      he was demanding, and if they wanted the lot,

2      this is what we are going to have to do, and I

3      never met Bill before this deal."

4              "Question, And the Rileys didn't want

5      a document referencing that the quarter million

6      dollars was actually going to good and valuable

7      consideration?  If you give a quarter million

8      dollars in cash, don't they want something to

9      confirm that they were actually purchasing

10     something, interest in something?"

11             "Answer, They had the assignments."

12             It just goes on and on.

13             Let me ask you again, when

14     Mr. Johnson asked you for the money in cash --

15             MR. CARMAN:  Objection.  Mr. Johnson

16     did not ask.

17  Q.  I apologize.  When Mr. Patierno asked you for the

18     money in cash, did you ask him what it was for?

19  A.  I don't recall a conversation.  Like I said, my

20     recollection is he explained it to me.  I'm not

21     sure I asked him what it was for.  I think he

22     said, I need this for these reasons.

23  Q.  According to his deposition --

24             MR. CARMAN:  I have read it, and

```
 1           there's another part where Mr. Patierno says he
 2           does not remember what the conversation was.  So
 3           you either didn't read both segments or you took
 4           it out of context.  Because I read Mr. Patierno's
 5           deposition very, very carefully.
 6     A.    My recollection is he explained it to me.
 7           Because I think it wasn't just, Hey, I need it,
 8           and not going to expect that I wouldn't ask
 9           questions.  So I came with this is what it's
10           going to take to get a buildable lot.
11     Q.    When you told Mr. Black that needed to be in cash
12           to give to Mr. Patierno, did Ken Black ask why?
13     A.    I'm not sure if I asked Ken or not about the cash
14           portion or not.  I don't remember.  Like I said,
15           a lot of it was, I'm going to need money along
16           the way.  I know Ken trusts Jim.  I trust Jim.
17           So the method of payment I'm not sure was
18           discussed with Ken.
19     Q.    But when you asked Ken for $150,000 in cash from
20           his company --
21     A.    I'm not sure I asked for it in cash.  I may have.
22           I would have to go back and see an e-mail or see
23           proof that I asked for it in cash.  Like I said,
24           a lot of my recollection is, I'm asking for an
```

1        Energy North loan in the amount of -- the method

2        of payment doesn't have to be referenced to ask,

3        I guess, is what I'm saying.

4    Q.  To be $150,000 in cash sent from Brinks, doesn't

5        Mr. Black have to sign off on that?

6    A.  No.

7    Q.  In your six years at that company, have you ever

8        had anyone give $150,000 in cash into the

9        headquarters safe?

10   A.  No.

11   Q.  You're the only one; correct?

12   A.  Correct.

13   Q.  Am I correct that in April of 2018 you knew

14       Mr. Johnson was in bankruptcy?

15   A.  No.

16   Q.  At what point did you find out Mr. Johnson was in

17       bankruptcy?

18   A.  Whenever I got a notice from you guys.

19   Q.  Isn't it fair to say that when Mr. Patierno asked

20       for the cash, you were concerned because the use

21       of the money could not be tracked?

22              MR. CARMAN:  Objection.

23   A.  No, I wasn't.  I trusted Jimmy.

24   Q.  And why did you trust Jimmy with a cash

1      transaction of a quarter million, what kind of

2      history did you have together that would justify

3      that kind -- what history did you have together

4      that would justify that kind of trust to give a

5      quarter million dollars with no documentation to

6      back it up and no real estate contract to support

7      it?

8   A. I had business dealings with him.  I know he's a

9      stand up guy, runs a good business, extremely

10     friendly with my uncle.  I trusted him, and we

11     agreed on a total purchase price.  So pieces for

12     X and Y didn't matter at that point.  I was still

13     looking at the total picture.

14  Q. When you say stand-up guy, do you believe in your

15     life experience that stand-up guys ask for a

16     quarter million dollars in cash to get the deal

17     done?

18  A. If they need to.

19  Q. If they need to?

20  A. Yeah.

21              MR. EHRHARD:  Okay.  Lisa and Joe, do

22     you want to jump in right now before I move on to

23     exhibits and so on?

24              MS. TINGUE:  I'll wait until the end,

1          if that's okay, James.

2                    MR. EHRHARD:  That's fine.

3                    MR. BALDIGA:  I have a quick

4          question.  Since we're on the money.

5                    Joe Baldiga here, Chapter 7 Trustee.

6          So I may be showing my ignorance a little bit,

7          but Mr. Riley, if someone asked me for cash, I'd

8          worry about bank reporting requirements because I

9          just know there's something about if you take out

10         or transact more than $10,000, there's some kind

11         of reporting.

12                   So did you have to report this

13         transaction because you were taking out more than

14         $10,000?

15                   MR. CARMAN:  Objection.  Report to

16         who?

17                   MR. BALDIGA:  Don't you have to fill

18         out a form at the bank or something or they have

19         to fill out something?

20                   MR. RILEY:  I did at Santander.

21                   MR. BALDIGA:  Say that again.

22                   MR. RILEY:  I did.  I filled out all

23         their necessary paperwork at Santander.

24                   MR. BALDIGA:  Okay.  In connection

 1          with that paperwork, do you have to state the

 2          purpose for the --

 3                    MR. RILEY:  They asked, and you can

 4          pull the paperwork, I'm confident it will say it

 5          was for construction purposes.

 6                    MR. BALDIGA:  Okay.  Thank you.

 7     BY MR. EHRHARD:

 8     Q.   If you didn't know what the quarter million

 9          dollars was for because you didn't ask Mr.

10          Patierno, when you signed that document at the

11          bank, how could you be truthful as to what the

12          purpose was?

13                    MR. CARMAN:  Objection.  You can

14          answer.

15     A.   I thought it was a general enough description.

16     Q.   When your company asked for $150,000 in cash,

17          what did they put down the purpose was for the

18          cash?

19     A.   They don't have to.  When you send a wire, you

20          don't have to send a purpose.

21     Q.   Is it safe to say you didn't have to give the

22          company $150,000 back, did you?

23     A.   That I didn't have to?

24     Q.   Yeah.  Was there any legal obligation to pay the

```
 1              $150,000 back?

 2    A.   Yes.  I took their money.  Just because there

 3         wasn't a document that said so, didn't mean I --

 4         wasn't a transaction that I owned up to and had

 5         verbally committed to.

 6    Q.   But there was no promissory note?

 7    A.   Does there have to be?

 8              MR. CARMAN:  Objection.

 9    Q.   Who did you verbally commit to?

10    A.   All of this has been through -- the ownership of

11         the company had signed off on whatever money I

12         took from Energy North and returned back.

13    Q.   Do you have documentation --

14    A.   Of course.

15    Q.   -- to support that the bank -- that the company

16         assented to $150,000 in cash?

17    A.   Via e-mails.  I mean, I'm not sure of the

18         specific cash piece.  Like I said, I'll have to

19         go back to the reference, but any time I asked

20         for money to borrow on the company's behalf, I

21         asked.

22    Q.   And when did you pay the money back?

23    A.   When I closed my mortgage in June of 2019.

24    Q.   Now, you did take out two mortgages in June of
```

1          2019, didn't you?

2     A.   No.

3     Q.   There was not two of them?

4     A.   No.  One mortgage.

5     Q.   I have one from -- Bear with me.  I have an M&T

6          Bank mortgage in the amount of $300,000.  Do you

7          recognize this mortgage?  And I have a mortgage

8          in the amount of --

9     A.   That might be the home equity line of credit.  I

10         don't consider that a mortgage.

11    Q.   I appreciate that.  So you had a first mortgage

12         with M&T Bank, and how much was that for?

13    A.   A little over 600 thousand.

14    Q.   And you had a second mortgage, i.e., equity loan.

15         How much was that for?

16    A.   Apparently, 300,000.  Unused.  I just want to

17         make sure it's clear that 300,000 was 100 percent

18         available and has never been touch.

19    Q.   That $600,000 you took out in 2019, where did it

20         go?

21    A.   Back to return to Energy North.

22    Q.   Now, you asked Energy North for $150,000 to pay

23         Jim Patierno in cash.

24    A.   M-hum.

1    Q.   You sold your house in Natick and testified you

2         received about $275,000 in equity, which you put

3         in a Santander account; correct?

4    A.   Capitol One, some Santander.

5    Q.   So if that money was still sitting in that

6         account, why did you need to get cash from Ken

7         Black and his company --

8    A.   I had the other closing, the Hooper and

9         Gilbertson lots.  I didn't want to deplete

10        everything I had for cash.

11   Q.   But it's your testimony today that you had no

12        knowledge what the money was specifically being

13        used for, the cash?

14   A.   Correct.

15   Q.   You had no -- tell me if I'm wrong, this is for

16        the record, you had no knowledge that Mr.

17        Patierno was going to be paying the Johnsons,

18        Mr. Johnson, that $250,000?

19   A.   Specifically, no.

20   Q.   It's your testimony you had no idea who it was

21        being paid to?

22   A.   I knew he was involved in helping get the

23        permits, and, you know, they had some knowledge

24        that Jim needed, but I didn't know the extent of

1          --

2     Q.   Did you ever have discussions with your wife

3          regarding the payment of this money in cash?

4     A.   I'm sure we touched base about it.

5     Q.   To this day, have you ever spoken with Mr.

6          Johnson?

7     A.   Never.

8               MR. CARMAN:  You're talking about

9          oral conversations, right, because we know

10         there's e-mails.

11    Q.   Oral conversations.

12    A.   Same way that I answered the first time.

13    Q.   So you have a combined four acre lot in Reading?

14    A.   Yup.

15    Q.   And back when you purchased the lot, what did you

16         think a four-acre lot would go for in Reading?

17    A.   I don't know.  I'm not an appraiser.

18    Q.   I appreciate that.  But what did you expect to

19         have to pay for a lot versus a fully constructed

20         house?

21    A.   Unfortunately, like I said, Jimmy knew my total

22         budget.  So I didn't have to break it up into

23         pieces.

24    Q.   Did you ever pay any money to Gail Johnson?

1    A.    Yes.

2    Q.    What did you pay Gail Johnson for?

3    A.    I believe it was, you know, for different various

4          work, the assignment piece, at the end of the

5          line making sure, again, it was all a buildable

6          lot.

7    Q.    What did Gail Johnson do to get permitting done?

8    A.    I don't know.

9    Q.    How much did you pay Gail Johnson in total?

10   A.    You'd know better than me.

11   Q.    I appreciate that.  I'm asking you because you

12         were involved in the --

13   A.    I think it was somewhere in 30, $35,000 range.

14         I'm going from memory.

15   Q.    Did you ever communicate with Mr. Patierno that

16         you actually paid the Johnson's $400,000?

17   A.    No.

18   Q.    No, you did not?

19   A.    I don't believe so.

20   Q.    As we sit here today, it's your testimony that --

21         how much do you believe you paid Mr. and

22         Mrs. Johnson or Arch Land Development in total

23         for the house that you live in?

24                    MR. CARMAN:  For the house?

1    Q.   And the property?

2    A.   My entire property, how much did I pay all in?

3    Q.   Yes, to the Johnsons.

4    A.   To Johnson.  I didn't pay --

5    Q.   To the Johnsons?

6    A.   The house --

7    Q.   You paid Gail Johnson you testified about

8         $30,000 --

9    A.   Yup.

10   Q.   -- in order to effectuate the purchase and

11        construction of your house; correct?

12             MR. CARMAN:  Objection.  That's not

13        his testimony.

14   Q.   Well, how much did you pay Gail Johnson?

15   A.   Whatever was on the record there, the 30,000 or

16        so.

17   Q.   And what did you pay Gail Johnson $30,000 for?

18   A.   Jim, like I said, Jim was working with her in

19        between.  They had an agreement that whatever it

20        was, whether it was assignments, whether it was,

21        you know, helping with conservation requirements,

22        whether it was land court, the Johnsons had good

23        knowledge of the lot.  So Jim worked with them to

24        make sure it was buildable.

1   Q.   It's your testimony -- did you pay Bill Johnson

2        any money?

3   A.   No.

4   Q.   Did you pay Arch Land Development any money?

5   A.   No.

6   Q.   Did you provide funds at all to your knowledge to

7        pay Bill Johnson money?

8   A.   No.

9   Q.   Did you provide funds to your knowledge to pay

10       Arch Land Development?

11  A.   No.

12  Q.   And you took out those mortgages when on the

13       house?

14  A.   Mortgage.

15  Q.   Mortgage, yes.

16  A.   I believe it finalized in June, I'm guessing.

17  Q.   Of 2019?

18  A.   Yup.

19  Q.   I'm going to put up on the screen, which is

20       Exhibit 50 in your book.  This is an e-mail from

21       Thursday, April 11, 2019.

22            MR. EHRHARD:  We're going to get it

23       on the screen here, guys.  Okay.  This is

24       Exhibit 50.  Lisa and Joe, can you see this?

```
 1                    MS. TINGUE:  Not yet.  Now, I can see
 2        it.
 3   Q.   I'm going to read the e-mail from the bottom.
 4        This is an e-mail that was forwarded to us by Jim
 5        on -- he e-mailed us documents.
 6                    This is an e-mail from April 10, 2019
 7        from Jim Patierno.  It's from Kevin Riley.
 8        "Here's what I have including yesterday's wire to
 9        John.  Only piece I don't have great detail on is
10        the check I received back from John for 15,000.
11        Let me know if you need anything else.  Thanks,
12        Kevin."
13                    And then the next page shows the
14        itemization.
15   A.   Sure.
16   Q.   I know that Lisa and Joe have seen this in other
17        depositions.  Do you recognize this, Kevin?
18   A.   Yes.
19                    MR. EHRHARD:  Let's go back to the
20        other page, Chris.
21   Q.   And then Kevin writes, "What about the 4,700 we
22        were trying to deduct."  Below that Jim writes,
23        "Sorry to say you do owe her," meaning Gail,
24        "5,000 more.  The total was $400,000."
```

```
 1    A.    Okay.

 2    Q.    And then you write, "What about the 4,700 we were

 3          trying to deduct?"  And then it goes, "So my

 4          total should be good then."

 5                    So isn't it not true that, Mr. Riley,

 6          that you paid the Johnsons up to $400,000 in

 7          monies?

 8    A.    No.

 9    Q.    How is that e-mail incorrect when Jim writes to

10          you, the total is $400,000, in reference to Gail

11          Johnson?

12                    MR. CARMAN:  Objection.  That's not

13          what the e-mail says.

14    Q.    Explain to me what you think this e-mail is

15          saying -- this e-mail chain is discussing?

16    A.    The e-mail chain was discussing Jim telling me I

17          owed a little bit more money.

18    Q.    To who?

19    A.    To him.

20    Q.    Who is the her?  Sorry to say you do owe her

21          5,000, who is that her?

22    A.    I would be speculating.  Those are his words.

23    Q.    Do you believe that they refer to Gail Johnson?

24    A.    Probably.
```

```
 1    Q.   Okay.  Let's go to Exhibit 51.  Do you recognize

 2         this e-mail?

 3    A.   Yup.

 4    Q.   And this e-mail is approximately six days after

 5         the last e-mail we looked at; correct?

 6    A.   Yup.  I'll take your word for it.

 7    Q.   And it says -- this is from Gail to you; correct?

 8    A.   Correct.

 9    Q.   Now, how did Gail get your e-mail address?

10    A.   I don't know.

11    Q.   Had you communicated with Gail Johnson prior to

12         this?

13    A.   No.

14    Q.   And you notice there's no one else on the e-mail

15         just you.

16    A.   Correct.

17    Q.   There's no Patierno on there.

18    A.   Right.

19    Q.   No Mr. Gallant.

20    A.   M-hum.

21    Q.   So why would Mrs. Johnson e-mail you directly and

22         not, to your knowledge, include anyone else?

23    A.   I guess she had tried her course through Jimmy

24         and was coming to me.
```

1   Q.   And by April 17th, you had just about moved into

2        the house; correct?

3                 MR. CARMAN:   Objection.

4   A.   Not quite, no.

5   Q.   But the house was built; correct?

6   A.   Was still being built.

7   Q.   But this is about a year after the deed had

8        transferred to the land; correct?

9   A.   Yup.

10  Q.   So presumably when the deed is transferred, you

11       would be done with the Johnsons, wouldn't you?

12                MR. CARMAN:   Objection.

13  Q.   It's a fair question.  Did you think you were

14       done with the Johnson after the deed transferred?

15  A.   I didn't -- like I said, I never dealt with the

16       Johnsons.  So I never did -- there was no closure

17       for me.  This was a process that I get a house to

18       live in.

19  Q.   So it says, "Dear Mr. Riley, as you are well

20       aware, I sold my agreement to purchase the

21       Arcadia property to Jim Patierno.  He then sold

22       the property to you.  I have extended an enormous

23       amount of time and patience to Mr. Patierno's

24       attorney, John Gallant, yet as of today, I still

1           haven't received the consideration due for my

2           assignment of real estate.  Today I will be going

3           to Cambridge to place a lien on the property."

4                   And then you wrote to Jim Patierno,

5           "Can we jump on a call?"

6      A.   Yup.

7      Q.   And Jim wrote, "Yes, call me."

8                   Why did Gail send that e-mail and what

9           was -- why did Gail send that e-mail to you?

10                  MR. CARMAN:  Objection.  It's been

11          asked and answered already.

12                  MR. EHRHARD.  It has not been

13          answered.  It has not been asked.

14                  MR. CARMAN:  Yeah, it was.  He said,

15          I'm assuming she ran her course with Mr. Patierno

16          and she reached out to me.

17                  MR. EHRHARD:  I have not put this

18          e-mail into evidence until now.  This is -- -

19     A.   You asked me five minutes ago.  I don't mind

20          answering again.  It's the same answer.

21     Q.   Looking at this e-mail does this refresh your

22          memory as to monies you paid to Gail Johnson?

23     A.   I didn't pay Gail Johnson.

24     Q.   Then why is Mrs. Johnson e-mailing you, to your

1           knowledge, as to why you owe her more money?

2                   MR. CARMAN:  Objection.  It's been

3           asked and answered.

4    Q.    Then answer it again.  I don't think you -- I

5           never asked about this e-mail.

6    A.    She must have ran her course with Jimmy, and she

7           was coming directly to me.

8    Q.    Did you ever speak to Mrs. Johnson after this

9           e-mail?

10   A.    I've never spoken with Mrs. Johnson.  I never

11          replied to an e-mail from Mrs. Johnson.  I've

12          never had any one-on-one communications with

13          either Johnson.

14   Q.    And then it says, "Can we jump on a call?"

15                  Did you and Mr. Patierno discuss this

16          e-mail?

17   A.    I'm sure we did.

18   Q.    What was the conclusion and the -- -what was the

19          substance of that phone call?

20   A.    She was under the impression there was something

21          more owed.

22   Q.    Did he tell you how much he paid the Johnsons?

23   A.    No.

24   Q.    You didn't ask?

1    A.    No.

2    Q.    You didn't ask Mr. Patierno, How much have you

3          paid this woman?

4    A.    That was their arrangement.  I didn't --

5    Q.    Did you ask Mr. Patierno does this involve the

6          $250,000 in cash I gave you?

7    A.    Absolutely not.

8    Q.    So you didn't want to know?

9    A.    No.  Why would I assume it was.

10   Q.    Okay.  So you give $250,000 in cash to Mr.

11         Patierno.

12   A.    Yup.

13   Q.    According to your testimony.

14   A.    Yup.

15   Q.    And your testimony is you didn't ask him as far

16         as you recall about where it was going.

17   A.    Like I said, I believe it was more explained, you

18         know, that's --

19   Q.    And if he said it was going to the Johnsons, then

20         wouldn't you question as to why Mrs. Johnson says

21         it wasn't paid?

22   A.    I don't believe he said it was going to the

23         Johnsons.

24   Q.    When you asked Mr. Patierno about this e-mail,

```
 1            did you ask him why does Mrs. Johnson think she

 2            hasn't been paid money?

 3     A.     I'm sure I did.

 4     Q.     What did he say?

 5     A.     Her math's wonky.  I don't -- she thought she was

 6            entitled to something more.

 7     Q.     I'm going to put on exhibit -- this is a document

 8            that was provided to us by both Mr. Patierno's

 9            counsel and by --

10                      MR. CARMAN:  Is that the agreement

11            and release?

12                      MR. EHRHARD:  Yes.  Off the record.

13            Let's put it on the record, actually.  We're

14            going to do the same thing.  We're going to label

15            this folder Exhibit 1.

16     Q.     What I'm going to be discussing and we're going

17            to pull up, guys.  Have you seen this document,

18            Mr. Riley?  It was provided to us by your counsel

19            and by Mr. Patierno's counsel.

20     A.     I don't believe I have.

21     Q.     This is Exhibit 29.  Exhibit 29.  Do you

22            recognize this document, Mr. Riley?

23     A.     I don't.

24     Q.     Have you seen this document prior to today?
```

1   A.   I don't believe so.

2   Q.   Your counsel provided it to our office.  Do you

3        know how your counsel got hold of this document?

4   A.   I don't.

5   Q.   Did you provide it to your counsel?

6   A.   No.

7   Q.   This document indicates that Arch Land

8        Development is to receive $265,000.  Am I correct

9        that Mrs. Johnson was to or Arch Land was to

10       receive $265,000?

11  A.   Not to my knowledge, no.

12  Q.   Do you have any idea why this agreement would

13       have been created?

14            MR. CARMAN:   Objection.  He said he's

15       never seen it before.

16  Q.   Fair enough.  But do have an idea why an

17       agreement like this would be created?

18  A.   Created to put things in writing.

19  Q.   What did you say?

20  A.   They obviously wanted it in writing.

21  Q.   But do you know why, what Arch Land Development

22       did to merit $265,000 in payment?

23  A.   I don't.  I didn't deal with Arch Land

24       Development.

1    Q.    You dealt with Mr. Patierno?

2    A.    I dealt with Mr. Patierno, right.

3    Q.    I'm going to put up on the board Exhibit 52.  Do

4          you recognize this document?

5    A.    Yeah.

6    Q.    What is this document to your knowledge?

7    A.    A check from Gallant's office.

8    Q.    To who?

9    A.    Gail Johnson.

10   Q.    Do you know why your attorney was giving a check

11         for $15,000 to Gail Johnson?

12   A.    As part of an agreement.

13   Q.    What was that agreement for?

14   A.    To help secure a buildable lot.

15   Q.    Was that money you gave to Mr. Gallant directly?

16   A.    I'd have to check, to be honest.

17   Q.    Did you pay in cash to Mr. Gallant that money or

18         did you write a check?

19   A.    Like I said, I don't know.  It could have been a

20         wire from Energy North.  It could have been a

21         check directly from me.

22   Q.    Because of the documents you gave us -- actually,

23         next one.  Do you recognize this one, Exhibit 53?

24   A.    Another check.

1    Q.   How much was that check for?

2    A.   20,300.

3    Q.   Did you give Mr. Gallant that money?

4    A.   I would have to go back, but I mean, most likely,

5         yeah.

6    Q.   Did you ever give any checks to Mr. Gallant for

7         the payment of the purchase of this real estate?

8    A.   I gave him money for, like I said, for any of the

9         assignments.  I don't know if one of the

10        purchases through Hooper or Gilbertson went

11        through Gallant's office for purchase of land,

12        but --

13   Q.   And why are there two checks?  Why is one 15 and

14        one is 20,300, why the distinction?

15   A.   I don't know.

16   Q.   We asked for checks, and we received no other

17        checks, but these two.  Did you use any checks at

18        all to purchase the real estate or construct the

19        house?

20   A.   To give to John?

21   Q.   To anyone.  We asked for checks --

22   A.   I'm sure I have given a check to John, yeah.

23   Q.   We don't have a copy of that canceled check.

24   A.   Okay.

1    Q.   If you did give a check to John Gallant for the

2         purchase of this real estate, I guess we would

3         like to see that and see where it came from.

4    A.   It would be on that itemized listing of the

5         spread sheet I provided.

6    Q.   But there's no check.  These are the only two

7         checks we received.

8    A.   It was labeled check.  The method of payment was

9         labeled on that sheet.

10   Q.   Let's look at Exhibit No. 54.  Do you recognize

11        this document?

12   A.   I guess.

13   Q.   Is that a yes?

14   A.   I mean, not specifically.  I recognize amount,

15        names.  I mean, to say I remember by itself.

16   Q.   To your knowledge, why is Gail Johnson

17        individually releasing you and your wife and

18        Stonehill?

19   A.   I don't know.

20   Q.   And what transaction occurred that led to the

21        need for such a release?

22   A.   Seems like there was -- those previous check

23        stubs were for, like I said, helping to get a

24        buildable lot and that was -- this looks like her

1            acknowledgement that she's been paid in full.

2   Q.    Now, this is dated April 18, 2019; correct?

3   A.    Yes.

4   Q.    The e-mail I asked you previously about being

5            owed $400,000, those were dated April 10, 2019.

6   A.    Okay.

7   Q.    So did you guys pay her these further funds to

8            make sure that you wouldn't be sued by her?

9   A.    I gave these to John Gallant.  These were paid by

10           John Gallant's office?

11  Q.    Yes, those two checks were.  But the e-mail

12           Exhibit 50, which we went over before, you said

13           -- you wrote to Mr. Patierno it says, otherwise

14           I'm confused.

15  A.    Okay.

16  Q.    Did Mr. Patierno ever provide an explanation as

17           to why further funds were paid to Mrs. Johnson?

18  A.    Like I said, to my knowledge, everything that was

19           given here was for securing a buildable lot.

20  Q.    But if a year after you owned the lots, why are

21           you still writing checks to Mrs. Johnson

22           individually?

23  A.    Well, I mean, John Gallant's office did.  I

24           didn't individually, and if there was an

```
 1              agreement in place, I was honoring the agreement.
 2    Q.   I appreciate that.  But before a $20,000 check is
 3         written to an individual named Gail Johnson,
 4         didn't you want to know why her, where is our
 5         obligation to pay this?
 6    A.   No.  I'm focused on the total purchase price.
 7         Following with Jimmy all along.  I wasn't worried
 8         about what pieces were what.  I was worried about
 9         what my total piece was and what my mortgage was
10         going to be and that I would be able to pay
11         Energy North back.  The pieces to all this were
12         confusing.
13    Q.   Okay.  I appreciate that.  We're going to put on
14         Exhibit 48.  It's a different e-mail.  This is an
15         e-mail from Bill Johnson to Mark Lanza and you
16         and Mr. Patierno and John Gallant.
17              Now, do you know who Mark Lanza was?
18    A.   I believe he was the attorney for one of the --
19         either Arch Land or -- he was an attorney in the
20         mix, right?
21    Q.   So this is in February.  Do you remember
22         reviewing this e-mail?
23    A.   Not recently.  I mean, I'm sure I read it if I'm
24         on here.
```

```
1    Q.   Mr. Patierno testified the 250,000 cash was given

2         to Bill Johnson.  If that's the case, why is Bill

3         Johnson e-mailing Mark Lanza and you on

4         February 21st, seven months later, asking about a

5         remaining monetary balance?

6                   MR. CARMAN:  Objection.

7    Q.   To your knowledge, why do you think that is?

8    A.   I don't know.

9    Q.   Did you ever ask --

10                  MR. CARMAN:  For the record, this

11        e-mail is from Gail Johnson not Bill Johnson.

12                  MR. EHRHARD:  This is from Bill

13        Johnson.

14   A.   It's signed Gail on the bottom.

15                  MR. CARMAN:  Bill and I went to

16        Attorney Gallant.  That means it's from Gail, not

17        Bill.

18                  MR. EHRHARD:  Well, we don't know

19        because it's Bill Johnson's e-mail account.

20   Q.   I mean, whose e-mail is that from?

21   A.   The address is from Bill, but I agree with Scott,

22        she signed it.

23   Q.   There's no signature on there, is there?

24   A.   It says Gail.
```

```
 1              MR. CARMAN:  It says, Bill and I.
 2    Q.   Fair enough.
 3    A.   If I sent an e-mail and wrote Kevin at the
 4         bottom, it would be from me.
 5    Q.   I can't imagine why the wife would be using
 6         someone else's e-mail here.
 7    A.   They have a joint e-mail.
 8    Q.   No, they don't.  So the question stands, you give
 9         a quarter million dollars to Mr. Patierno and
10         testified you never asked him what it was for, as
11         far as you can recall.
12    A.   Okay.
13    Q.   And you testified he never told you what it was
14         for.
15    A.   All of it was in the context of getting a
16         buildable lot.
17    Q.   And now you're receiving e-mails from a Bill
18         Johnson, signed by a Gail Johnson, saying you owe
19         us a remaining monetary balance.
20              Did you inquire from Mr. Patierno for
21         an itemization and accounting of where your money
22         was going?
23    A.   No.
24    Q.   And why not?
```

```
 1    A.    I didn't need one.

 2    Q.    Why did you not need one?

 3    A.    We had an agreement as to what we would budget

 4          and it was all, let me know how I'm tracking,

 5          over or under budget.

 6    Q.    And where was that agreement?

 7    A.    It wasn't an agreement.

 8    Q.    Was it in writing?

 9    A.    No.

10    Q.    So you had a contractor --

11    A.    Yup.

12    Q.    -- build a house.

13    A.    Yup.

14    Q.    And never put in writing the terms and the

15          outline of that agreement?

16    A.    That's correct.

17    Q.    You're the CFO of Energy North?

18    A.    Yup.

19    Q.    Would you ever allow Energy North to build a

20          project without a written contract laying out the

21          guardrails of that contract?

22    A.    We probably have with Jim.

23    Q.    With Jim.  Okay.

24                This is Exhibit 48.  Do you see that's
```

1          Bill Johnson's e-mail.  We're going to go to

2          Exhibit 51, because apparently we don't believe

3          this, but who's e-mail address is that?  That's

4          Gail Johnson.

5     A.   Okay.

6     Q.   So isn't it based on that e-mail that Bill

7          Johnson signed his wife's name to an e-mail?

8     A.   Anything's possible.

9     Q.   Isn't possible it possible that Mr. Patierno --

10         that you gave $250,000 to hide from the

11         bankruptcy court?

12              MR. CARMAN:  Objection.

13    A.   Is it possible that I gave --

14    Q.   Is it possible that the $250,000 --

15    A.   It's not possible because I was unaware of any

16         bankruptcy court.  So it was impossible.

17    Q.   Did you give $250,000 in cash to Mr. Patierno for

18         the singular -- for the purpose of avoiding that

19         money being tracked so that no one would know

20         that Bill Johnson received it?

21              MR. CARMAN:  Objection.

22    A.   No.

23    Q.   Did you know that Bill Johnson was in bankruptcy?

24    A.   No.

```
 1    Q.   When did you find out Bill Johnson was in

 2         bankruptcy?

 3    A.   When I received letters from your office.

 4    Q.   Didn't you think it was untoward and possibly

 5         criminal that Mr. Patierno was receiving $250,000

 6         in cash and never explained what it was being

 7         used for specifically?

 8                   MR. CARMAN:  Objection.

 9    A.   I thought it was unreasonable.

10    Q.   Why did you agree to do it?

11    A.   Because I trusted Jim.

12    Q.   Why would you trust -- was he your brother?

13    A.   No.

14    Q.   Was he your Army brother?

15    A.   How was he going to screw me?  He does work with

16         our business.  It would be biting your nose off

17         to spite your face.  He screws me out of 250,000

18         and he loses out on a lot of construction

19         projects.  He knows my uncle.  It wouldn't make

20         any sense.  It wouldn't be logical for Jim to

21         screw me.

22    Q.   Didn't you say when asked why would people pay in

23         cash, and you said because they often get a break

24         on price?
```

```
 1   A.   That's one -- yes, that's one way.

 2   Q.   So by giving the money to Mr. Patierno in cash,

 3        didn't you get a break on the price of those

 4        lots?

 5             MR. CARMAN:  Objection.

 6   A.   It was for a buildable lot.  How it was

 7        allocated, I don't know where I got breaks or

 8        what I got breaks.

 9   Q.   But by paying cash, didn't you allow yourself to

10        get those lots for cheaper than if you paid on an

11        open check basis?

12   A.   I don't know.

13             MR. CARMAN:  Objection.

14   Q.   So if the Chapter 7 trustee had sold those lots

15        with an open sale, wouldn't he have ended up

16        selling them for more than you paid because you

17        did it in cash?

18   A.   I don't know.

19   Q.   At what point did you know that the lots had been

20        approved for building?

21   A.   For building?

22   Q.   Fully available to be built on?

23   A.   I'm guessing.  Would you like me to guess?  I

24        don't know.  When they were approved?
```

```
 1    Q.    Yes.

 2    A.    I would guess September of -- I don't know.  I

 3          don't know.  I'm literally guessing.

 4    Q.    So before I go to the exhibits, we can move to

 5          there.

 6                    Isn't it true you got a building

 7          permit on April 24th of 2018?

 8                    MR. CARMAN:  Objection.

 9    A.    I'll take your word for it.  The time line, I

10          mean, I really --

11    Q.    And isn't it true that April 2018 is when the

12          $250,000 cash was given to Mr. Patierno?

13    A.    That is true.

14    Q.    So just for the sake of taking my facts as they

15          are, if indeed the building permit was gotten on

16          April 24, 2018, doesn't that time line match the

17          same time Mr. Patierno asked for the $250,000 in

18          cash?

19                    MR. CARMAN:  Objection.

20    Q.    You can answer.

21                    MR. CARMAN:  If he understands.

22    A.    Were they around -- yeah, they were around the

23          same time.

24    Q.    Wasn't the $250,000 in cash given to Mr. Patierno
```

```
 1            to pay Bill Johnson for the lots being now

 2            buildable?

 3                      MR. CARMAN:  Objection.

 4       A.   No.

 5       Q.   So in your opinion, why did Mr. Patierno give

 6            over $250,000 in cash to Bill Johnson?

 7                      MR. CARMAN:  Objection.

 8       Q.   In your opinion.

 9       A.   In my opinion?

10       Q.   Yes.

11       A.   To help provide a buildable lot.

12       Q.   And what did Bill Johnson do to justify that kind

13            of money?

14       A.   I don't know.

15       Q.   Didn't he take less money than if he had sold it

16            on an open market sale?

17                      MR. CARMAN:  Objection.

18       A.   I don't know what a lot goes for in Reading.

19       Q.   Before I go to the exhibit board --

20                      MR. EHRHARD:  We're going to look at

21            the exhibit book, guys, and try to move as quick

22            as we can here.  Okay.  We have 50 exhibits.  I'm

23            going to try to ask the ones that I think are

24            relative.  Okay?
```

1    Q.    I have a question, how involved were you in the

2          day-to-day processes of the permitting of the

3          lots and were you involved in keeping track on a

4          day-to-day basis?

5    A.    Very little.

6    Q.    If you were living in a two-bedroom apartment in

7          Reading and just left a house in Natick, why

8          weren't you keeping track of it on a near

9          week-to-week basis?

10   A.    I have a pretty busy job.

11   Q.    But you weren't going to move out of the

12         apartment until your new house was built;

13         correct?

14   A.    A lot of this was out of my hands.

15   Q.    Whose hands was it in?

16   A.    Jim's.

17   Q.    But couldn't you have just bought a house that

18         showed up on the market in the same neighborhood?

19              MR. CARMAN:   Objection.

20   A.    I could have.  I'm not sure there was one for

21         sale.  This was a great spot.  We wanted to be

22         there.

23   Q.    But what writing did you have memorializing and

24         confirming that you had a contractual right to

Case 15-42445   Doc 434-3   Filed 03/23/21   Entered 03/23/21 20:38:02   Desc Exhibit
Kevin Riley 10/21/2020 depo transcript   Page 90 of 169

90

1          buy those lots?  What writing existed?

2     A.   When I bought the lots from Hooper and

3          Gilbertson.

4     Q.   But you moved into an apartment in Reading;

5          correct?

6     A.   Correct.

7     Q.   And when you moved into the apartment in Reading,

8          did you have any contract that you could enforce

9          to ensure that you could build a house?

10                   MR. CARMAN:  Objection.

11    A.   No.

12                   MR. CARMAN:  Slow down.  He's asking

13         legal questions.

14    A.   I didn't have a contract.  We established that.

15    Q.   At what point did you have in writing a written

16         agreement such that you knew you would be having

17         a house built and a set time line?

18    A.   Whenever we closed on that second lot.

19    Q.   And when was that?

20    A.   I don't remember the exact date.

21    Q.   Give me an approximate, please?

22    A.   I think before the closing in April of 2018.

23    Q.   So you've been living in an apartment since

24         August of 2017.

```
 1    A.    Yup.

 2    Q.    And from August 2017 until April of 2018, you had

 3          nothing in writing protecting your ability to

 4          move into a house on that lot?

 5    A.    A hundred percent correct.

 6    Q.    But you weren't looking for a house anywhere

 7          else?

 8    A.    We were looking at Zillow every day.  My wife,

 9          you know, up, down, left, right, but until we

10          found something better, we were committed to

11          staying and trying to get this done.

12    Q.    Until the lots were deeded over to you in April

13          of 2018, you had nothing in writing?

14    A.    Correct.

15    Q.    But in April of 2018, you gave $250,000 in cash

16          to Jim Patierno.

17    A.    M-hum.

18    Q.    And you had nothing in writing?

19    A.    That's correct.

20    Q.    And you're the CFO of Energy North?

21    A.    Yes.

22    Q.    You understand why a lot of us have questions

23          about this?

24    A.    Absolutely.  But if I had an agreement, I would
```

```
 1              give it to you.  I didn't.  I get it.  It's

 2              unusual.

 3       Q.     And Jim Patierno wasn't your brother?

 4       A.     No.

 5       Q.     He wasn't family?

 6       A.     He would have more to lose by screwing me.

 7       Q.     How much revenue do you provide to Jim Patierno

 8              on an annual basis, company, how much does --

 9       A.     More than 250,000.

10       Q.     A year?

11       A.     Depends on what projects are going on, but

12              probably in the last couple of years, yes.

13       Q.     Because I had asked you how much of Energy North

14              involved real estate construction, and you said

15              very, very little.

16       A.     It is very little.  Compared to what -- I mean,

17              we have a portfolio of 50 properties.  If Jim

18              works on one gas station this year, that's very

19              little to me.  That can be a half a million

20              dollar job as an example.  That in my scope is

21              little.

22       Q.     So how much did Energy North pay to Jim Patierno

23              and/or his subsidiaries over a five-year basis --

24              on average over five years, how much did you pay
```

1       him?

2   A.  It depends very wildly on what projects --

3   Q.  Low and high?

4   A.  You could go a year with nothing and you could go

5       a year with a couple million.

6   Q.  In the last three years, how much did you pay to

7       Jim Patierno at Energy North?

8   A.  Last three years?

9   Q.  Yes.

10  A.  I'm guessing, right, I don't know.  Over a

11      million dollars.

12  Q.  A million dollars the last three years?

13  A.  Yes.

14  Q.  So based on that number --

15  A.  Based on that, based on Ken knows him, I've

16      worked with him.  It's the truth.

17              MS. TINGUE:  James, may I ask a

18      question?

19              MR. EHRHARD:  Yes, please.

20              MS. TINGUE:  Mr. Riley, I'm sorry to

21      interrupt you.  So you've indicated that you felt

22      perfectly comfortable that Mr. Patierno was not

23      going to screw you, as you said, because he would

24      be giving up an opportunity to work with your

1       uncle; is that correct?

2              MR. RILEY:  I'm sure that's one of

3       the reasons, right.  Yes.

4              MS. TINGUE:  Well, what if Mr.

5       Patierno just, you know, did something improper

6       unknowingly, what if he made a mistake, what if

7       somebody sued him, what if this deal that he had

8       with the Johnsons didn't go through properly just

9       because of something that the Johnsons did or

10      that Mr. Patierno did wrong, it wasn't

11      necessarily an evil motive to screw you, what if

12      something like that were to happen, you'd be left

13      high and dry.

14             MR. CARMAN:  Objection.

15             MS. TINGUE:  Why wouldn't you want to

16      protect yourself from that type of instance?

17             MR. CARMAN:  Objection.

18             MR. RILEY:  He didn't ask for an

19      agreement.  I didn't ask for an agreement.  I was

20      willing to take the associated risk.

21             MS. TINGUE:  Why were you willing to

22      take the risk?

23             MR. CARMAN:  Objection.

24             THE WITNESS:   Because I trusted Jim.

1              MS. TINGUE:  But things happen,

2       people don't, you know, as I said before, it

3       might not be something that Jim could control.

4       It doesn't make -- it's not credible, frankly,

5       that you would take that kind of a risk without

6       having some kind of backup to protect yourself

7       for any number type of circumstances that could

8       happen.

9              MR. CARMAN:  Objection.  There's no

10      question pending.

11             MR. RILEY:  It may not be credible,

12      but it's true.

13             MS. TINGUE:  I just want to make sure

14      that we get that on the record.   Thank you.

15             MR. RILEY:  A hundred percent, yup.

16      BY MR. EHRHARD:

17  Q.    I want to -- by paying in cash, I asked you

18      previously if people -- why they pay in cash, and

19      one of the things you said is because they can

20      offer a break in price.  Then I asked -- that's

21      what you said; right?

22  A.    That's one of the reasons.

23  Q.    Then I asked does Energy North ever do cash deals

24      to get a break in price, and you said, No, we

```
 1              don't.
 2    A.    I think it's less common for businesses to do it.
 3    Q.    And why is it less common?
 4    A.    For a business to do it?
 5    Q.    Yeah.
 6    A.    Just more stringent reporting.
 7    Q.    Why is it more stringent reporting?
 8    A.    Because the dollar amounts are higher.  It's a
 9          commercial business.
10    Q.    Isn't it fair to say that people do cash
11          transactions to avoid the authorities tracking
12          the money?
13                MR. CARMAN:  Objection.
14    A.    I'm sure that's one way people use it.
15    Q.    And isn't it true that when you gave the money to
16          Jim Patierno, you knew it allowed Mr. Patierno to
17          avoid having the money tracked?
18                MR. CARMAN:  Objection.
19    A.    I mean, I think that's just fact if you give
20          someone some money in cash, it can't be tracked.
21    Q.    Now, A.J. and Sons is the contractor that you
22          used; correct?
23    A.    Correct.
24    Q.    When we say Jim Patierno, we actually mean A.J.
```

1        and Sons, don't we?

2                    MR. CARMAN:  Objection.

3   A.   Sure.

4   Q.   A.J. and Sons, Incorporated is a business;

5        correct?

6   A.   Yup.

7   Q.   And A.J. and Sons does the construction on your

8        -- Energy North's projects; correct?

9   A.   Not all of them, but some.

10  Q.   To your knowledge, why would A.J. and Sons,

11       Incorporated take a cash transaction like that?

12                   MR. CARMAN:  Objection.

13  A.   I don't know.

14  Q.   When you gave the money to Jim, did he give you a

15       receipt from A.J. and Sons when you gave him the

16       money?

17  A.   No.

18  Q.   Did he give you a receipt of any kind?

19  A.   No.

20  Q.   I know -- explain to me why you as a Bentley

21       graduate --

22  A.   Bryant.

23  Q.   -- CFO of Energy North --

24  A.   Yup.

1    Q.   -- gave $250,000 in cash to Jim Patierno and

2         didn't get a receipt for it?

3    A.   I trusted Jim.  A piece of paper with his

4         signature, what was that going to do.  At that

5         point what was that going to do.

6    Q.   Mr. Patierno took a picture of the money.

7    A.   Okay.

8    Q.   Why didn't you take a picture of the money?

9    A.   I trusted Jim.

10   Q.   Did you send a 1099 to A.J. and Sons,

11        Incorporated for giving him that money?

12   A.   No.

13   Q.   Did you give any tax documentation to the IRS or

14        the Mass Department of Revenue memorializing that

15        sum was given to A.J. and Sons, Incorporated?

16   A.   No.  I didn't give them any information on any

17        money I paid to A.J. and Sons.  I don't think

18        you have to.

19   Q.   That's a discussion for a different day.

20   A.   I paid them a lot of money.  I didn't report any

21        of it.

22   Q.   Did Mr. Patierno tell you that it was for Bill

23        Johnson?

24                  MR. CARMAN:  Objection.  It's been

1          asked and answered --

2    A.    No.

3                   MR. EHRHARD:  Lisa, are you done for

4          now or -- -

5                   MR. BALDIGA:  James, I want to ask a

6          couple of questions.  I'm trying to hear

7          everything, but sometimes you're going in and

8          out.  And Mr. Riley, you're going in and out.  So

9          I want to make sure we're very clear on the

10         record here because I'm assume that we're going

11         to have further depositions under oath.  So I

12         want to make sure that your testimony is very,

13         very clear on this point.

14                   CROSS-EXAMINATION

15         BY MR. BALDIGA:

16   Q.    So as I understand the questions so far and your

17         answers, and I'll just ask again, so your

18         testimony is that Mr. Patierno never advised you

19         that he needed that cash to give to Mr. Johnson?

20   A.    Correct.

21   Q.    And what was the purpose that he told you for

22         needing 250 in cash?

23   A.    To facilitate the buildable lot.

24   Q.    And his explanation didn't go beyond that?

```
 1    A.    No.

 2    Q.    And you didn't question further as to what that

 3          meant as to how that would facilitate the

 4          acquisition of the lot or the building of the

 5          lot, whatever you said?

 6    A.    Correct.

 7    Q.    And you had no information whatsoever to suggest

 8          to you that the recipient of that cash was going

 9          to be Gail or Bill Johnson?

10    A.    At the time, no.  I mean, obviously, there's

11          e-mails and lots of things pointing there now,

12          but at the time, no.

13    Q.    So at the time, and I want to make sure you're

14          very clear in your answer, because again, there's

15          going to be further depositions on this, and if

16          there are contrary answers to yours now, I assume

17          Attorney Tingue is going to go after you for

18          perjury.  So at the time you had no understanding

19          that those funds were going to end up with the

20          Johnsons?

21    A.    Correct.

22                    MR. BALDIGA:  Okay.  Go ahead, Lisa.

23                    MS. TINGUE:  Thank you.

24                    CROSS-EXAMINATION
```

Case 15-42445   Doc 434-3   Filed 03/23/21   Entered 03/23/21 20:38:02   Desc Exhibit
Kevin Riley 10/21/2020 depo transcript   Page 101 of 169

101

```
 1          BY MS. TINGUE:
 2     Q.   So Mr. Riley, when you're wife was answering
 3          questions earlier today, she was shown an e-mail
 4          in which she was concerned about Bill Johnson
 5          being a fraud.  Do you know that e-mail?
 6     A.   No.
 7     Q.   Did you have similar concerns about Bill Johnson
 8          being a fraud?
 9     A.   No.  He appeared scattered, I guess.  Because he
10          would off and on e-mails and would disappear at
11          times, but fraud, no.
12     Q.   Okay.  And so what were you expecting of Mr.
13          Johnson?
14     A.   I wasn't expecting anything.
15     Q.   What was he -- why was your wife concerned that
16          he was a fraud, why do you say he was in and out,
17          what was he supposed to be doing for you?
18     A.   He was working with Jim on assignments of the
19          land and facilitating a buildable lot.
20     Q.   Okay.  And so did you understand that he was
21          going to be compensated for his efforts?
22     A.   I don't think we got to that level of detail.  I
23          mean, it would be an assumption.  It wouldn't be
24          specific knowledge.
```

1    Q.   Did you assume he was helping you for free?

2    A.   He wasn't helping me.

3    Q.   Well, he was facilitating, let's use your

4         carefully worded phrase that comes up a lot,

5         facilitating getting a buildable lot.  That's

6         what he was doing, right?

7    A.   Yeah.  Him or Gail.  I don't know.  I do not know

8         his involvement.

9    Q.   Okay.  The Johnsons were doing that?

10   A.   Jim was dealing with the Johnsons to facilitate a

11        buildable lot.

12   Q.   So what does that mean to facilitate a buildable

13        lot, does that mean to buy a buildable lot?

14   A.   I would say, yeah, it's part of it, sure.

15   Q.   So you were buying a lot?

16   A.   Not necessarily from the Johnsons.  I was buying

17        the lots from Hooper and Gilbertson, and

18        everything else was related to the facilitation

19        of the lot.

20   Q.   You were buying a lot from what?

21   A.   From Joan Hooper and Gilbertson.

22   Q.   But the $250,000 that you gave to Jim was to buy

23        the lot?

24             MR. CARMAN:  Objection.

1   Q.   To go towards buying the lot; right?

2              MR. CARMAN:  Objection.

3   A.   That's not what Jim told me.

4   Q.   That's not what Jim told you.

5   A.   No, like I said, it was to facilitate a buildable

6        lot.

7   Q.   I'm sorry?

8              MR. EHRHARD:  Lisa, we lost you.

9        What was your last statement?

10  Q.   What does facilitate a buildable lot mean?  I

11       don't even understand those words together in a

12       sentence.  What does it mean?

13  A.   I guess I don't really either.  I'm not a

14       builder.  I don't know everything it needs to

15       take.  All I know is this was a very complicated

16       transaction that touched conservation, it touched

17       multiple pieces of property, adjoining them in

18       court, over land court.  You name it, this had

19       it.  So there was a lot to navigate.

20  Q.   Okay.  So are you saying that those $250,000 were

21       for, you know, legal fees to navigate through

22       conservation regulations, etc, is that what it

23       was for?

24  A.   I don't believe it was for legal fees, no.

Case 15-42445   Doc 434-3   Filed 03/23/21   Entered 03/23/21 20:38:02   Desc Exhibit
Kevin Riley 10/21/2020 depo transcript   Page 104 of 169

104

1   Q.   Did you think that you were going to pay hundreds

2        of thousands of dollars for a lot, and then just

3        throw in $250,000 on top of it or to facilitate

4        it, but that wasn't getting -- that wasn't buying

5        you the land, is that what you thought?

6   A.   I mean, I guess I didn't really break it out to

7        that level.  I was focused on what the total

8        purchase price was, which is what Jim and I had

9        always talked about for everything all in.

10  Q.   Okay.  So how long had you wanted to live in

11       Reading?

12  A.   I don't know.  I'd have to think back time line.

13       We wanted to live there for a year while we were

14       in Natick because I -- to move closer to work, so

15       I wanted to live closer to work.

16  Q.   Okay.  And so of all of the other places that

17       were closer to work, what was attractive to you

18       about Reading?

19  A.   A lot of it was my wife, to be honest.  I didn't

20       care.  She really liked the town.  I was taking

21       her out of her comfort zone in the Metrowest.  So

22       she was attracted by the school system, and

23       normal things that anybody would be attracted to.

24  Q.   And then did you have to confirm that it would

1    fit into your budget to be able to afford to live

2    and purchase a house in Reading?

3  A.  Yeah, that was important, sure.

4  Q.  And when did you decide to build instead of

5    purchase?

6  A.  When Jim found the piece of property that

7    ultimately I live on.

8  Q.  Okay.  And how did you decide that you could get

9    the same bang for your buck by building on that

10    piece of property than by purchasing an already

11    built home or -- yeah, how did you determine

12    that?

13  A.  How did I determine I was going to get good

14    value?  I'm sorry.  What was your question?

15  Q.  How did you determine that you would get the same

16    bang for your buck doing this deal with Jim and

17    building instead of taking the same amount of

18    money and purchasing an already built home?

19  A.  I don't know if it was that or just the scarcity

20    of available houses, and we had looked in Reading

21    for a long time, and we were having a hard time

22    finding what we wanted.

23  Q.  So you were kind of familiar with the values then

24    in Reading.  You looked there for a long time,

1           you said.

2    A.     Sure.  Yeah.

3    Q.     Okay.  And so this deal afforded you the same

4           thing that you would be looking for, and you had

5           enough left over, $250,000, to facilitate things?

6                   MR. CARMAN:  Objection.

7    Q.     Is that your testimony?

8    A.     I guess -- the question one more time.

9    Q.     So you were able to purchase -- to purchase land,

10          build a house, and still have $250,000 in your

11          budget just to give Jim to facilitate things?

12   A.     It was part of the project that we had agreed on

13          a total.  So I guess I don't look at it that way.

14   Q.     Right.  Part of the project, but you're not

15          getting anything tangible for it according to

16          your testimony.

17                  MR. CARMAN:  Objection.

18   A.     I got a buildable lot, which from the sounds of

19          it took years to make it buildable.  There's a

20          ton of value, and people had tried to put this

21          together for years it sounded like.

22   Q.     Okay.  Let me understand something that you

23          testified to before.  You said that you got the

24          $250,000 in cash in two separate amounts; right?

Case 15-42445   Doc 434-3   Filed 03/23/21   Entered 03/23/21 20:38:02   Desc Exhibit
Kevin Riley 10/21/2020 depo transcript   Page 107 of 169

107

1       You got $100,000 out of the bank and you said you

2       went from the bank to Jim's right afterward; is

3       that correct?

4    A.   That's correct.

5    Q.   So you gave Jim $100,000 first?

6    A.   Yup.

7    Q.   And then was it the same day that you went and

8       got the $150,000 from the company safe?

9    A.   No, it would have been a different day.

10   Q.   How many days apart was that?

11   A.   I'd be guessing.  I'd have to look at the spread

12      sheet.

13   Q.   And so when you went to the bank, you said it was

14      -- the money was for construction purposes;

15      correct?

16   A.   Yup.

17   Q.   Okay.  But that's really not what it was for;

18      right?

19   A.   Why not?  I guess I don't follow.

20   Q.   But it had nothing to do with construction;

21      right?

22           MR. CARMAN:  Objection.

23   A.   I guess they're one in the same to me.  Like I

24      said, I guess I can't say it enough.  I was

```
 1              looking at the project as a whole.  So I had

 2              secured the land, everything else it was --

 3        Q.    Mr. Riley, you can look at it however you want,

 4              but the $100,000 that you took out of the bank,

 5              and you told the bank was for construction

 6              purposes, was not for construction purposes;

 7              correct?

 8                      MR. CARMAN:  Objection.

 9        A.    I don't know.  I mean, I guess that's a Jim

10              question.

11        Q.    No.  It's a question for you.  Mr. Riley, that's

12              what you told the bank on that piece of paper?

13        A.    Yeah.

14        Q.    Right?

15        A.    Yup.

16        Q.    And it wasn't for construction, was it?

17                      MR. CARMAN:  Objection.

18        A.    I guess I don't see the difference between the

19              construction purposes and facilitating a

20              buildable lot.  The two are hand-in-hand.

21        Q.    You don't?

22        A.    No.

23        Q.    You don't see the difference in that?  You don't

24              see the difference in writing down to get
```

```
 1            permits, or you know, to negotiate a deal.

 2            Construction is a very specific word.  Why would

 3            you put that on the bank documents?

 4                      MR. CARMAN:  Objection.

 5     A.     I don't know.  Like I said, that was what -- at

 6            the time that was what I was using it for.

 7     Q.     Okay.  So you two separate times put 100 and

 8            $150,000 in the trunk of your car --

 9     A.     M-hum.

10     Q.     -- and drove it and gave it to Jim.

11     A.     Yup.

12     Q.     Okay.  And you've said several times that you

13            trusted Jim, and I know that Mr. Ehrhard tried to

14            investigate that a little bit.  But one of the

15            things that you said was that he had done

16            business with your uncle; right?

17     A.     Yup.

18     Q.     So were you just sort of trading on your uncle's

19            trust of Jim or what was your personal reason to

20            trust Jim?

21     A.     I guess both.

22     Q.     Both.  And what was the basis of your personal

23            reason?

24     A.     I had gotten to know him.  You know, he was
```

```
 1              around the office.  He did our headquarters years

 2              ago.  I got to know him.  So he was a familiar

 3              face that we had had plenty of business

 4              transactions under our belt and was a man of his

 5              word.

 6      Q.      Okay.  And so he was a man of his word; right?

 7      A.      Yup.

 8      Q.      And so what was his word to you, what did he tell

 9              you that you trusted him?

10      A.      For the 250,000?

11      Q.      Yes.

12      A.      That this was what we need to get a buildable

13              lot, and I'll make sure it gets done.

14      Q.      That's it?

15      A.      I don't --

16      Q.      And we need it in cash, and that's all he said,

17              that's all his word was to you?

18      A.      That's my recollection of it.  Again, this is

19              what, three years ago, but yeah, he explained it

20              to me.  I thought it was unusual.  I realize it

21              doesn't look credible to not have a receipt to an

22              agreement, but that's what happened.

23      Q.      Well, this is what I'm trying to investigate

24              because you said he explained it to you, but
```

```
 1           you're telling us he didn't explain it to you.

 2    A.     He didn't explain it further than that.

 3    Q.     He didn't explain it at all.  He said, I need

 4           this.  That's all he said to you?

 5    A.     I need it to make a buildable lot, like I said.

 6    Q.     Okay.  We see that there were other -- you didn't

 7           feel it necessary to document things with Jim,

 8           but you did it seems feel necessary to keep other

 9           documentation during the course of this.  For

10           instance, the release from Gail Johnson; correct?

11    A.     I'm sorry.  You went in and out.

12    Q.     You may not have or you say you didn't need any

13           documentation between you and Jim, but you did

14           want documentation from the Johnsons, for

15           instance, that release from Gail Johnson?

16    A.     I'm not sure --

17                   MR. CARMAN:  Objection.  That was not

18           his testimony.

19    Q.     Well, did you want a release from Gail Johnson,

20           Mr. Riley?

21    A.     I didn't deal with Gail Johnson.  Everything was

22           through, you know, a lawyer at that point.  So

23           Jim or a lawyer wanted it done.  I didn't request

24           a release from Gail Johnson.  There's no e-mail.
```

```
 1              I never talked to her.  So I never asked for a

 2        release.

 3   Q.   I didn't ask that, if you asked her for a

 4        release.

 5              But you had dealings with her.  It

 6        may not have been person-to-person, but you have

 7        a document signed by her releasing you of all

 8        claims; correct?

 9   A.   Yes.

10   Q.   Okay.  And it's your testimony that your lawyer

11        is the one that asked for that; is that correct?

12   A.   I don't know who asked for it.

13   Q.   So you know nothing about that and why --

14   A.   I know I was not directing traffic there.  So I

15        don't know who was, if it was legal or if it was

16        Jim.

17              MS. TINGUE:  I think that's all I

18        have right now.  Thank you.

19              MR. BALDIGA:  Let me jump in for a

20        few more questions, please.

21              MR. CARMAN:  Just for logistics,

22        unless you guys tell me I'm wrong, I don't see

23        any viable chance that we're done here in an

24        hour.
```

1                    MR. EHRHARD:  I think we will be.

2                    MR. CARMAN:  I don't want to stay

3          until five if you're going to make us come back,

4          with the exception of additional documents you're

5          asking for.

6                    MR. EHRHARD:  We'll move quick after

7          Joe's done.

8                    MR. BALDIGA:  I'll be five minutes.

9                    CROSS-EXAMINATION

10         BY MR. BALDIGA:

11    Q.   Mr. Riley, back to your position with Energy

12         North, did you say you're the CFO?

13    A.   That's correct.

14    Q.   And as CFO did you have to certify as to -- it's

15         not a public company, right, it's a private

16         company?

17    A.   Correct.

18    Q.   But do you certify as to internally prepared

19         financial statements or sign off on the tax

20         returns for the company, how does that work?

21    A.   Yup.

22    Q.   You do?

23    A.   Correct.

24    Q.   So this loan that you received personally from

```
 1              Energy North, you said was not documented?

 2    A.   That's correct.

 3                   MR. CARMAN:   Objection.

 4    Q.   Was there any provision for interest?

 5    A.   No.

 6    Q.   So how was the loan carried on the books of the

 7         company?

 8    A.   As other receivable, if you will.

 9    Q.   Other receivable with you as the account debtor?

10    A.   No, Energy North had a receivable.  It was my

11         personal debt, but on Energy North's books it was

12         an other receivable.  There was money owed to

13         Energy North.

14    Q.   But does it identify you as the payor?

15    A.   In what form?  I mean, I guess it's a journal

16         entry at the end of the day.

17    Q.   Right.  Is there a journal entry indicating that

18         you're the obligor on this obligation to Energy

19         North?

20    A.   There was documentation in our supporting

21         documents that it was my loan to pay back, yes.

22    Q.   Okay.

23                   MR. BALDIGA:   James, are you going to

24         request this stuff in a supplemental document
```

1          request?

2                    MR. EHRHARD:  Yes.  I mean, my hope

3          is they give us this voluntarily.  I mean, I want

4          --

5                    MR. BALDIGA:  I just want to make

6          sure because there's references to documentation,

7          and we haven't seen this stuff.

8                    MR. CARMAN:  The only thing I'm aware

9          of that you've asked for at this time is e-mails

10         that he sent to someone within Energy North

11         Haffner's that say, Hey, I'm taking this money or

12         I'm taking this wire.  That's what's been

13         requested.

14                   MR. EHRHARD:  Now we're requesting

15         the documents from Energy North delineating or

16         memorializing and the receipt and payment of the

17         money, $150,000.

18                   MR. CARMAN:  Well, I certainly hope

19         you understand I can't commit to that because

20         he's not here as a representative of Energy

21         North.

22                   MR. EHRHARD:  Yes, you can.

23                   MR. CARMAN:  No, I can't.  He's not

24         here as a representative of Energy North.  I can

```
 1              find out if they'll agree to produce it.
 2                   MR. BALDIGA:  But I want
 3              documentation that Mr. Riley has on the personal
 4              side, and I want to see --
 5    Q.   How did you report this loan, for example, on
 6         your tax returns?  Is this reported on your
 7         personal tax returns?
 8    A.   No.
 9    Q.   And it's not taken as income, right, because you
10         paid back the loan?
11    A.   That's correct.
12    Q.   And you didn't claim any interest that you paid
13         as a deductible, for example?
14    A.   No.
15    Q.   And Energy North didn't claim any interest
16         because you didn't pay any interest on it?
17    A.   That's correct.
18    Q.   Is there a restriction with private companies,
19         and I just don't know, I know public companies
20         there might be, but where this stuff has to be
21         treated differently.  Does that apply to private
22         companies as well, do you know as your position
23         as CFO?
24    A.   Not that I'm aware of, no.
```

1    Q.    And no special disclosures or anything where

2          insiders --

3    A.    No, I mean, our financial statements are audited.

4          We have an audit firm that comes in and examines

5          the books, looks under the hood, and discloses

6          everything that's required to be disclosed.

7                    MR. EHRHARD:  Who's the auditor, by

8          the way?

9                    MR. RILEY:  Marcum LLP.

10   BY MR. BALDIGA:

11   Q.    On your personal tax returns I assume you

12         accounted for the expenses for the house

13         somewhere on your tax returns?

14   A.    No.

15   Q.    You don't keep track of that for capital tax

16         gains purposes down the road if you sell the

17         house?

18   A.    No.  I kept the -- you've seen the spread sheet

19         that I have.  That's the tally of everything that

20         I paid.  So I know what I paid.

21   Q.    And do you have anything else anywhere where you

22         describe the expenses other that just line items

23         and saying how it was paid?

24   A.    No.  I mean, the bills from A.J. and Sons are

1          pretty basic.

2      Q.  Right, but you don't have any receipts or

3          anything like that.  So do you have anything

4          which describes even so you recollect what the

5          250 was for in cash?

6      A.  No.

7      Q.  Nothing like that?

8      A.  No.

9      Q.  We don't have to characterize your testimony, but

10         being asked to put 250 in your trunk and convey

11         cash for this, and for you to say, Oh, no, I

12         didn't ask anymore questions, isn't credible.

13              MR. BALDIGA:  And, Lisa, I certainly

14         hope you investigate that further.

15              MR. EHRHARD:  Are you all set, Joe?

16              MR. BALDIGA:  Yup.

17              MR. EHRHARD:  As we move forward to

18         the end, we are going to take the 2004 exam of

19         Energy North as to the audits.  But anyway, we

20         are going to move through this.  And, guys, jump

21         in any time you want, okay.

22                   REDIRECT EXAMINATION

23     BY MR. EHRHARD:

24     Q.  Let's go to Exhibit 1.  What I'm going to put up

1       is a bunch of e-mails.  And the reason I'm

2       putting them on is so, you know, I want you to

3       see what we're looking at.  Okay?

4    A.  Yup.

5    Q.  And I think why a lot of us is we're at a loss as

6       to what happened here.

7                   Exhibit 1.

8                   MR. EHRHARD:  Start at the bottom, if

9       you could, Chris.

10   Q.  Can you review that e-mail quickly, and as you

11      review it, if you can please explain to me after

12      reviewing this e-mail, this is from October 2017,

13      Exhibit 1.

14                  Does this refresh your memory to the

15      extent that Bill Johnson was involved in the

16      process of having --

17   A.  I mean, I was on the e-mail so I knew he was

18      involved in the process, but specifically what --

19   Q.  Okay.  I'm going to move to Exhibit No. 5.

20      Exhibit 3.

21                  This is Mr. Patierno's deposition

22      testimony from March 6, 2020.  This is his first

23      deposition.  After we became aware of the money,

24      we took a second deposition.  I want you to read

Case 15-42445   Doc 434-3   Filed 03/23/21   Entered 03/23/21 20:38:02   Desc Exhibit
Kevin Riley 10/21/2020 depo transcript   Page 120 of 169

120

```
1         his original testimony when we asked him how much

2         he paid to Johnson.  Okay.

3                    MR. CARMAN:  Is that the part that's

4         squared off?

5    Q.   Yes.

6                    It says, "Question, Now, how much did

7         you pay Mr. Johnson or Arch Land Development for

8         the purchase and sale agreement?"

9                    This is the Hooper and Gilbertson lot?

10   A.   Yup.

11   Q.   "I didn't pay any."

12                   "Who did?"

13                   "Rileys."

14                   "How much do you believe he paid?"

15                   "$15,000, I believe."

16                   "And to your understanding did that

17        number -- how was that number arrived at,

18        15,000?"

19                   "I believe it was written in the

20        negotiations, to the best of my recollection."

21                   "I appreciate that.  Did the Rileys,

22        to your knowledge, speak to the Johnsons directly

23        or did you act as intermediary in the

24        conversations?"
```

1              "I acted as intermediary and very

2        limited because it became -- it more wound up

3        going to the attorney to get the land court taken

4        care of."

5              Now, we're going to go to Exhibit

6        No. 7.  Do you recognize that?

7   A.   Yes.

8   Q.   By the date stamp on it?

9   A.   Yes.

10  Q.   And what is that?

11  A.   That appears to be the cash that I gave to Jim.

12  Q.   And do you know who took that picture?

13  A.   I believe Jim did.

14  Q.   Why did you not take a picture of the cash?

15  A.   It goes back to I trusted Jim.  I didn't think I

16       needed to.

17  Q.   Now, after we got a hold of this picture, we took

18       his deposition again, and the date of the

19       deposition was September 14, 2020.

20             "Question, And yet you asked them to

21       give you a quarter million dollars in cash for

22       you to give to the Johnsons; is that correct?"

23             "Yes."

24             So he changed his testimony.

 1          Rehabilitated himself.  Now, you said that you

 2          did not ask for a receipt for the money --

 3   A.     Correct.

 4   Q.     -- because you trusted Mr. Patierno?

 5   A.     Yup.

 6   Q.     Did not ask for any written memorialization of

 7          the agreements?

 8                    MR. CARMAN:  If we're going to finish

 9          by five, asking him the same questions again is

10          not going to --

11                    MR. EHRHARD:  I'm going to finish by

12          five.

13                    MR. CARMAN:  All right.

14   Q.     You testified that you didn't ask for a written

15          agreement because you trusted him?

16   A.     M-hum.

17   Q.     So you knew Mr. Patierno?

18   A.     Yes.

19   Q.     And you understood his character to the best of

20          your ability; correct?

21   A.     Yes.

22   Q.     With that said, in your opinion, why did Mr.

23          Patierno not tell the truth when he was first

24          questioned about the quarter million dollars?

1           MR. CARMAN:  Objection.

2    Q.   You can answer that question.

3    A.   I don't know.

4    Q.   Based on the fact that you trusted him to give a

5         quarter million dollars, why do you believe the

6         second deposition, after confronted with this

7         picture, he testified that he actually gave a

8         quarter million dollars or 225 to the Johnsons,

9         since you know him, as you testified, and knowing

10        his character as you testified you do, why would

11        he give two different answers to the same

12        question?

13          MR. CARMAN:  Objection.

14   Q.   You can answer that.

15   A.   He remembered it differently.  That's a Jim

16        question.

17   Q.   Exhibit No. 5.  Now, this is a document we asked

18        your wife about.  Can you please review this.

19          MR. EHRHARD:  You can read it from

20        the bottom up, Chris.

21   Q.   Do you recognize that e-mail?

22   A.   Yes.

23   Q.   And you were on this e-mail chain; correct?

24   A.   Yes.  It looks like I'm on this one, yup.

1    Q.    Is it fair to say that Mr. Johnson, based on this

2          e-mail, was deeply involved in the process --

3                    MR. CARMAN:   Objection.

4    Q.    -- in your opinion of getting the permitting and

5          getting the lots transferred?

6                    MR. CARMAN:   Objection.

7    A.    Based on this e-mail was he part of the process

8          of the permitting?

9    Q.    Of getting the lots transferred, yes?

10   A.    I guess I don't know transferred versus

11         permitting.   Yeah, I mean, he was involved in the

12         process.

13   Q.    Did you have any idea what he was being paid for

14         this work?

15   A.    No.

16   Q.    Now, your wife says, Sorry.  I feel like I want

17         to out this guy being a complete fraud.  Did you

18         have the same concerns about Mr. Johnson?

19   A.    Fraud, no.  Flaky, yes.

20   Q.    With that being said, were you concerned how he

21         was being paid?

22   A.    No.  I didn't have an arrangement with him.

23   Q.    Who did you have an arrangement with?

24   A.    Jim Patierno.

1    Q.    Was it in writing?

2    A.    No.

3    Q.    So then you may have had an arrangement with Mr.

4          Johnson too you just didn't know it?

5                MR. CARMAN:   Objection.

6    A.    I don't know that you can have an arrangement

7          with someone without speaking or communicating

8          with them.

9    Q.    But you were e-mailing him back and forth.  You

10         were part of the e-mail chain.

11               MR. CARMAN:   Objection.

12   A.    I was not e-mailing him.

13   Q.    Were you part of this e-mail chain?

14   A.    Sure.

15   Q.    So is it fair to say that being on the e-mail

16         chain indicated people thought you wanted to know

17         this information?

18               MR. CARMAN:   Objection.

19   A.    Yes.

20   Q.    Exhibit No. 6.  And I do want, from the top to

21         the bottom, I do want everyone to read this one.

22         Okay.  The e-mail I really care about is

23         November 2, 2017 from Bill Johnson, and it is

24         Bill Johnson's e-mail, to Jim Patierno.  And

1    you'll see that as you get to the top of the

2    e-mail list, that e-mail from November 2, 2017

3    was forwarded to you, Mr. Riley, and you

4    responded to it.

5  A.  Okay.

6  Q.  I'm going to read the e-mail from November 2,

7    2017 from Bill Johnson to Jim Patierno.

8             "Jim, we are making progress, and I am

9    confident I will have the foundation permit soon

10   so we can close this month.  I need to hear from

11   you that you are going to agree, or not, my

12   assignment of my agreement that I have with my

13   seller.  Are we in agreement to the following.

14   There have been many, many parts that have been

15   expensive since you and I have met.  Regardless

16   of my unforeseen fees, I have not changed the

17   price with the exception of pulling my offer to

18   pay one percent of Eriksen's commission.  I hope

19   that will not be a deterrent.  Please confirm

20   your position on the following.  Bill.  One,

21   foundation permit; two, accepting assignment of

22   my agreement; three, cash buyer; four, clear and

23   marketable title.  I don't want to get bogged

24   down with conditions a lender would require."

```
 1                        Did you read that?
 2   A.   Yup.
 3   Q.   Is that what the e-mail says?
 4   A.   That's what the e-mail says.
 5   Q.   Do you think a lender would allow someone to pay
 6        $250,000 in cash to buy a property?
 7   A.   I guess not.
 8   Q.   Let's keep moving through the e-mail chain.  That
 9        e-mail was sent to you from Jim Patierno where he
10        writes.  "This is a mess.  I don't know how you
11        want to handle this.  It is not recommended to
12        take over his ownership and assignment of his P&S
13        maybe okay you need to talk to John or Tim."
14                        Who is John?
15   A.   John Gallant.
16   Q.   Who is Tim?
17   A.   Tim Ervin.
18   Q.   Who is Tim Ervin?
19   A.   He was the partner at Gallant and Ervin.
20   Q.   They're both lawyers.  Then you e-mail, "Hey Tim,
21        let me know when you have a minute to talk
22        through this.  Thanks, Kevin."
23                        Does it say that?
24   A.   Yes.
```

Case 15-42445   Doc 434-3   Filed 03/23/21   Entered 03/23/21 20:38:02   Desc Exhibit
Kevin Riley 10/21/2020 depo transcript   Page 128 of 169

128

1    Q.   Does Tim write back to you, "I'm available

2        tomorrow to discuss.  I am at chemo today."

3                Does it say that?

4    A.   Yes.

5    Q.   Then you write, "I reached out to John as well.

6        Not sure I'll be able to get back to Bill today.

7        Hopefully, that's okay."

8                Am I reading these e-mails correctly?

9    A.   Yes.

10   Q.   So let me ask again, is it not true that you were

11       in communication directly or indirectly with Bill

12       Johnson regarding the sale of the purchase and

13       sale agreement?

14             MR. CARMAN:  Objection.

15   A.   I was in contact with Jim, not Bill.

16   Q.   Indirectly with Bill Johnson?

17             MR. CARMAN:  Objection.

18   Q.   Is it fair to say that when Bill Johnson e-mails

19       Jim Patierno, Jim would forward that e-mail to

20       you, correct, if he felt it was relevant to you?

21   A.   I assume so, sure.

22   Q.   And then you would communicate back to Jim about

23       that; correct?

24   A.   Yup.

1    Q.   And then he would get back to Bill?

2    A.   I don't know.  I mean, I wasn't on those.

3    Q.   Isn't it true that you received an e-mail from

4         Jim, which you sent to your counsel, discussing

5         about what Bill says, I want a cash buyer, and I

6         don't want to deal with conditions of a lender.

7         Correct?

8              And isn't it correct that Jim Patierno

9         e-mailed you and said, This is a mess?

10   A.   Yup.

11   Q.   And he said, It's not recommended to take over

12        this P&S; am I correct.

13   A.   As it stood that day, yes.

14   Q.   And then you talked to your counsel --

15   A.   Okay.

16   Q.   -- about the concerns presumably Jim had about

17        Bill Johnson.

18              MR. CARMAN:  Objection.  You can't

19        testify as to what you talk to your counsel

20        about.

21   Q.   You brought this e-mail to your attorney's

22        attention, obviously.

23   A.   Yes.

24   Q.   And you still went forward with it.

```
 1   A.   Yes.

 2   Q.   So is it true to state under oath that you knew

 3        Bill Johnson was integral to the assignment of

 4        the purchase and sale, is that true, yes or no?

 5   A.   I knew he was involved in the process.

 6   Q.   And did you know that Bill Johnson was going to

 7        be receiving funds from this sale?

 8             MR. CARMAN:   Objection.

 9   A.   I didn't know what the money I was giving to was

10        going.  I didn't know how he was getting paid.

11   Q.   Didn't Bill Johnson say in that e-mail he wanted

12        a cash buyer?

13   A.   Yup.

14   Q.   Didn't he say he didn't want to be bogged down,

15        quote, unquote, with conditions a lender would

16        require?

17   A.   Yup.

18   Q.   Isn't that true?

19   A.   That's true.

20   Q.   So when Jim Patierno asked you for a quarter

21        million in cash, didn't it raise concerns --

22             MR. CARMAN:   Objection.

23   Q.   -- that it was going to be going to Bill Johnson?

24   A.   No.  It was an unusual ask, and I trusted Jim,
```

1          and I gave him the cash.

2     Q.   So according to this e-mail, Jim Patierno was

3          concerned, it says in this e-mail, about the

4          assignment.  What made you decide after receiving

5          this e-mail and reviewing the e-mail from Bill to

6          actually move forward?  Tell me your thought

7          process and how you came to that decision?

8     A.   I can't tell you specifically that I know the

9          thought process at that time.  Everything that --

10         this changed eighteen times from beginning to

11         end, and I was in contact with legal and Jim

12         about it to --

13    Q.   Bill Johnson --

14              MR. EHRHARD:  And everyone can see

15         this e-mail, correct, guys?  Everyone can see

16         this e-mail, correct, guys, Lisa and Joe?

17              MS. TINGUE:  I couldn't understand

18         what you just said, James.  I'm sorry.

19              MR. EHRHARD:  You're able to see this

20         e-mail on your screen; correct?

21              MS. TINGUE:  Yes.

22    Q.   So what does Bill Johnson say -- mean when he

23         says, Regardless of my unforeseen fees, what are

24         Bill Johnson's unforeseen fees?

1          MR. CARMAN:  Objection.

2     A.   I don't know.

3     Q.   Did you ask Jim Patierno what his unforeseen fees

4          were?

5     A.   No, that was between Jim and Bill.

6     Q.   Okay.  But weren't you paying all fees and costs

7          for this closing?

8     A.   I was paying for, yeah, everything at the end of

9          the day for the house, yes, I paid for.

10    Q.   So if someone says unforeseen fees, wouldn't you

11         want a specific itemization of what that is?

12    A.   Not unless it was going to change the scope of

13         the project.

14    Q.   And what was the scope of the project?  What was

15         your underlying cost going to be?

16    A.   We were planning on an 850 to $900,000 house.

17    Q.   So since it's a range, wouldn't you want it to be

18         in the low range?

19    A.   Yes.

20    Q.   So wouldn't you want an item -- your testimony is

21         that you agreed to buy a house somewhere between

22         850 and 900?

23    A.   M-hum.

24    Q.   But you did not require an itemization as the

1      project moved forward?

2   A.  Not -- I mean, at different stages I was -- that

3       was not a big part of the process that we went

4       through.

5   Q.  When did it become a big part of the process?

6   A.  It never was a big part of the process.

7   Q.  Mr. Patierno testified that he was owed --

8           MR. EHRHARD:  How much --

9           MR. LYONS:  86,000.

10  Q.  At his first deposition, he testified he was owed

11      $86,000.  Do you know why Mr. Patierno back in

12      March of 2020 thought he was owed $86,000?

13  A.  I do.

14  Q.  Why?

15  A.  He had overages that he hadn't communicated to me

16      at that point.

17  Q.  How could there be overages if there was no

18      written contract?

19          MR. CARMAN:  Objection.

20  A.  He was passing along costs.  In theory, he was

21      doing this as close to cost as possible.

22      Everything was from his standpoint was not trying

23      to make money on my bills.

24  Q.  And what about the line where Bill Johnson says,

Case 15-42445   Doc 434-3   Filed 03/23/21   Entered 03/23/21 20:38:02   Desc Exhibit
Kevin Riley 10/21/2020 depo transcript   Page 134 of 169

134

1          I have not changed the price with the exception

2          of pulling my offer to pay one percent of

3          Eriksen's commission.  What does that mean?

4   A.   I didn't talk to Bill.  I don't know what that

5          means.

6   Q.   You talked to Jimmy Patierno.

7   A.   Not specifically about the e-mail.

8   Q.   He says, It's not recommended --

9   A.   That's outside of the fees.  I think those are

10         two separate things.

11   Q.   How do you know?  So you read this e-mail from

12         Bill Johnson of November 2, 2017; correct?

13   A.   Sure.

14   Q.   And you relayed it to your counsel?

15   A.   Yup.

16   Q.   You spoke to your counsel?

17   A.   Yup.

18   Q.   And moved forward with the project?

19   A.   Yeah.  I don't know if it moved forward in that

20         exact fashion.  Like I said, things changed.

21         I'm sure there were five other curve balls before

22         pen was put to paper or anything else moved on,

23         but at that stage, yes, I read the e-mail,

24         consult with legal, and navigate as best as

```
 1            possible.

 2     Q.     And you're a CFO of a midsized company?

 3     A.     Yup.

 4                  MR. CARMAN:  Again, we're not going

 5            to finish by five o'clock.  If the question of

 6            you're a CFO -- we've already been over this.

 7            There's no dispute.  There's no documents.

 8     Q.     So you read cash buyer; correct?

 9     A.     Yup.

10     Q.     You read bogged down with conditions from a

11            lender?

12     A.     Yup.

13     Q.     You knew that was Bill Johnson's concerns;

14            correct?

15     A.     Yes.

16     Q.     Okay.  You understand our concerns here; right?

17     A.     Yes.

18     Q.     We're going to go to Exhibit 14.

19                  MS. TINGUE:  I just have a quick

20            question, James.  This e-mail says, I haven't

21            changed the price.  Do you see that?

22                  MR. EHRHARD:  I do.

23                  MS. TINGUE:  Where did Mr. Johnson

24            earlier say what his price was, where did he
```

1        articulate that or write that down in an e-mail?

2        Where does it say my price is X?

3                    MR. EHRHARD:  Are you asking me?

4                    MS. TINGUE:  No, I'm asking the

5        deponent.

6                    MR. RILEY:  I don't know.

7                    MS. TINGUE:  So you're not familiar

8        with any document that establishes a price?

9                    MR. RILEY:  I mean, I saw the one

10       that was earlier on the table here that was

11       unsigned.

12                   MS. TINGUE:  Oh, the one that was

13       unsigned.  Okay.  Had you ever seen that before?

14                   MR. RILEY:  No.

15                   MS. TINGUE:  Okay.  And also, do you

16       know where the offer to pay one percent of

17       Eriksen's commission is that written down any

18       place or documented any place?

19                   MR. RILEY:  It might be with Jim.  I

20       don't have any written down of that, no.

21                   MS. TINGUE:  Thank you.

22                   MR. RILEY:  Yup.

23       BY MR. EHRHARD:

24       Q.  Do you remember that e-mail we showed you from

1          2019, April 2019, where it pointed out $400,000

2          and says her.  Isn't that an e-mail memorializing

3          that the Johnson's wanted $400,000?

4                    MR. CARMAN:  Objection.

5     A.   Can I see the e-mail again.

6     Q.   It's Exhibit No. 50.  Exhibit 50 is on the board

7          soon.  This is on April 11, 2019.  Approximately

8          a year after you bought the lots, correct, and it

9          says from Jim Patierno on Wednesday April 10th at

10         2:20.  "Sorry to hear you do owe her 5,000 more.

11         The total was 400,000."

12                    Is it not correct that that is a

13         memorialization that the Johnsons, either Arch

14         Land or Bill or Gail, were owed $400,000?

15                    MR. CARMAN:  Objection.

16    A.   I mean, to Jim not necessarily to me.

17    Q.   To Jim, the Johnsons were owed 400,000; correct?

18    A.   M-hum.

19    Q.   And Jim wasn't buying the property, you were;

20         correct?

21                    MR. CARMAN:  Objection.

22    A.   Right.

23    Q.   So you owed the Johnsons 400,000?

24    A.   Not for the -- I mean, like I said, the money I

Case 15-42445   Doc 434-3   Filed 03/23/21   Entered 03/23/21 20:38:02   Desc Exhibit
Kevin Riley 10/21/2020 depo transcript   Page 138 of 169

138

```
 1            gave Jim was to facilitate a buildable lot.  My

 2            land transactions were the land transactions.

 3            But -- if you want to add it all up to get to

 4            400, the math goes to 400.

 5     Q.     And the Johnsons received 400,000?

 6     A.     In hindsight, yes, that's what happened.

 7     Q.     And after that e-mail on April 18, a $15,000

 8            check went from John Gallant to Gail Johnson;

 9            correct?

10     A.     Yes.

11     Q.     And a $20,300 check went from John Gallant;

12            correct?

13     A.     Yup.

14     Q.     So am I correct, that it is on that e-mail a

15            memorialization that they were owed $400,000?

16                     MR. CARMAN:  Objection.

17     A.     It appears that way.

18     Q.     So let's keep moving.

19                     MR. CARMAN:  Let's just suspend at

20            4:30.

21                     MR. EHRHARD:  I'm almost done.  Off

22            the record.

23                     (Discussion off the record.)

24                     MR. EHRHARD:  Back on.  Okay.  Last
```

1           one, Exhibit No. 17, Chris, put that up.

2    Q.    Exhibit No. 17, Page 3 of Exhibit 17.  E-mail, it

3          says, "Jim, I received a message from Lanza."

4                   This is dated February 26, 2018.  This

5          is approximately two months before you closed on

6          the parcels; correct?

7    A.    Yup.

8    Q.    "Jim, I received a message from Lanza and it

9          appears to me there is no reason why we can't

10         make this happen this week."

11                  This e-mail is from Bill Johnson;

12         correct?

13   A.    Yes.

14   Q.    "As you know, once Gail assigns you her rights in

15         her agreement, you can close any time with the

16         seller.  The lawyer for the smaller parcel has

17         completed his part in reviving the corp. that

18         once owned that parcel.  Both parcels have clear

19         title which Lanza will provide to you.  I can get

20         the permit once I know we have a scheduled time."

21         Last sentence, "Please forward this e-mail to

22         your lawyer so we can all work together."

23                  Jim Patierno wrote, "Will this work."

24                  Do you recognize this e-mail?

Case 15-42445   Doc 434-3   Filed 03/23/21   Entered 03/23/21 20:38:02   Desc Exhibit
Kevin Riley 10/21/2020 depo transcript   Page 140 of 169

140

1    A.    I don't know that I've seen this one.

2    Q.    The base of this e-mail is a fair assertion that

3          Bill Johnson was involved in this process with

4          selling the parcels to the very end?

5    A.    Selling the parcels or being part of the process,

6          yes.

7    Q.    And the last exhibit, Exhibit 15.  I'm going  to

8          read it out loud.  Tell me if you recognize this

9          e-mail.

10              "Jim," this is from Bill Johnson to

11         Jim on February 10, 2018.

12              "Jim, I tried calling, but it went to

13         voice mail.  I think you told us that you had a

14         customer.  If that ever falls apart, my broker

15         has a customer who has been waiting to find out

16         if this lot becomes available, they're willing to

17         move quickly.  They need financing but were

18         willing to pay about 50,000 higher on the lot,

19         but only if we built their house.  If your plan

20         falls apart, let me know.  I will hook you up

21         with my broker.  I would love to take further --

22         I'd love to take the offer myself, but our

23         arrangement was more attractive and the timing to

24         get this completed is critical.

1                    You and I have been at this a while,

2          over a year, and because of the complexity and

3          appeal my wife and I just never could be certain

4          a permit would be issued, therefore we couldn't

5          sign an agreement.  Even today my wife who holds

6          the agreement won't lock in with you other than

7          her verbal commitment and hand shake on the terms

8          that were discussed.  The assignment of her

9          agreement to you will lay out the consideration

10         due to Gail Johnson to be a $5K deposit and

11         attorney fees which is around 10,000.  Parcel 1

12         is 25K, parcel 2 is 95K.  Those agreements will

13         be sent to you and your lawyer once they speak.

14         I spoke with Steven Eriksen this morning, and he

15         asked that Gail pay him.  Gail's attorney, Mark

16         Lanza, has completed the title and will work out

17         the final details with your lawyer."

18                   Have you ever seen any of the

19         agreements that Mr. Johnson references?

20    A.   I mean, only what's already been provided.

21         Nothing outside of that.

22    Q.   Did you ever sign an agreement with Gail Johnson

23         for this?

24    A.   No.

1    Q.   Is it fair to say based on this e-mail that your

2         agreements with the Johnsons --

3                   MR. CARMAN:  Objection.

4    Q.   -- and Mr. Patierno were handshake only or orally

5         agreed upon?

6                   MR. CARMAN:  Objection.

7    A.   With Jim Patierno they were orally agreed upon.

8    Q.   Based on this e-mail, isn't it fair to say that

9         Jim Patierno's agreements were also oral?

10                  MR. CARMAN:  Objection.

11   A.   It appears that way.

12   Q.   And this is my last one, I promise I'm done.

13        This is an account that was provided to us by

14        your counsel.  I want to go over it together.

15        This was provided by your counsel.

16                  MS. TINGUE:  James, I don't have the

17        exhibit on my screen.  I lost it.  I don't know

18        if I did something on my end.

19                  MR. EHRHARD:  Do you see it?

20                  MS. TINGUE:  I can't see it, no.

21                  MR. EHRHARD:  I apologize.  I'll go

22        over it with you.

23   Q.   This is an itemization.  Do you recognize this

24        document?

```
1    A.    Yes.

2    Q.    Did you prepare this document?

3    A.    That's correct.

4    Q.    And what materials did you use to prepare this

5          document?

6    A.    I mean, at the time I would log anything that I

7          wired or wrote a check for.

8    Q.    But if you didn't know -- so these are payments

9          made by you for the purchase and construction of

10         your house?

11   A.    Correct.

12   Q.    And every one of these dollars went to Jim

13         Patierno; correct?

14   A.    Or John Gallant.

15   Q.    So a $16,000 check on April 18, 2018, who was

16         that to?

17   A.    I believe it was to John Gallant.

18   Q.    And why?

19   A.    I think it was either a deposit or some piece of

20         one of the Gilbertson or Hooper lots.

21   Q.    April 13, 2018, cash, $250,000.

22   A.    Yup.

23   Q.    What is that?

24   A.    That's what we spoke about earlier.
```

1    Q.    What was that for?

2    A.    To give to Jim.

3    Q.    To Jim for what purpose?

4    A.    To secure a buildable lot.

5    Q.    And April 13, wire, what was that for?

6    A.    I'm assuming it's either the Gilbertson or the

7          Hooper land.

8    Q.    June 7, 2018, wire, 100,000.

9    A.    Yup.

10   Q.    What was that for?

11   A.    Same thing.  Purchase of land.

12   Q.    So at this point you paid $350,000 for two

13         purchases of the land at least; correct?

14   A.    Yes.

15   Q.    And returned check of 15,000, June 25th, what was

16         that about, $15,907?

17   A.    I think part of the math was wrong, and you know,

18         earlier estimates through John said, this is

19         what's owed back to you based on the purchase and

20         sales.

21   Q.    March 13, 2019, wire, $150,000?

22   A.    Yup.

23   Q.    Who was that wired to.

24   A.    Say that again.

1    Q.    March 13, 2019, who was that wired to?

2    A.    A.J. and Sons.

3    Q.    That's Patierno's company?

4    A.    That's correct.

5    Q.    And January 2, 2019, $150,000 wire, who was that

6          to?

7    A.    A.J. and Sons.

8    Q.    For what?

9    A.    Construction of the house.

10   Q.    Do you have any invoices to back any of these

11         payments up?

12   A.    Yup.

13   Q.    Can you read this e-mail, Exhibit 47.

14              MR. CARMAN:  You didn't keep your

15         word, James.

16              MR. EHRHARD:  This is the last one.

17         My apologies.

18   Q.    Exhibit 47.

19              MR. CARMAN:  47, you said.

20              MR. EHRHARD:  Yes.

21   Q.    Here is an e-mail from you on January 2, 2019;

22         correct?

23   A.    Yup.

24   Q.    To Jeff Black?

1    A.    Yup.

2    Q.    That's your uncle in law?

3    A.    That's my cousin.

4    Q.    He's part of the Black family?

5    A.    Yes, he's Ken's son.

6    Q.    He's one of the owners of the company you work

7          for?

8    A.    That's correct.

9    Q.    It says, "Hi Jeff, confirming you're still good

10         with fronting these and will reimburse at a later

11         date?  I may queue a wire to take care of it if

12         that's okay as well.  Thanks."

13               What was that e-mail about and why did

14         you send it?

15   A.    Same as we referenced earlier, any time I used

16         company funds, I would document, get his approval

17         and that would allow me to initiate the

18         transaction.

19   Q.    So it's fair to say that Energy North you were

20         using as a private bank to fund your real estate

21         transaction and construction?

22               MR. CARMAN:  Objection.

23   A.    Short-term loan is how we all looked at it.  It

24         was going to be paid back in short order.

1    Q.   But it was all a handshake?

2    A.   Yes.

3    Q.   And you have my word?

4    A.   Yes.

5    Q.   Okay.

6                 MR. EHRHARD:  I think I'm all set.

7                 MS. TINGUE:  James, I have a couple

8         more questions.  Very short.

9                 RECROSS-EXAMINATION

10        BY MS. TINGUE:

11   Q.   Mr. Riley, do you have copies of the documents

12        that you filled out for the bank when you got the

13        $100,000 out?

14   A.   No.

15   Q.   You don't have --

16   A.   Sorry.

17                MR. EHRHARD:  Lisa, you're breaking

18        up.  Ask again.

19   Q.   Mr. Riley, do you have copies of the documents

20        that you filled out with the bank when you took

21        out the $100,000 in cash?

22   A.   No.

23   Q.   Can you please tell me the address of the bank

24        that you went to to get those funds?

```
 1    A.    It's on Main Street in Andover.  Right downtown
 2          Andover.  I don't know the exact address.  I
 3          could get it for you.
 4    Q.    Okay.  And that was -- what was the name of the
 5          bank again, please?
 6    A.    It was Santander.
 7    Q.    And did you have to speak to -- who did you speak
 8          to at the bank?
 9    A.    Someone with enough authority.  I don't know
10          specifically.
11    Q.    Do you know the title at least, if not the name?
12    A.    I'd be guessing, to be honest.  You can guess
13          it's branch manager or whoever was the highest
14          ranking official that day.
15    Q.    Okay.  And what day was that, what's the date
16          that you took out the $100,000 in cash?
17    A.    I'm guessing it was that 4/13 date on the spread
18          sheet.
19    Q.    That's the day you took it out, not the day you
20          necessarily paid it out, 4/13?
21    A.    No, like I said, I would have brought it to Jim
22          the same day.
23    Q.    And did you retain your bank statements that
24          shows the  $100,000 coming out of your account?
```

1   A.   No.

2   Q.   Did you provide James with any account, bank

3        account statements, or numbers of your bank

4        accounts?

5   A.   No.

6   Q.   And by James, I meant James Ehrhard.

7             MS. TINGUE:  James, did you ask for

8        any of that?

9             MR. EHRHARD:  I would have to look at

10       the e-mail I sent out.  Remember there was an

11       e-mail chain between me and Joe Baldiga and Mr.

12       Carman, and we asked for any and all

13       documentation and communication related to the

14       purchase of the lots and the construction of the

15       home.  Obviously, the nature of the case would be

16       understood we want the bank documents to back it

17       up.

18             MS. TINGUE:  I'd be interested in

19       those bank documents once we can ascertain you

20       have any, and we'll have to go back to Mr. Riley

21       to get those.

22             MR. RILEY:  Okay.

23             MS. TINGUE:  So that's all I have

24       right now.  Thank you.

Case 15-42445   Doc 434-3   Filed 03/23/21   Entered 03/23/21 20:38:02   Desc Exhibit
Kevin Riley 10/21/2020 depo transcript    Page 150 of 169

150

1              MR. BALDIGA:  Nothing more from me.

2              (Exhibit No. 1, documents, marked.)

3              (Whereupon the deposition

4              was suspended at 4:39 p.m.)

Case 15-42445   Doc 434-3   Filed 03/23/21   Entered 03/23/21 20:38:02   Desc Exhibit
Kevin Riley 10/21/2020 depo transcript   Page 151 of 169

151

1                           ERRATA SHEET.

2           In accordance with the rules of procedure
         governing depositions, you are entitled to read
3        and correct your deposition.  Accordingly, please
         carefully read your deposition and, on this
4        errata sheet, make any changes or corrections in
         form or substance to your deposition that you
5        feel should be made.  PLEASE DO NOT MARK THE
         TRANSCRIPT.  After completing this procedure,
6        sign at the conclusion of such
         changes/corrections (if any) and return it in
7        accordance with your instructions.

8

         PAGE LINE
9        ____ ____        CHANGE:_____
                          REASON:_____
10       ____ ____        CHANGE:_____
                          REASON:_____
11       ____ ____        CHANGE:_____
                          REASON:_____
12       ____ ____        CHANGE:_____
                          REASON:_____
13       ____ ____        CHANGE:_____
                          REASON:_____
14       ____ ____        CHANGE:_____
                          REASON:_____
15       ____ ____        CHANGE:_____
                          REASON:_____
16       ____ ____        CHANGE:_____
                          REASON:_____
17       ____ ____        CHANGE:_____
                          REASON:_____
18       ____ ____        CHANGE:_____
                          REASON:_____
19       ____ ____        CHANGE:_____
                          REASON:_____
20       ____ ____        CHANGE:_____
                          REASON:_____
21

22       DATE:            _____
                               KEVIN RILEY
23

24

1       Excerpt from Rule 30 (e):
        Submission to Witness; Changes; Signing.
2
            When the testimony is fully transcribed,
3       the deposition shall be submitted to the witness
        for examination and shall be read to or by
4       him/her, unless such examination and reading are
        waived by the witness and by the parties.  Any
5       changes in form or substance which the witness
        desires to make shall be entered upon the
6       deposition by the officer with a statement of the
        reasons given by the witness for making them.
7       This procedure must be accomplished within 30
        days of receipt of the transcript.
8

9       ****************************************

10

11        I have read the foregoing, and it is a true
          transcript of the testimony given by me at the
12        taking of the subject deposition.

13

14

15                     _____
                            KEVIN RILEY
16

17       _____   ___
                            DATE
18

19

20

21

22

23       CASE NAME:  In Re:  William Johnson
         DATE TAKEN:  October 21, 2020
24

1

Commonwealth of Massachusetts
2      Bristol, ss.

3

           I, Melissa R. McKenzie, Notary Public
4      in and for the Commonwealth of Massachusetts, do
       hereby certify that there came before me on the
5      21st day of October, 2020, KEVIN RILEY, who was
       satisfactorily identified and duly sworn by me;
6      that the ensuing examination upon oath of the
       said deponent was reported stenographically by
7      me and transcribed into typewriting under my
       direction and control; and that the written
8      transcript is a true record of the questions
       asked and answers given at said deposition.

9

10           I FURTHER CERTIFY that I am neither
       attorney nor counsel for, nor related to or
11     employed by any of the parties to the action in
       which this deposition is taken; and, further,
12     that I am not a relative or employee of any
       attorney or financially interested in the
13     outcome of the action.

14

15           IN WITNESS WHEREOF I have hereunto
       set my hand and affixed my seal of office this
16     9th day of November, 2020 at Attleboro.

17

       _____
18     Melissa R. McKenzie, CSR
       Notary Public,
19     Commonwealth of Massachusetts
       My Commission Expires: 5/4/23

20

21

22

23

24

## $

**$10,000** [2] - 58:10, 58:14
**$100,000** [14] - 32:17, 32:20, 32:21, 32:23, 33:22, 34:13, 35:2, 107:1, 107:5, 108:4, 147:13, 147:21, 148:16, 148:24
**$15,000** [3] - 76:11, 120:15, 138:7
**$15,907** [1] - 144:16
**$150,000** [21] - 35:12, 36:4, 37:10, 41:8, 41:14, 41:22, 42:10, 44:2, 55:19, 56:4, 56:8, 59:16, 59:22, 60:1, 60:16, 61:22, 107:8, 109:8, 115:17, 144:21, 145:5
**$16,000** [1] - 143:15
**$20,000** [1] - 80:2
**$20,300** [1] - 138:11
**$225,000** [1] - 51:23
**$250,000** [31] - 32:6, 33:4, 33:9, 44:14, 44:15, 45:9, 45:18, 50:6, 51:8, 51:22, 62:18, 73:6, 73:10, 84:10, 84:14, 84:17, 85:5, 87:12, 87:17, 87:24, 88:6, 91:15, 98:1, 102:22, 103:20, 104:3, 106:5, 106:10, 106:24, 127:6, 143:21
**$265,000** [3] - 75:8, 75:10, 75:22
**$275,000** [1] - 62:2
**$30,000** [3] - 9:17, 65:8, 65:17
**$300,000** [1] - 61:6
**$35,000** [1] - 64:13
**$350,000** [1] - 144:12
**$400,000** [9] - 64:16, 67:24, 68:6, 68:10, 79:5, 137:1, 137:3, 137:14, 138:15
**$50,000** [5] - 48:15, 48:18, 48:20, 49:9, 49:13
**$5K** [1] - 141:10
**$600,000** [2] - 23:13, 61:19
**$650,000** [1] - 23:4
**$86,000** [2] - 133:11, 133:12

## $900,000 [2] - 12:7, 132:16

## 0

**01581** [1] - 2:10
**01604** [1] - 1:23
**01608** [2] - 2:3, 2:13
**02111** [1] - 2:7

## 1

**1** [7] - 3:11, 74:15, 118:24, 119:7, 119:13, 141:11, 150:2
**1,100** [1] - 13:18
**1,800** [1] - 12:15
**10** [3] - 67:6, 79:5, 140:11
**10,000** [1] - 141:11
**100** [5] - 1:19, 3:6, 15:20, 61:17, 109:7
**100,000** [3] - 18:3, 33:1, 144:8
**103** [1] - 12:13
**1099** [1] - 98:10
**10th** [1] - 137:7
**11** [2] - 66:21, 137:7
**110** [2] - 10:6, 10:10
**110,000** [1] - 10:7
**113** [3] - 3:5, 5:22, 7:9
**118** [1] - 3:4
**13** [4] - 143:21, 144:5, 144:21, 145:1
**14** [3] - 52:17, 121:19, 135:18
**141** [1] - 2:6
**1445F97** [1] - 1:16
**147** [1] - 3:6
**149** [1] - 3:11
**14th** [1] - 2:13
**15** [2] - 77:13, 140:7
**15,000** [3] - 67:10, 120:18, 144:15
**15-42445-CJP** [1] - 1:7
**150** [1] - 39:11
**150,000** [5] - 32:19, 33:5, 43:1, 43:7
**17** [3] - 139:1, 139:2
**17th** [1] - 70:1
**18** [4] - 6:12, 79:2, 138:7, 143:15
**1800** [1] - 2:9

## 2

**2** [7] - 125:23, 126:2, 126:6, 134:12, 141:12, 145:5,

145:21
**20** [1] - 18:1
**20,300** [2] - 77:2, 77:14
**2003** [1] - 6:10
**2004** [1] - 118:18
**2008** [1] - 35:11
**2010** [2] - 12:21, 16:24
**2011** [1] - 17:1
**2012** [1] - 16:23
**2015** [1] - 24:15
**2017** [18] - 11:8, 12:22, 13:1, 14:4, 14:14, 14:15, 14:18, 24:15, 24:19, 37:21, 45:5, 90:24, 91:2, 119:12, 125:23, 126:2, 126:7, 134:12
**2018** [22] - 8:21, 8:23, 13:13, 24:19, 32:7, 33:13, 37:19, 39:5, 45:6, 56:13, 87:7, 87:11, 87:16, 90:22, 91:2, 91:13, 91:15, 139:4, 140:11, 143:15, 143:1, 144:8
**2019** [17] - 7:15, 13:24, 60:23, 61:1, 61:19, 66:17, 66:21, 67:6, 79:2, 79:5, 137:1, 137:7, 144:21, 145:1, 145:5, 145:21
**2020** [8] - 1:20, 52:17, 119:22, 121:19, 133:12, 152:23, 153:5, 153:15
**21** [2] - 1:20, 152:23
**21st** [2] - 81:4, 153:5
**225** [1] - 123:8
**225,000** [2] - 51:16, 52:7
**24** [1] - 87:16
**24th** [1] - 87:7
**250** [7] - 2:3, 17:7, 32:8, 33:5, 99:22, 118:5, 118:10
**250,000** [5] - 32:15, 81:1, 85:17, 92:9, 110:10
**25K** [1] - 141:12
**25th** [1] - 144:15
**26** [1] - 139:4
**275** [1] - 17:9
**29** [2] - 74:21
**2:20** [1] - 137:10

## 3

**3** [2] - 119:20, 139:2

**3,300** [1] - 8:8
**30** [3] - 64:13, 152:1, 152:7
**30,000** [1] - 65:15
**300** [2] - 16:22, 17:4
**300,000** [2] - 61:16, 61:17
**35** [3] - 10:6, 10:11, 18:6

## 4

**4** [1] - 3:4
**4,700** [2] - 67:21, 68:2
**4/13** [2] - 148:17, 148:20
**400** [3] - 2:9, 138:4
**400,000** [4] - 137:11, 137:17, 137:23, 138:5
**410** [1] - 2:3
**446** [1] - 2:13
**47** [3] - 145:13, 145:18, 145:19
**48** [2] - 80:14, 83:24
**4:30** [1] - 138:20
**4:39** [1] - 150:4

## 5

**5** [2] - 119:19, 123:17
**5,000** [3] - 67:24, 68:21, 137:10
**5/4/23** [1] - 153:19
**50** [7] - 66:20, 66:24, 79:12, 88:22, 92:17, 137:6
**50,000** [2] - 48:19, 140:18
**508** [3] - 1:23, 2:4, 2:10
**51** [2] - 69:1, 84:2
**52** [1] - 76:3
**53** [1] - 76:23
**54** [1] - 78:10
**575** [1] - 16:18

## 6

**6** [2] - 119:22, 125:20
**600** [1] - 61:13
**600,000** [1] - 43:18
**650,000** [1] - 43:13

## 7

**7** [5] - 5:3, 58:5, 86:14, 121:6, 144:8
**753-4131** [1] - 1:23
**791-8411** [1] - 2:4

## 8

**8** [1] - 1:22
**850** [5] - 11:20, 12:6, 15:23, 132:16, 132:22
**86,000** [1] - 133:9
**860-1448** [1] - 2:10

## 9

**900** [3] - 11:20, 15:23, 132:22
**95K** [1] - 141:12
**99** [1] - 3:5
**9th** [5] - 32:7, 33:12, 34:23, 34:24, 153:15

## A

**A.J** [14] - 23:8, 42:20, 96:21, 96:24, 97:4, 97:7, 97:10, 97:15, 98:10, 98:15, 98:17, 117:24, 145:2, 145:7
**ability** [4] - 10:14, 10:18, 91:3, 122:20
**able** [12] - 14:16, 14:21, 15:17, 35:16, 35:17, 37:13, 38:21, 80:10, 105:1, 106:9, 128:6, 131:19
**absolutely** [5] - 11:18, 40:7, 44:8, 73:7, 91:24
**Absolutely** [1] - 37:15
**acceptable** [1] - 42:1
**accepting** [1] - 126:21
**access** [2] - 38:15, 38:24
**accomplished** [1] - 152:7
**accordance** [2] - 151:2, 151:7
**according** [4] - 54:23, 73:13, 106:15, 131:2
**Accordingly** [1] - 151:3
**account** [14] - 17:15, 17:18, 17:20, 17:23, 32:18, 33:4, 62:3, 62:6, 81:19, 114:9, 142:13, 148:24, 149:2, 149:3
**accounted** [1] - 117:12
**accounting** [4] - 6:8, 36:22, 42:7, 82:21
**accounts** [1] - 149:4
**acknowledgement** [1]

- 79:1
acquire [1] - 10:18
acquisition [1] - 100:4
acre [3] - 12:19, 63:13, 63:16
acreage [1] - 16:2
acres [6] - 8:11, 8:12, 8:13, 8:16, 8:22, 12:18
act [1] - 120:23
acted [1] - 121:1
Action [1] - 1:6
action [2] - 153:11, 153:13
actual [1] - 31:8
add [1] - 138:3
additional [1] - 113:4
address [1] - 7:8, 69:9, 81:21, 84:3, 147:23, 148:2
adjoining [1] - 103:17
advised [1] - 99:18
affixed [1] - 153:15
afford [1] - 105:1
afforded [1] - 106:3
age [1] - 6:12
AGENCY [1] - 1:22
ago [4] - 24:3, 71:19, 110:2, 110:19
agree [4] - 81:21, 85:10, 116:1, 126:11
agreed [7] - 4:2, 4:6, 57:11, 106:12, 132:21, 142:5, 142:7
agreement [35] - 10:22, 27:9, 27:21, 27:23, 28:2, 30:23, 65:19, 70:20, 74:10, 75:12, 75:17, 76:12, 76:13, 80:1, 83:3, 83:6, 83:7, 83:15, 90:16, 91:24, 94:19, 110:22, 120:8, 122:15, 126:12, 126:13, 126:22, 128:13, 139:15, 141:5, 141:6, 141:9, 141:22
agreements [5] - 122:7, 141:12, 141:19, 142:2, 142:9
ahead [2] - 33:23, 100:22
allocated [1] - 86:7
allow [5] - 26:11, 83:19, 86:9, 127:5, 146:17
allowed [1] - 96:16
almost [1] - 138:21
altogether [1] - 32:13

amount [8] - 50:13, 50:14, 56:1, 61:6, 61:8, 70:23, 78:14, 105:17
amounts [2] - 96:8, 106:24
Andover [1] - 33:19, 148:1, 148:2
annual [1] - 92:8
Answer [1] - 54:11
answer [14] - 27:5, 30:15, 42:14, 52:24, 53:4, 53:17, 53:24, 59:14, 71:20, 72:4, 87:20, 100:14, 123:2, 123:14
answered [6] - 6:11, 63:12, 71:11, 71:13, 72:3, 99:1
answering [3] - 30:13, 71:20, 101:2
answers [3] - 15:2, 99:17, 100:16, 123:11, 153:8
anyway [1] - 118:19
apart [4] - 14:10, 107:10, 140:14, 140:20
apartment [11] - 13:4, 13:13, 13:15, 13:19, 14:1, 15:12, 89:6, 89:12, 90:4, 90:7, 90:23
apartments [1] - 13:20
apologies [1] - 145:17
apologize [2] - 54:17, 142:21
appeal [1] - 141:3
APPEARANCES [1] - 2:1
appeared [1] - 101:9
applicable [1] - 1:13
apply [1] - 116:21
appraiser [1] - 63:17
appreciate [8] - 5:5, 10:10, 61:11, 63:18, 64:11, 80:2, 80:13, 120:21
approval [4] - 23:10, 36:13, 36:17, 146:16
approved [2] - 86:20, 86:24
approximate [1] - 90:21
April [27] - 8:21, 8:23, 33:13, 34:11, 35:5, 37:19, 45:6, 56:13, 66:21, 67:6, 70:1, 79:2, 79:5, 87:7, 87:11, 87:16, 90:22,

91:2, 91:12, 91:15, 137:1, 137:7, 137:9, 138:7, 143:15, 143:21, 144:5
April-ish [1] - 8:23
Arcadia [4] - 5:22, 7:9, 12:9, 70:21
Arch [12] - 28:5, 31:18, 64:22, 66:4, 66:10, 75:7, 75:9, 75:21, 75:23, 80:19, 120:7, 137:13
archive [1] - 38:19
Arizona [2] - 21:3, 21:5
Army [1] - 85:14
arrangement [6] - 73:4, 124:22, 124:23, 125:3, 125:6, 140:23
arrived [1] - 120:17
articulate [1] - 136:1
ascertain [1] - 149:19
aside [2] - 29:2, 29:4
aspect [1] - 48:8
assented [1] - 60:16
assertion [1] - 140:2
assign [1] - 22:9
assigned [1] - 10:23
assignment [17] - 10:24, 27:22, 27:24, 28:1, 30:22, 31:6, 31:8, 31:9, 31:12, 64:4, 71:2, 126:12, 126:21, 127:12, 130:3, 131:4, 141:8
assignments [9] - 26:4, 27:17, 28:20, 31:2, 53:20, 54:11, 65:20, 77:9, 101:18
assigns [1] - 139:14
Assistant [1] - 4:24
associated [1] - 94:20
ASSOCIATES [1] - 2:2
Associates [1] - 22:20
assume [2] - 53:11, 73:9, 99:10, 100:16, 102:1, 117:11, 128:21
assuming [2] - 71:15, 144:6
assumption [1] - 101:23
attempting [1] - 17:24
attention [2] - 15:18, 129:22
Attleboro [1] - 153:15
attorney [12] - 4:24, 18:16, 18:20, 70:24, 76:10, 80:18, 80:19,

121:3, 141:11, 141:15, 153:10, 153:12
Attorney [4] - 23:22, 29:2, 81:16, 100:17
attorney's [1] - 129:21
attorneys [2] - 22:12, 28:17
attracted [2] - 104:22, 104:23
attractive [2] - 104:17, 140:23
audit [1] - 117:4
audited [1] - 117:3
auditor [1] - 117:7
audits [1] - 118:19
August [8] - 13:1, 13:6, 13:13, 14:14, 14:15, 14:18, 90:24, 91:2
authorities [1] - 96:11
authority [2] - 27:2, 148:9
authorized [1] - 41:22
available [6] - 34:18, 61:18, 86:22, 105:20, 128:1, 140:16
Ave [2] - 5:22, 7:9
average [1] - 92:24
avoid [2] - 96:11, 96:17
avoiding [1] - 84:18
aware [5] - 11:6, 70:20, 115:8, 116:24, 119:23

**B**

background [3] - 4:23, 5:3, 5:23
backup [1] - 95:6
Bacon [1] - 12:13
bad [2] - 15:10, 22:5
balance [2] - 81:5, 82:19
BALDIGA [21] - 2:8, 34:3, 34:6, 58:3, 58:17, 58:21, 58:24, 59:6, 99:5, 99:15, 100:22, 112:19, 113:8, 113:10, 114:23, 115:5, 116:2, 117:10, 118:13, 118:16, 150:1
Baldiga [2] - 3:5, 5:2, 24:18, 58:5, 149:11
balls [1] - 134:21
bang [2] - 105:9,

105:16
bank [31] - 17:12, 17:13, 32:16, 33:14, 33:16, 35:20, 42:16, 42:17, 42:18, 58:8, 58:18, 59:11, 60:15, 107:1, 107:2, 107:13, 108:4, 108:5, 108:12, 109:3, 146:20, 147:12, 147:20, 147:23, 148:5, 148:8, 148:23, 149:2, 149:3, 149:16, 149:19
Bank [3] - 39:21, 61:6, 61:12
BANKRUPTCY [1] - 1:1
Bankruptcy [1] - 2:11
bankruptcy [9] - 5:2, 5:5, 24:15, 56:14, 56:17, 84:11, 84:16, 84:23, 85:2
banks [1] - 39:20
base [2] - 63:4, 140:2
based [10] - 84:6, 93:14, 93:15, 123:4, 124:1, 124:7, 142:1, 142:8, 144:19
basic [1] - 118:1
basis [6] - 86:11, 89:4, 89:9, 92:8, 92:23, 109:22
bathroom [1] - 44:6
BAY [1] - 1:22
Bear [1] - 61:5
beautiful [2] - 4:22, 16:7
became [2] - 119:23, 121:2
become [1] - 133:5
becomes [1] - 140:16
bedroom [1] - 89:6
bedrooms [5] - 8:9, 12:16, 12:17, 13:15, 13:16
began [1] - 11:3
beginning [1] - 131:10
behalf [2] - 1:12, 60:20
behind [1] - 35:13
belief [3] - 14:15, 14:20, 15:1
bell [3] - 27:11, 27:12, 28:6
below [2] - 6:12, 67:22
belt [1] - 110:4
Bentley [1] - 97:20
best [5] - 49:21, 49:22,

Case 15-42445    Doc 434-3    Filed 03/23/21    Entered 03/23/21 20:38:02    Desc Exhibit
Kevin Riley 10/21/2020 depo transcript    Page 156 of 169

3

120:20, 122:19, 134:24
**better** [3] - 28:11, 64:10, 91:10
**between** [8] - 4:2, 43:19, 65:19, 108:18, 111:13, 132:5, 132:21, 149:11
**beyond** [2] - 43:7, 99:24
**big** [11] - 8:7, 10:5, 10:7, 10:11, 12:14, 15:14, 36:18, 38:3, 133:3, 133:5, 133:6
**biggest** [1] - 19:20
**Bill** [78] - 23:18, 24:11, 24:14, 25:1, 25:10, 25:14, 25:16, 25:20, 25:22, 26:1, 26:5, 26:11, 26:18, 31:7, 31:13, 31:20, 31:24, 32:3, 40:8, 51:11, 51:12, 51:23, 53:23, 54:3, 66:1, 66:7, 80:15, 81:2, 81:11, 81:12, 81:15, 81:17, 81:19, 81:21, 82:1, 82:17, 84:1, 84:6, 84:20, 84:23, 85:1, 88:1, 88:6, 88:12, 98:22, 100:9, 101:4, 101:7, 119:15, 125:23, 125:24, 126:7, 128:6, 128:11, 128:15, 128:16, 128:18, 129:1, 129:5, 129:17, 130:3, 130:6, 130:11, 130:23, 131:5, 131:13, 131:22, 131:24, 132:5, 133:24, 134:4, 134:12, 135:13, 137:14, 139:11, 140:3, 140:10
**bill** [1] - 126:20
**bills** [2] - 117:24, 133:23
**bit** [6] - 7:24, 14:7, 44:23, 58:6, 68:17, 109:14
**biting** [1] - 85:16
**Black** [23] - 20:10, 21:13, 21:17, 21:20, 22:13, 23:11, 24:4, 35:24, 37:3, 37:5, 37:10, 38:4, 38:9, 38:12, 40:20, 40:22,

42:2, 55:11, 55:12, 56:5, 62:7, 145:24, 146:4
**black** [4] - 22:8, 29:23, 30:2, 30:4
**Black's** [2] - 39:2, 40:12
**board** [3] - 76:3, 88:19, 137:6
**bogged** [3] - 126:23, 130:14, 135:10
**book** [2] - 66:20, 88:21
**books** [3] - 114:6, 114:11, 117:5
**borrow** [1] - 60:20
**Boston** [1] - 2:7
**bottom** [6] - 67:3, 81:14, 82:4, 119:8, 123:20, 125:21
**bought** [6] - 18:1, 27:6, 49:2, 89:17, 90:2, 137:8
**bounce** [1] - 13:22
**branch** [1] - 148:13
**brand** [2] - 6:18, 6:22
**break** [8] - 49:18, 49:20, 63:22, 85:23, 86:3, 95:20, 95:24, 104:6
**breaking** [1] - 147:17
**breaks** [2] - 86:7, 86:8
**Brinks** [3] - 35:19, 40:16, 56:4
**Bristol** [1] - 153:2
**broad** [2] - 16:7, 37:21
**broadly** [2] - 43:2, 45:4
**broker** [2] - 140:14, 140:21
**brother** [5] - 20:12, 20:13, 85:12, 85:14, 92:3
**brought** [3] - 15:18, 129:21, 148:21
**Bryant** [5] - 5:24, 6:5, 6:7, 6:9, 42:5, 97:22
**buck** [2] - 105:9, 105:16
**bucket** [1] - 33:3
**budget** [5] - 63:22, 83:3, 83:5, 105:1, 106:11
**build** [9] - 14:22, 15:17, 23:15, 48:22, 83:12, 83:19, 90:9, 105:4, 106:10
**buildable** [27] - 46:9, 51:6, 55:10, 64:5, 65:24, 76:14, 78:24,

79:19, 82:16, 86:6, 88:2, 88:11, 99:23, 101:19, 102:5, 102:11, 102:12, 102:13, 103:5, 103:10, 106:18, 106:19, 108:20, 110:12, 111:5, 138:1, 144:4
**builder** [2] - 48:20, 103:14
**building** [8] - 11:14, 86:20, 86:21, 87:6, 87:15, 100:4, 105:9, 105:17
**built** [11] - 8:5, 8:20, 9:22, 70:5, 70:6, 86:22, 89:12, 90:17, 105:11, 105:18, 140:19
**bunch** [1] - 119:1
**business** [19] - 12:5, 19:6, 19:23, 21:10, 30:6, 30:17, 35:14, 35:15, 35:19, 48:11, 53:19, 57:8, 57:9, 85:16, 96:4, 96:9, 97:4, 109:16, 110:3
**businesses** [1] - 96:2
**busy** [1] - 89:10
**buy** [14] - 10:19, 14:16, 15:19, 15:24, 17:24, 18:10, 22:13, 27:1, 49:9, 90:1, 102:13, 102:22, 127:6, 132:21
**buyer** [6] - 10:20, 48:23, 126:22, 129:5, 130:12, 135:8
**buying** [8] - 26:21, 30:22, 102:15, 102:16, 102:20, 103:1, 104:4, 137:19
**buys** [1] - 48:22
**BY** [10] - 4:13, 59:7, 95:16, 99:15, 101:1, 113:10, 117:10, 118:23, 136:23, 147:10

---

## C

**Cambridge** [1] - 71:3
**Camry** [3] - 35:9, 39:3, 39:7
**canceled** [1] - 77:23
**capital** [1] - 117:15
**Capital** [1] - 33:4
**Capitol** [6] - 17:14, 17:15, 17:18, 17:22,

33:5, 62:4
**car** [5] - 35:7, 35:8, 35:17, 39:4, 109:8
**care** [4] - 104:20, 121:4, 125:22, 146:11
**carefully** [3] - 55:5, 102:4, 151:3
**CARMAN** [107] - 2:5, 2:6, 10:16, 11:23, 27:4, 29:2, 30:12, 30:15, 30:24, 33:24, 35:4, 38:14, 38:23, 42:13, 44:6, 47:9, 47:19, 50:4, 52:5, 54:15, 54:24, 56:22, 58:15, 59:13, 60:8, 63:8, 64:24, 65:12, 68:12, 70:3, 70:12, 71:10, 71:14, 72:2, 74:10, 75:14, 81:6, 81:10, 81:15, 82:1, 84:12, 84:21, 85:8, 86:5, 86:13, 87:8, 87:19, 87:21, 88:3, 88:7, 88:17, 89:19, 90:10, 90:12, 94:14, 94:17, 94:23, 95:9, 96:13, 96:18, 97:2, 97:12, 98:24, 102:24, 103:2, 106:6, 106:17, 107:22, 108:8, 108:17, 109:4, 111:17, 112:21, 113:2, 114:3, 115:8, 115:18, 115:23, 120:3, 122:8, 122:13, 123:1, 123:13, 124:3, 124:6, 125:5, 125:11, 125:18, 128:14, 128:17, 129:18, 130:8, 130:22, 132:1, 133:19, 135:4, 137:4, 137:15, 137:21, 138:16, 138:19, 142:3, 142:6, 142:10, 145:14, 145:19, 146:22
**Carman** [2] - 28:24, 149:12
**carried** [1] - 114:6
**CASE** [1] - 152:23
**case** [4] - 5:5, 10:21, 81:2, 149:15
**cash** [133] - 32:6, 32:8, 33:9, 33:11, 33:15,

33:16, 34:13, 34:18, 34:22, 35:6, 35:14, 35:15, 35:16, 35:18, 36:4, 39:6, 40:17, 41:22, 42:10, 43:1, 43:24, 44:2, 44:14, 45:1, 45:5, 45:9, 45:18, 45:19, 45:21, 45:24, 46:1, 46:6, 46:8, 46:21, 46:24, 47:10, 47:13, 47:16, 47:17, 48:1, 48:3, 48:16, 48:19, 48:20, 48:24, 49:1, 49:3, 49:6, 49:9, 49:18, 49:19, 49:22, 49:24, 50:1, 50:6, 50:7, 50:11, 51:3, 51:8, 51:15, 51:17, 52:16, 52:19, 52:23, 53:8, 53:22, 54:8, 54:14, 54:18, 55:11, 55:13, 55:19, 55:21, 55:23, 56:4, 56:8, 56:20, 56:24, 57:16, 58:7, 59:16, 59:18, 60:16, 60:18, 61:23, 62:6, 62:10, 62:13, 63:3, 73:6, 73:10, 76:17, 81:1, 84:17, 85:6, 85:23, 86:2, 86:9, 86:17, 87:12, 87:18, 87:24, 88:6, 91:15, 95:17, 95:18, 95:23, 96:10, 96:20, 97:11, 98:1, 99:19, 99:22, 100:8, 106:24, 110:16, 118:5, 118:11, 121:11, 121:14, 121:21, 126:22, 127:6, 129:5, 130:12, 130:21, 131:1, 135:8, 143:21, 147:21, 148:16
**CENTRAL** [1] - 1:2
**CEO** [2] - 21:2, 21:3
**certain** [1] - 48:1, 141:3
**certainly** [3] - 20:2, 115:18, 118:13
**certainty** [1] - 15:6
**Certified** [1] - 1:15
**certify** [3] - 113:14, 113:18, 153:4
**CERTIFY** [1] - 153:10
**cetera** [2] - 26:18
**CFO** [11] - 7:3, 21:7, 41:18, 83:17, 91:20, 97:23, 113:12,

113:14, 116:23, 135:2, 135:6
**chain** [9] - 25:16, 68:15, 68:16, 123:23, 125:10, 125:13, 125:16, 127:8, 149:11
**chance** [1] - 112:23
**CHANGE** [12] - 151:9, 151:10, 151:11, 151:12, 151:13, 151:14, 151:15, 151:16, 151:17, 151:18, 151:19, 151:20
**change** [1] - 132:12
**changed** [6] - 121:24, 126:16, 131:10, 134:1, 134:20, 135:21
**changes** [2] - 151:4, 152:5
**Changes** [1] - 152:1
**changes/corrections** [1] - 151:6
**changing** [1] - 13:20
**Chapter** [3] - 5:3, 58:5, 86:14
**character** [2] - 122:19, 123:10
**characterize** [1] - 118:9
**cheaper** [1] - 86:10
**check** [27] - 38:22, 46:3, 47:13, 47:16, 47:17, 48:4, 67:10, 76:7, 76:10, 76:16, 76:18, 76:21, 76:24, 77:1, 77:22, 77:23, 78:1, 78:6, 78:8, 78:22, 80:2, 86:11, 138:8, 138:11, 143:7, 143:15, 144:15
**checking** [1] - 42:2
**checks** [9] - 77:6, 77:13, 77:16, 77:17, 77:21, 78:7, 79:11, 79:21
**chemo** [1] - 128:2
**chief** [3] - 7:4, 41:20, 48:5
**children** [1] - 6:12
**Chris** [5] - 2:17, 67:20, 119:9, 123:20, 139:1
**circle** [1] - 28:10
**circumstances** [1] - 95:7
**Civil** [2] - 1:6, 1:14
**claim** [2] - 116:12,

116:15
**claims** [1] - 112:8
**clarify** [2] - 5:15, 11:23
**clear** [8] - 34:1, 36:20, 61:17, 99:9, 99:13, 100:14, 126:22, 139:18
**close** [4] - 19:21, 126:10, 133:21, 139:15
**closed** [6] - 12:23, 27:7, 53:2, 60:23, 90:18, 139:5
**closer** [5] - 11:11, 45:5, 104:14, 104:15, 104:17
**closing** [3] - 62:8, 90:22, 132:7
**closings** [1] - 9:14
**closure** [1] - 70:16
**code** [1] - 5:2
**college** [2] - 5:24, 6:5
**combined** [1] - 63:13
**comfort** [1] - 104:21
**comfortable** [2] - 36:24, 93:22
**coming** [5] - 4:17, 5:5, 69:24, 72:7, 148:24
**command** [2] - 21:7, 21:11
**Commercial** [1] - 2:3
**commercial** [1] - 96:9
**commission** [3] - 126:18, 134:3, 136:17
**Commission** [1] - 153:19
**commit** [2] - 60:9, 115:19
**commitment** [1] - 141:7
**committed** [4] - 14:9, 14:12, 60:5, 91:10
**committee** [2] - 7:20, 7:22
**common** [2] - 96:2, 96:3
**Commons** [1] - 13:3
**Commonwealth** [4] - 1:17, 153:1, 153:4, 153:19
**communicate** [3] - 44:21, 64:15, 128:22
**communicated** [3] - 25:10, 69:11, 133:15
**communicating** [1] - 125:7
**communication** [5] - 25:12, 37:8, 37:16, 128:11, 149:13

**communications** [1] - 72:12
**companies** [3] - 116:18, 116:19, 116:22
**company** [39] - 19:9, 20:17, 20:18, 20:19, 35:24, 36:5, 36:13, 36:14, 38:16, 38:17, 38:19, 39:2, 40:13, 41:1, 41:6, 42:1, 42:10, 43:19, 48:6, 48:8, 48:14, 49:19, 55:20, 56:7, 59:16, 59:22, 60:11, 60:15, 62:7, 92:8, 107:8, 113:15, 113:16, 113:20, 114:7, 135:2, 145:3, 146:6, 146:16
**company's** [2] - 36:7, 60:20
**compared** [1] - 92:16
**compel** [2] - 52:6
**compensated** [1] - 101:21
**competitive** [1] - 11:12
**complete** [1] - 124:17
**completed** [3] - 139:17, 140:24, 141:16
**completing** [1] - 151:5
**complex** [2] - 13:4, 13:21
**complexity** [1] - 141:2
**complicated** [2] - 27:17, 103:15
**component** [1] - 35:15
**concern** [1] - 50:14
**concerned** [4] - 46:23, 47:2, 47:6, 47:7, 50:10, 50:13, 56:20, 101:4, 101:15, 124:20, 131:3
**concerns** [6] - 101:7, 124:18, 129:16, 130:21, 135:13, 135:16
**conclusion** [2] - 72:18, 151:6
**conditions** [4] - 126:24, 129:6, 130:15, 135:10
**confident** [2] - 59:4, 126:9
**confirm** [3] - 54:9, 104:24, 126:19
**confirmed** [1] - 40:18

**confirming** [2] - 89:24, 146:9
**confronted** [1] - 123:6
**confused** [1] - 79:14
**confusing** [2] - 31:1, 80:12
**connection** [1] - 58:24
**consent** [1] - 23:10
**conservation** [6] - 7:20, 7:22, 8:15, 65:21, 103:16, 103:22
**consider** [1] - 61:10
**consideration** [3] - 54:7, 71:1, 141:9
**construct** [2] - 19:10, 77:18
**constructed** [1] - 63:19
**construction** [29] - 19:8, 25:24, 26:17, 40:1, 40:2, 43:4, 43:11, 43:12, 47:23, 48:8, 48:12, 48:14, 49:17, 59:5, 65:11, 85:18, 92:14, 97:7, 107:14, 107:20, 108:5, 108:6, 108:16, 108:19, 109:2, 143:9, 145:9, 146:21, 149:14
**consult** [1] - 134:24
**contact** [2] - 128:15, 131:11
**context** [4] - 19:23, 24:14, 55:4, 82:15
**contract** [6] - 57:6, 83:20, 83:21, 90:8, 90:14, 133:18
**contractor** [4] - 19:9, 49:13, 83:10, 96:21
**contractors** [1] - 47:22
**contractual** [1] - 89:24
**contrary** [1] - 100:16
**control** [2] - 95:3, 153:7
**controller** [1] - 36:23
**conversation** [5] - 37:12, 38:1, 38:3, 54:19, 55:2
**conversations** [4] - 21:23, 63:9, 63:11, 120:24
**convey** [1] - 118:10
**COO** [2] - 21:10, 41:22
**copies** [3] - 38:7, 147:11, 147:19
**copy** [1] - 77:23
**corp** [1] - 139:17

**correct** [103] - 6:6, 7:5, 8:5, 8:6, 8:17, 9:6, 9:23, 10:13, 13:5, 13:14, 17:19, 20:16, 22:17, 22:23, 23:12, 31:22, 39:18, 41:10, 41:18, 42:5, 42:8, 43:9, 43:20, 43:22, 48:7, 52:2, 53:6, 53:9, 56:11, 56:12, 56:13, 62:3, 62:14, 65:11, 69:5, 69:7, 69:8, 69:16, 70:2, 70:5, 70:8, 75:8, 79:2, 83:16, 89:13, 90:5, 90:6, 91:5, 91:14, 91:19, 94:1, 96:22, 96:23, 97:5, 97:8, 99:20, 100:6, 100:21, 107:3, 107:4, 107:15, 108:7, 111:10, 112:8, 112:11, 113:13, 113:17, 113:23, 114:2, 116:11, 116:17, 121:22, 122:3, 122:20, 123:23, 128:20, 128:23, 129:7, 129:8, 129:12, 131:15, 131:16, 131:20, 134:12, 135:8, 135:14, 137:8, 137:12, 137:17, 137:20, 138:9, 138:12, 138:14, 139:6, 139:12, 143:3, 143:11, 143:13, 144:13, 145:4, 145:22, 146:8, 151:3
**Correct** [1] - 53:4
**corrections** [1] - 151:4
**correctly** [1] - 128:8
**cost** [4] - 53:17, 53:18, 132:15, 133:21
**costs** [2] - 132:6, 133:20
**counsel** [18] - 4:2, 18:24, 28:14, 29:12, 74:9, 74:18, 74:19, 75:2, 75:3, 75:5, 129:4, 129:14, 129:19, 134:14, 134:16, 142:14, 142:15, 153:10
**Counsel** [3] - 2:4, 2:7, 2:11
**counted** [1] - 52:11

**couple** [6] - 24:9, 32:9, 92:12, 93:5, 99:6, 147:7
**course** [5] - 60:14, 69:23, 71:15, 72:6, 111:9
**COURT** [1] - 1:1
**court** [7] - 34:7, 65:22, 84:11, 84:16, 103:18, 121:3
**cousin** [1] - 146:3
**created** [3] - 75:13, 75:17, 75:18
**credentials** [1] - 40:19
**credible** [4] - 95:4, 95:11, 110:21, 118:12
**credit** [1] - 61:9
**Creditor** [2] - 1:12, 2:4
**criminal** [1] - 85:5
**critical** [1] - 140:24
**CROSS** [4] - 3:2, 99:14, 100:24, 113:9
**CROSS-EXAMINATION** [3] - 99:14, 100:24, 113:9
**CSR** [1] - 153:18
**curious** [1] - 26:16
**curve** [1] - 134:21
**customer** [2] - 140:14, 140:15

**D**

**date** [11] - 34:21, 36:20, 39:9, 40:18, 52:24, 90:20, 121:8, 121:18, 146:11, 148:15, 148:17
**DATE** [3] - 151:22, 152:17, 152:23
**dated** [5] - 34:23, 34:24, 79:2, 79:5, 139:4
**dates** [2] - 22:2, 32:10
**David** [1] - 23:24
**day-to-day** [2] - 89:2, 89:4
**days** [3] - 69:4, 107:10, 152:7
**deal** [15] - 11:3, 14:21, 18:10, 18:18, 19:2, 29:22, 54:3, 57:16, 75:23, 94:7, 105:16, 106:3, 109:1, 111:21, 129:6
**dealing** [2] - 47:22, 102:10
**dealings** [5] - 12:5, 22:6, 30:6, 57:8,

112:5
**deals** [1] - 95:23
**dealt** [5] - 18:13, 26:2, 70:15, 76:1, 76:2
**Dear** [3] - 70:19
**debt** [3] - 24:16, 41:24, 114:11
**debtor** [1] - 114:9
**December** [2] - 37:21, 45:4
**decent** [1] - 35:18
**decent-sized** [1] - 35:18
**decide** [3] - 105:4, 105:8, 131:4
**decision** [2] - 13:8, 131:7
**deduct** [2] - 67:22, 68:3
**deductible** [1] - 116:13
**deed** [8] - 8:16, 9:4, 9:11, 9:12, 11:4, 70:7, 70:10, 70:14
**deeded** [2] - 8:22, 91:12
**deeply** [1] - 124:2
**degree** [5] - 5:24, 6:5, 38:20, 42:7, 46:16
**delineating** [1] - 115:15
**delivered** [1] - 35:21
**delivery** [2] - 35:19, 40:18
**DEMALLIE** [1] - 2:9
**DeMallie** [1] - 1:18
**demanding** [1] - 54:1
**denied** [1] - 24:16
**department** [1] - 38:22
**Department** [1] - 98:14
**deplete** [1] - 62:9
**deponent** [3] - 4:3, 136:5, 153:6
**deposit** [3] - 18:1, 141:10, 143:19
**DEPOSITION** [1] - 1:11
**deposition** [33] - 4:5, 4:18, 5:7, 24:20, 28:13, 28:16, 29:1, 29:9, 29:19, 29:20, 29:24, 30:8, 45:14, 52:13, 52:18, 54:23, 55:5, 119:21, 119:23, 119:24, 121:18, 121:19, 123:6, 133:10, 150:3, 151:3, 151:3, 151:4, 152:3, 152:6,

152:12, 153:8, 153:11
**depositions** [4] - 67:17, 99:11, 100:15, 151:2
**describe** [1] - 117:22
**describes** [1] - 118:4
**description** [1] - 59:15
**DESCRIPTION** [1] - 3:10
**desires** [1] - 152:5
**detail** [2] - 67:9, 101:22
**details** [2] - 22:9, 141:17
**determine** [3] - 105:11, 105:13, 105:15
**deterrent** [1] - 126:19
**Development** [9] - 28:5, 31:18, 64:22, 66:4, 66:10, 75:8, 75:21, 75:24, 120:7
**difference** [3] - 108:18, 108:23, 108:24
**different** [10] - 9:17, 19:8, 32:10, 43:4, 64:3, 80:14, 98:19, 107:9, 123:11, 133:2
**differently** [2] - 116:21, 123:15
**dinner** [1] - 20:4
**DIRECT** [1] - 3:2
**direct** [1] - 4:12
**directing** [1] - 112:14
**direction** [1] - 153:7
**directly** [16] - 10:20, 22:15, 23:7, 23:14, 25:19, 31:20, 33:1, 35:21, 36:4, 39:9, 69:21, 72:7, 76:15, 76:21, 120:22, 128:11
**disappear** [1] - 101:10
**discharge** [1] - 24:16
**disclosed** [1] - 117:6
**discloses** [1] - 117:5
**disclosures** [1] - 117:1
**discount** [1] - 48:3
**discuss** [3] - 22:8, 72:15, 128:2
**discussed** [2] - 55:18, 141:8
**discussing** [4] - 68:15, 68:16, 74:16, 129:4
**discussion** [3] - 4:20, 98:19, 138:23

**discussions** [2] - 28:13, 63:2
**dispute** [1] - 135:7
**disruptive** [1] - 15:14
**distinction** [1] - 77:14
**DIVISION** [1] - 1:2
**DO** [1] - 151:5
**document** [22] - 40:15, 54:5, 59:10, 60:3, 74:7, 74:17, 74:22, 74:24, 75:3, 75:7, 76:4, 76:6, 78:11, 111:7, 112:7, 114:24, 123:17, 136:8, 142:24, 143:2, 143:5, 146:16
**documentation** [15] - 40:24, 41:9, 41:15, 41:24, 43:15, 57:5, 60:13, 98:13, 111:9, 111:13, 111:14, 114:20, 115:6, 116:3, 149:13
**documented** [4] - 42:17, 114:1, 136:18
**Documents** [1] - 3:11
**documents** [15] - 28:9, 28:14, 40:13, 67:5, 76:22, 109:3, 113:4, 114:21, 115:15, 135:7, 147:11, 147:19, 149:16, 149:19, 150:2
**dollar** [4] - 9:16, 48:3, 92:20, 96:8
**dollars** [21] - 39:6, 45:1, 45:24, 46:18, 46:24, 53:8, 53:13, 54:6, 54:8, 57:5, 57:16, 59:9, 82:9, 93:11, 93:12, 104:2, 121:21, 122:24, 123:5, 123:8, 143:12
**done** [21] - 14:21, 19:1, 19:19, 47:3, 47:4, 48:15, 50:16, 50:17, 57:17, 64:7, 70:11, 70:14, 91:11, 99:3, 109:15, 110:13, 111:23, 112:23, 113:7, 138:21, 142:12
**doubt** [1] - 46:12
**down** [13] - 5:14, 10:23, 59:17, 90:12, 91:9, 108:24, 117:16, 126:24, 130:14, 135:10, 136:1, 136:17,

136:20
**downtown** [2] - 33:19, 148:1
**drilled** [1] - 51:5
**Drive** [1] - 2:9
**driven** [1] - 47:6
**drove** [4] - 39:9, 39:12, 39:13, 109:10
**dry** [1] - 94:13
**due** [2] - 71:1, 141:10
**duly** [2] - 4:10, 153:5
**during** [2] - 19:17, 111:9

**E**

**e-mail** [106] - 25:16, 36:17, 37:16, 38:1, 38:16, 38:17, 44:16, 44:20, 44:22, 55:22, 66:20, 67:3, 67:4, 67:6, 68:9, 68:13, 68:14, 68:15, 68:16, 69:2, 69:4, 69:5, 69:9, 69:14, 69:21, 71:8, 71:9, 71:18, 71:21, 72:5, 72:9, 72:11, 72:16, 73:24, 79:4, 79:11, 80:14, 80:15, 80:22, 81:11, 81:19, 81:20, 82:3, 82:6, 82:7, 84:1, 84:3, 84:6, 84:7, 101:3, 101:5, 111:24, 119:10, 119:12, 119:17, 123:21, 123:23, 124:2, 124:7, 125:10, 125:13, 125:15, 125:22, 125:24, 126:2, 126:6, 127:3, 127:4, 127:8, 127:9, 127:20, 128:19, 129:3, 129:21, 130:11, 131:2, 131:3, 131:5, 131:15, 131:16, 131:20, 134:7, 134:11, 134:23, 135:20, 136:1, 136:24, 137:2, 137:5, 138:7, 138:14, 139:2, 139:11, 139:21, 139:24, 140:2, 140:9, 142:1, 142:8, 145:13, 145:21, 146:13, 149:10, 149:11

Case 15-42445   Doc 434-3   Filed 03/23/21   Entered 03/23/21 20:38:02   Desc Exhibit
Kevin Riley 10/21/2020 depo transcript   Page 159 of 169

6

e-mailed [6] - 25:14, 25:19, 37:7, 38:15, 67:5, 129:9
e-mailing [4] - 71:24, 81:3, 125:9, 125:12
e-mails [18] - 26:13, 26:14, 28:19, 38:4, 38:7, 38:8, 38:12, 38:19, 41:2, 60:17, 63:10, 82:17, 100:11, 101:10, 115:9, 119:1, 128:8, 128:18
early [3] - 8:3, 8:4, 11:8
easier [1] - 46:3
educational [1] - 5:23
effectuate [1] - 65:10
efforts [1] - 101:21
Ehrhard [5] - 3:4, 4:14, 22:20, 109:13, 149:6
EHRHARD [52] - 2:2, 2:2, 4:13, 4:19, 4:21, 6:16, 12:2, 34:5, 38:11, 44:8, 57:21, 58:2, 59:7, 66:22, 67:19, 71:12, 71:17, 74:12, 81:12, 81:18, 88:20, 93:19, 95:16, 99:3, 103:8, 113:1, 113:6, 115:2, 115:14, 115:22, 117:7, 118:15, 118:17, 118:23, 119:8, 122:11, 123:19, 131:14, 131:19, 133:8, 135:22, 136:3, 136:23, 138:21, 138:24, 142:19, 142:21, 145:16, 145:20, 147:6, 147:17, 149:9
eighteen [1] - 131:10
either [8] - 8:3, 55:3, 72:13, 80:19, 103:13, 137:13, 143:19, 144:6
electrician [1] - 48:2
elementary [1] - 16:9
employed [1] - 153:11
employee [3] - 41:14, 42:11, 153:12
end [10] - 28:12, 57:24, 64:4, 100:19, 114:16, 118:18, 131:11, 132:8, 140:4, 142:18
ended [2] - 13:20,

86:15
Energy [59] - 6:15, 6:18, 6:19, 7:1, 19:1, 19:6, 19:7, 19:15, 22:14, 22:15, 22:19, 23:1, 23:9, 23:10, 24:5, 24:9, 32:19, 35:21, 35:23, 41:7, 41:8, 41:11, 41:13, 42:24, 43:5, 43:7, 43:10, 43:18, 48:17, 48:18, 48:22, 56:1, 60:12, 61:21, 61:22, 76:20, 80:11, 83:17, 83:19, 91:20, 92:13, 92:22, 93:7, 95:23, 97:8, 97:23, 113:11, 114:1, 114:10, 114:11, 114:13, 114:18, 115:10, 115:15, 115:20, 115:24, 116:15, 118:19, 146:19
enforce [1] - 90:8
enormous [1] - 70:22
ensuing [1] - 153:6
ensure [1] - 90:9
entered [1] - 152:5
entire [1] - 65:2
entitled [2] - 74:6, 151:2
entity [1] - 6:20
entry [4] - 114:16, 114:17
equity [4] - 17:17, 61:9, 61:14, 62:2
Eriksen [1] - 141:14
Eriksen's [3] - 126:18, 134:3, 136:17
ERRATA [1] - 151:1
errata [1] - 151:4
Ervin [3] - 127:17, 127:18, 127:19
ESQUIRE [4] - 2:2, 2:5, 2:8, 2:12
essence [1] - 11:4
established [1] - 90:14
establishes [1] - 136:8
estate [13] - 18:18, 48:22, 48:24, 49:10, 52:14, 52:20, 57:6, 71:2, 77:7, 77:18, 78:2, 92:14, 146:20
estimates [1] - 10:9, 144:18
et [2] - 26:18
etc [1] - 103:22
evidence [1] - 71:18

evidencing [1] - 43:15
evil [1] - 94:11
exact [8] - 7:8, 9:8, 9:24, 17:8, 34:21, 90:20, 134:20, 148:2
exactly [5] - 9:8, 9:9, 16:6, 32:15, 46:15
exam [1] - 118:18
examination [3] - 152:3, 152:4, 153:6
EXAMINATION [5] - 99:14, 100:24, 113:9, 118:22, 147:9
examined [1] - 4:11
examines [1] - 117:4
example [4] - 49:12, 92:20, 116:5, 116:13
except [1] - 4:7
exception [3] - 113:4, 126:17, 134:1
Excerpt [1] - 152:1
Exhibit [31] - 66:20, 66:24, 69:1, 74:15, 74:21, 76:3, 76:23, 78:10, 79:12, 80:14, 83:24, 84:2, 118:24, 119:7, 119:13, 119:19, 119:20, 121:5, 123:17, 125:20, 135:18, 137:6, 139:1, 139:2, 140:7, 145:13, 145:18, 150:2
exhibit [6] - 52:6, 74:7, 88:19, 88:21, 140:7, 142:17
EXHIBITS [1] - 3:10
exhibits [3] - 57:23, 87:4, 88:22
existed [1] - 90:1
expect [6] - 12:2, 15:22, 15:24, 16:12, 55:8, 63:18
expectation [2] - 12:3, 16:2, 49:16
expectations [2] - 15:16, 16:14
expecting [2] - 101:12, 101:14
expenses [2] - 117:12, 117:22
expensive [1] - 126:15
experience [1] - 57:15
expired [1] - 8:1
Expires [1] - 153:19
explain [11] - 26:1, 26:22, 33:17, 34:10, 44:5, 68:14, 97:20, 111:1, 111:2, 111:3, 119:11

explained [7] - 51:4, 54:20, 55:6, 73:17, 85:6, 110:19, 110:24
explanation [4] - 39:21, 46:8, 79:16, 99:24
extended [1] - 70:22
extent [5] - 21:24, 26:7, 38:14, 38:23, 39:21, 51:24, 62:24, 119:15
extra [1] - 13:22
extremely [3] - 31:1, 36:20, 57:9

## F

face [2] - 85:17, 110:3
facilitate [10] - 99:23, 100:3, 102:10, 102:12, 103:5, 103:10, 104:3, 106:5, 106:11, 138:1
facilitating [4] - 101:19, 102:3, 102:5, 108:19
facilitation [1] - 102:18
fact [3] - 42:3, 96:19, 123:4
facts [1] - 87:14
fair [16] - 14:14, 19:21, 30:21, 47:15, 56:19, 70:13, 75:16, 82:2, 96:10, 124:1, 125:15, 128:18, 140:2, 142:1, 142:8, 146:19
falls [2] - 140:14, 140:20
familiar [3] - 105:23, 110:2, 136:7
family [7] - 7:24, 20:18, 20:22, 35:23, 35:24, 92:5, 146:4
far [4] - 20:2, 73:15, 82:11, 99:16
fashion [1] - 134:20
fast [2] - 5:12, 34:8
father's [1] - 20:12
February [6] - 24:19, 37:19, 80:21, 81:4, 139:4, 140:11
fees [12] - 24:4, 24:9, 103:21, 103:24, 126:16, 131:23, 131:24, 132:3, 132:6, 132:10, 134:9, 141:11
feet [3] - 8:8, 12:15,

13:18
fell [1] - 14:10
felt [2] - 93:21, 128:20
few [1] - 112:20
figure [1] - 26:3
filed [5] - 24:14
fill [3] - 34:14, 40:13, 40:15, 58:17, 58:19
filled [4] - 39:19, 58:22, 147:12, 147:20
final [1] - 141:17
finalize [1] - 18:9
finalized [1] - 66:16
financial [7] - 7:4, 31:4, 41:20, 42:9, 48:5, 113:19, 117:3
financially [1] - 153:12
financing [1] - 140:17
fine [1] - 58:2
finish [3] - 122:8, 122:11, 135:5
firm [5] - 22:20, 23:8, 31:11, 117:4
first [11] - 5:10, 24:2, 25:1, 37:9, 37:11, 61:11, 63:12, 107:5, 119:22, 122:23, 133:10
fit [2] - 11:16, 105:1
five [11] - 19:16, 19:17, 71:19, 92:23, 92:24, 113:3, 113:8, 122:9, 122:12, 134:21, 135:5
five-year [2] - 19:17, 92:23
flaky [1] - 124:19
Floor [1] - 2:13
focused [2] - 80:6, 104:7
folder [1] - 74:15
folks [1] - 36:21
follow [1] - 107:19
following [4] - 37:24, 80:7, 126:13, 126:20
follows [1] - 4:12
footage [1] - 13:17
foregoing [1] - 152:11
form [7] - 4:7, 37:8, 39:19, 58:18, 114:15, 151:4, 152:5
forms [1] - 34:14
forth [1] - 125:9
forward [9] - 26:6, 118:17, 128:19, 129:24, 131:6, 133:1, 134:18, 134:19, 139:21
forwarded [3] - 38:12,

67:4, 126:3
**foundation** [2] -
126:9, 126:21
**four** [8] - 8:10, 8:12,
8:13, 8:16, 8:22,
63:13, 63:16, 126:22
**four-acre** [1] - 63:16
**frame** [3] - 8:4, 33:13,
34:11
**Francis** [1] - 5:20
**frankly** [1] - 95:4
**fraud** [6] - 101:5,
101:8, 101:11,
101:16, 124:17,
124:19
**free** [1] - 102:1
**friend** [1] - 20:1
**friendly** [2] - 20:3,
57:10
**Front** [1] - 1:19
**front** [2] - 24:8, 37:13
**fronting** [1] - 146:10
**full** [4] - 5:18, 11:22,
21:4, 79:1
**fully** [4] - 27:18, 63:19,
86:22, 152:2
**fund** [1] - 146:20
**funds** [10] - 23:5,
32:23, 66:6, 66:9,
79:7, 79:17, 100:19,
130:7, 146:16,
147:24
**FURTHER** [1] - 153:10

## G

**Gail** [43] - 28:3, 31:15,
31:17, 63:24, 64:2,
64:7, 64:9, 65:7,
65:14, 65:17, 67:23,
68:10, 68:23, 69:7,
69:9, 69:11, 71:8,
71:9, 71:22, 71:23,
76:9, 76:11, 78:16,
80:3, 81:11, 81:14,
81:16, 81:24, 82:18,
84:4, 100:9, 102:7,
111:10, 111:15,
111:19, 111:21,
111:24, 137:14,
138:8, 139:14,
141:10, 141:15,
141:22
**Gail's** [1] - 141:15
**gain** [1] - 26:9
**gaining** [1] - 31:5
**gains** [1] - 117:16
**gallant** [1] - 69:19
**Gallant** [21] - 18:14,
18:16, 24:2, 29:3,

29:4, 29:13, 70:24,
76:15, 76:17, 77:3,
77:6, 78:1, 79:9,
80:16, 81:16,
127:15, 127:19,
138:8, 138:11,
143:14, 143:17
**Gallant's** [7] - 9:24,
18:23, 24:4, 76:7,
77:11, 79:10, 79:23
**gamble** [1] - 14:7
**gas** [5] - 6:23, 6:24,
19:10, 92:18
**general** [2] - 37:12,
38:2, 59:15
**generally** [1] - 10:19
**Gilbertson** [8] - 62:9,
77:10, 90:3, 102:17,
102:21, 120:9,
143:20, 144:6
**Gilbertsons** [2] -
27:10, 27:21
**given** [10] - 23:6,
77:22, 79:19, 81:1,
87:12, 87:24, 98:15,
152:6, 152:11, 153:8
**governing** [1] - 151:2
**graduate** [2] - 6:9,
97:21
**great** [6] - 15:11, 16:8,
22:6, 38:13, 67:9,
89:21
**guardrails** [1] - 83:21
**guess** [37] - 10:17,
11:7, 11:8, 12:22,
17:4, 18:11, 20:18,
21:3, 21:8, 27:16,
28:19, 30:7, 31:9,
46:2, 47:10, 47:21,
56:3, 69:23, 78:2,
78:12, 86:23, 87:2,
101:9, 103:13,
104:6, 106:8,
106:13, 107:19,
107:23, 107:24,
108:9, 108:18,
109:21, 114:15,
124:10, 127:7,
148:12
**guessed** [1] - 16:24
**guessing** [11] - 35:1,
37:20, 45:7, 47:20,
66:16, 86:23, 87:3,
93:10, 107:11,
148:12, 148:17
**Gulf** [1] - 6:23
**guy** [3] - 57:9, 57:14,
124:17
**guys** [1] - 34:7,
56:18, 57:15, 66:23,

74:17, 79:7, 88:21,
112:22, 118:20,
131:15, 131:16

## H

**Haffner's** [4] - 6:17,
6:18, 6:24, 115:11
**half** [1] - 92:19
**hand** [4] - 108:20,
141:7, 153:15
**hand-in-hand** [1] -
108:20
**handle** [1] - 127:11
**hands** [3] - 34:13,
89:14, 89:15
**handshake** [2] -
142:4, 147:1
**hard** [1] - 105:21
**Haskell** [1] - 23:24
**head** [2] - 7:22, 22:11
**headquarter** [1] - 36:8
**headquarters** [3] -
36:10, 56:9, 110:1
**hear** [3] - 99:6,
126:10, 137:10
**heard** [1] - 49:14
**held** [1] - 20:19
**help** [21] - 21:17, 23:14,
26:6, 76:14, 88:11
**helping** [5] - 62:22,
65:21, 78:23, 102:1,
102:2
**helps** [1] - 19:8
**hereby** [1] - 153:4
**hereunto** [1] - 153:14
**hesitate** [1] - 5:14
**Hi** [1] - 146:9
**hide** [1] - 84:10
**high** [3] - 6:1, 93:3,
145:9
**High** [1] - 6:2
**higher** [3] - 15:4, 96:8,
140:18
**highest** [1] - 148:13
**him/her** [1] - 152:4
**himself** [1] - 122:1
**hindsight** [2] - 15:15,
138:6
**history** [2] - 57:2, 57:3
**hit** [1] - 39:1
**hold** [2] - 75:3, 121:17
**holds** [1] - 141:5
**home** [5] - 21:6, 61:9,
105:11, 105:18,
149:15
**honest** [4] - 45:7,
76:16, 104:19,
148:12
**honoring** [1] - 80:1

**hood** [1] - 117:5
**hook** [1] - 140:20
**Hooper** [17] - 10:1,
10:3, 10:8, 10:11,
18:4, 27:6, 27:9,
27:15, 27:21, 62:8,
77:10, 90:2, 102:17,
102:21, 120:9,
143:20, 144:7
**hope** [4] - 115:2,
115:18, 118:14,
126:18
**hopeful** [1] - 15:3
**hopefully** [2] - 13:11,
128:7
**hour** [1] - 112:24
**house** [70] - 7:10,
7:13, 7:18, 8:1, 8:5,
8:7, 8:19, 9:1, 9:22,
11:13, 12:1, 12:6,
12:14, 13:23, 14:5,
14:12, 14:16, 14:19,
14:22, 14:24, 15:9,
15:17, 15:19, 15:21,
15:22, 16:1, 16:16,
17:3, 17:5, 18:2,
25:24, 26:1, 32:24,
33:6, 40:1, 40:2,
43:12, 49:2, 49:5,
52:2, 62:1, 63:20,
64:23, 64:24, 65:6,
65:11, 66:13, 70:2,
70:5, 70:17, 77:19,
83:12, 89:7, 89:12,
89:17, 90:9, 90:17,
91:4, 91:6, 105:2,
106:10, 117:12,
117:17, 132:9,
132:16, 132:21,
140:19, 143:10,
145:9
**household** [1] - 12:9
**houses** [1] - 105:20
**housing** [1] - 11:11
**hum** [10] - 9:3, 40:3,
41:5, 61:24, 69:20,
91:17, 109:9,
122:16, 132:23,
137:18
**hundred** [4] - 9:15,
48:3, 91:5, 95:15
**hundreds** [1] - 104:1
**husband** [1] - 20:14

## I

**i.e** [1] - 61:14
**idea** [7] - 22:5, 22:6,
62:20, 75:12, 75:16,
124:13

**identified** [2] - 4:10,
153:5
**identify** [1] - 114:14
**ignorance** [1] - 58:6
**imagine** [1] - 82:5
**important** [4] - 16:3,
16:4, 34:1, 105:3
**impossible** [1] - 84:16
**impression** [1] - 72:20
**improper** [1] - 94:5
**IN** [2] - 1:5, 153:14
**in-law** [1] - 20:15
**include** [1] - 69:22
**including** [1] - 67:8
**income** [1] - 116:9
**Incorporated** [2] -
6:15, 97:4, 97:11,
98:11, 98:15
**incorrect** [1] - 68:9
**indeed** [1] - 87:15
**indefinitely** [1] - 13:12
**indicated** [2] - 93:21,
125:16
**indicates** [1] - 75:7
**indicating** [1] - 114:17
**indirectly** [2] - 128:11,
128:16
**individual** [1] - 80:3
**individually** [3] -
78:17, 79:22, 79:24
**industry** [3] - 47:23,
49:15, 49:17
**industry-related** [1] -
49:15
**information** [5] -
26:12, 39:20, 98:16,
100:7, 125:17
**initiate** [1] - 146:17
**inquire** [1] - 82:20
**inside** [1] - 13:20
**insiders** [1] - 117:2
**instance** [4] - 49:8,
94:16, 111:10,
111:15
**instead** [2] - 105:4,
105:17
**instructions** [1] -
151:7
**instruments** [1] - 31:4
**integral** [1] - 130:3
**intent** [2] - 31:24, 32:3
**interest** [4] - 54:10,
114:4, 116:12,
116:15, 116:16
**interested** [4] - 11:13,
11:17, 149:18,
153:12
**interface** [1] - 21:17
**intermediary** [2] -
120:23, 121:1

internally [1] - 113:18
International [2] - 36:11, 39:17
interrogatories [1] - 4:12
interrupt [3] - 34:2, 34:3, 93:21
investigate [3] - 109:14, 110:23, 118:14
invite [1] - 20:4
invoices [1] - 145:10
involuntary [1] - 24:15
involve [1] - 73:5
involved [12] - 28:4, 62:22, 64:12, 89:1, 89:3, 92:14, 119:15, 119:18, 124:2, 124:11, 130:5, 140:3
involvement [1] - 102:8
IRS [1] - 98:13
ish [1] - 8:23
issued [1] - 141:4
IT [1] - 38:22
item [1] - 132:20
itemization [5] - 67:14, 82:21, 132:11, 132:24, 142:23
itemized [1] - 78:4
items [1] - 117:22
itself [2] - 16:3, 78:15

**J**

JACKOWITZ [1] - 2:6
JAMES [1] - 2:2
James [15] - 4:14, 34:4, 58:1, 93:17, 99:5, 114:23, 131:18, 135:20, 142:16, 145:15, 147:7, 149:2, 149:6, 149:7
January [2] - 145:5, 145:21
Jeff [4] - 21:9, 21:11, 145:24, 146:9
Jim [116] - 2:16, 11:6, 12:3, 12:4, 14:8, 14:16, 15:18, 16:5, 18:12, 19:2, 19:5, 19:22, 21:13, 21:17, 23:7, 23:13, 39:10, 42:23, 43:4, 43:6, 44:13, 44:21, 46:17, 51:22, 55:16, 61:23, 62:24, 65:18, 65:23, 67:4, 67:7, 67:22,

68:9, 68:16, 70:21, 71:4, 71:7, 83:22, 83:23, 85:11, 85:20, 91:16, 92:3, 92:7, 92:17, 92:22, 93:7, 94:24, 95:3, 96:16, 96:24, 97:14, 98:1, 98:3, 98:9, 101:18, 102:10, 102:22, 103:3, 103:4, 104:8, 105:6, 105:16, 106:11, 107:5, 108:9, 109:10, 109:13, 109:19, 109:20, 111:7, 111:13, 111:23, 112:16, 121:11, 121:13, 121:15, 123:15, 124:24, 125:24, 126:7, 126:8, 127:9, 128:15, 128:19, 128:22, 129:4, 129:8, 129:16, 130:20, 130:24, 131:2, 131:11, 132:3, 132:5, 136:19, 137:9, 137:16, 137:17, 137:19, 138:1, 139:3, 139:8, 139:23, 140:10, 140:11, 140:12, 142:7, 142:9, 143:12, 144:2, 144:3, 148:21
Jim's [3] - 39:17, 89:16, 107:2
Jimmy [14] - 14:20, 20:3, 22:6, 26:2, 26:15, 29:14, 29:16, 56:23, 56:24, 63:21, 69:23, 72:6, 80:7, 134:6
Joan [7] - 10:1, 10:3, 10:8, 10:10, 27:6, 27:9, 102:21
job [2] - 89:10, 92:20
jobs [1] - 48:14
Joe [7] - 57:21, 58:5, 66:24, 67:16, 118:15, 131:16, 149:11
Joe's [1] - 113:7
John [23] - 9:24, 18:14, 18:16, 24:9, 67:9, 67:10, 70:24, 77:20, 77:22, 78:1, 79:9, 79:10, 79:23, 80:16, 127:13,

127:14, 127:15, 128:5, 138:8, 138:11, 143:14, 143:17, 144:18
Johnson [119] - 23:18, 24:11, 24:14, 24:22, 24:24, 25:1, 25:4, 25:10, 25:14, 25:17, 25:20, 26:1, 26:11, 28:3, 29:24, 31:13, 31:15, 31:21, 31:24, 32:4, 51:12, 51:13, 51:23, 53:9, 53:23, 54:14, 54:15, 56:14, 56:16, 62:18, 63:6, 63:24, 64:2, 64:7, 64:9, 64:22, 65:4, 65:7, 65:14, 65:17, 66:1, 66:7, 68:11, 68:23, 69:11, 69:21, 70:14, 71:22, 71:23, 71:24, 72:8, 72:10, 72:11, 72:13, 73:20, 74:1, 75:9, 76:9, 76:11, 78:16, 79:17, 79:21, 80:3, 80:15, 81:2, 81:3, 81:11, 81:13, 82:18, 84:4, 84:7, 84:20, 84:23, 85:1, 88:1, 88:6, 88:12, 98:23, 99:19, 100:9, 101:4, 101:7, 101:13, 111:10, 111:15, 111:19, 111:21, 111:24, 119:15, 120:2, 120:7, 124:1, 124:18, 125:4, 125:23, 126:7, 128:12, 128:16, 128:18, 129:17, 130:3, 130:6, 130:11, 130:23, 131:13, 131:22, 133:24, 134:12, 135:23, 138:8, 139:11, 140:3, 140:10, 141:10, 141:19, 141:22, 152:23
JOHNSON [1] - 1:7
Johnson's [12] - 5:4, 25:22, 26:18, 31:7, 40:8, 64:16, 81:19, 84:1, 125:24, 131:24, 135:13, 137:3
Johnsons [26] - 53:14, 62:17, 65:3, 65:5, 65:22, 68:6, 70:11, 70:16, 72:22, 73:19,

73:23, 94:8, 94:9, 100:20, 102:9, 102:10, 102:16, 111:14, 120:22, 121:22, 123:8, 137:13, 137:17, 137:23, 138:5, 142:2
joined [1] - 9:18
joint [2] - 17:20, 82:7
JOSEPH [1] - 2:8
Joseph [1] - 5:2
journal [2] - 114:15, 114:17
jump [5] - 57:22, 71:5, 72:14, 112:19, 118:20
June [9] - 7:14, 8:4, 13:23, 24:19, 60:23, 60:24, 66:16, 144:8, 144:15
justify [3] - 57:2, 57:4, 88:12

**K**

keep [5] - 111:8, 117:15, 127:8, 138:18, 145:14
keeping [3] - 49:23, 89:3, 89:8
Ken [20] - 20:10, 21:8, 21:13, 21:17, 21:20, 22:13, 22:15, 22:16, 23:10, 24:4, 37:3, 37:12, 42:2, 55:12, 55:13, 55:16, 55:18, 55:19, 62:6, 93:15
Ken's [1] - 146:5
kept [1] - 117:18
KEVIN [5] - 1:11, 4:9, 151:22, 152:15, 153:5
Kevin [9] - 2:7, 3:3, 11:15, 67:7, 67:12, 67:17, 67:21, 82:3, 127:22
kevin [1] - 5:20
kids [5] - 13:7, 13:10, 14:12, 15:9, 15:12
kind [12] - 18:14, 35:8, 36:13, 57:1, 57:3, 57:4, 58:10, 88:12, 95:5, 95:6, 97:18, 105:23
knowing [4] - 17:24, 31:5, 123:9
knowledge [26] - 18:21, 21:5, 21:13, 25:19, 25:22, 26:8, 26:10, 32:3, 41:13,

41:17, 62:12, 62:16, 62:23, 65:23, 66:6, 66:9, 69:22, 72:1, 75:11, 76:6, 78:16, 79:18, 81:7, 97:10, 101:24, 120:22
knows [2] - 85:19, 93:15
KREMS [1] - 2:6
Kristen [1] - 2:7

**L**

label [1] - 74:14
labeled [2] - 78:8, 78:9
land [34] - 8:5, 8:15, 8:18, 8:19, 8:22, 9:4, 9:7, 9:8, 9:9, 9:13, 9:21, 11:2, 12:1, 12:5, 15:24, 16:3, 26:18, 27:7, 65:22, 70:8, 77:11, 101:19, 103:18, 104:5, 106:9, 108:2, 121:3, 138:2, 144:7, 144:11, 144:13
Land [12] - 28:5, 31:18, 64:22, 66:4, 66:10, 75:7, 75:9, 75:21, 75:23, 80:19, 120:7, 137:14
land/building [1] - 11:7
Lanza [10] - 23:20, 23:22, 24:21, 80:15, 80:17, 81:3, 139:3, 139:8, 139:19, 141:16
large [6] - 18:4, 27:9, 48:8, 50:13, 50:14, 51:11
last [12] - 30:2, 69:5, 92:12, 93:6, 93:8, 93:12, 103:9, 138:24, 139:21, 140:7, 142:12, 145:16
late [2] - 8:3, 16:24
law [2] - 20:15, 146:2
Lawrence [1] - 36:11
lawyer [7] - 111:22, 111:23, 112:10, 139:16, 139:22, 141:13, 141:17
lawyers [1] - 127:20
lay [1] - 141:9
laying [1] - 83:20
learn [1] - 26:12
lease [1] - 8:1
least [2] - 144:13,

148:11
**leave** [1] - 36:20
**led** [1] - 78:20
**left** [4] - 89:7, 91:9, 94:12, 106:5
**legal** [2] - 6:20, 10:14, 10:18, 18:15, 27:2, 59:24, 90:13, 103:21, 103:24, 112:15, 131:11, 134:24
**lender** [2] - 126:24, 127:5, 129:6, 130:15, 135:11
**less** [5] - 17:4, 21:4, 88:15, 96:2, 96:3
**letters** [1] - 85:3
**level** [3] - 20:6, 101:22, 104:7
**lien** [1] - 71:3
**life** [2] - 45:8, 57:15
**likely** [1] - 77:4
**limbo** [2] - 13:9, 18:2
**limited** [1] - 121:2
**LINE** [1] - 151:8
**line** [9] - 34:1, 61:9, 64:5, 87:9, 87:16, 90:17, 104:12, 117:22, 133:24
**lisa** [3] - 66:24, 103:8, 147:17
**LISA** [1] - 2:12
**Lisa** [9] - 4:22, 28:10, 47:12, 57:21, 67:16, 99:3, 100:22, 118:13, 131:16
**list** [1] - 126:2
**listen** [1] - 14:8
**listing** [1] - 78:4
**literally** [1] - 87:3
**live** [12] - 5:21, 7:6, 12:10, 12:12, 12:20, 64:23, 70:18, 104:10, 104:13, 104:15, 105:1, 105:7
**lived** [2] - 7:10, 13:19
**living** [2] - 89:6, 90:23
**LLC's** [1] - 18:20
**LLP** [3] - 2:6, 2:9, 117:9
**loan** [15] - 22:14, 22:19, 22:20, 32:19, 37:5, 37:15, 42:10, 56:1, 61:14, 113:24, 114:6, 114:21, 116:5, 116:10, 146:23
**loans** [2] - 22:16, 22:22
**located** [1] - 36:10

**lock** [1] - 141:6
**log** [1] - 143:6
**logic** [1] - 21:11
**logical** [1] - 85:20
**logistics** [1] - 112:21
**long-standing** [1] - 21:14
**look** [10] - 28:14, 28:15, 28:17, 78:10, 88:20, 106:13, 107:11, 108:3, 110:21, 149:9
**looked** [5] - 28:21, 69:5, 105:20, 105:24, 146:23
**looking** [11] - 9, 11:10, 16:6, 16:11, 21:9, 57:13, 71:21, 91:6, 91:8, 106:4, 108:1, 119:3
**looks** [5] - 51:11, 51:12, 78:24, 117:5, 123:24
**lose** [1] - 92:6
**loses** [1] - 85:18
**loss** [1] - 119:5
**lost** [2] - 103:8, 142:17
**loud** [1] - 140:8
**Lougee** [1] - 1:18
**LOUGEE** [1] - 2:9
**love** [2] - 140:21, 140:22
**low** [2] - 93:3, 132:18
**LYONS** [1] - 133:9
**Lyons** [1] - 2:16

## M

**M&T** [2] - 61:5, 61:12
**M-hum** [6] - 40:3, 41:5, 91:17, 109:9, 122:16, 137:18
**m-hum** [4] - 9:3, 61:24, 69:20, 132:23
**MA** [5] - 1:23, 2:3, 2:7, 2:10, 2:13
**mail** [107] - 25:16, 36:17, 37:16, 38:1, 38:16, 38:17, 44:16, 44:20, 44:22, 55:22, 66:20, 67:3, 67:4, 67:6, 68:9, 68:13, 68:14, 68:15, 68:16, 69:2, 69:4, 69:5, 69:9, 69:14, 69:21, 71:8, 71:9, 71:18, 71:21, 72:5, 72:9, 72:11, 72:16, 73:24, 79:4, 79:11, 80:14, 80:15, 80:22, 81:11,

81:19, 81:20, 82:3, 82:6, 82:7, 84:1, 84:3, 84:6, 84:7, 101:3, 101:5, 111:24, 119:10, 119:12, 119:17, 123:21, 123:23, 124:2, 124:7, 125:10, 125:13, 125:15, 125:22, 125:24, 126:2, 126:6, 127:3, 127:4, 127:8, 127:9, 127:20, 128:19, 129:3, 129:21, 130:11, 131:2, 131:3, 131:5, 131:15, 131:16, 131:20, 134:7, 134:11, 134:23, 135:20, 136:1, 136:24, 137:2, 137:5, 138:7, 138:14, 139:2, 139:11, 139:21, 139:24, 140:2, 140:9, 140:13, 142:1, 142:8, 145:13, 145:21, 146:13, 149:10, 149:11
**mailed** [8] - 25:14, 25:19, 37:7, 38:15, 52:2, 52:3, 67:5, 129:9
**mailing** [4] - 71:24, 81:3, 125:9, 125:12
**mails** [18] - 26:13, 26:14, 28:19, 38:4, 38:7, 38:8, 38:12, 38:19, 41:2, 60:17, 63:10, 82:17, 100:11, 101:10, 115:9, 119:1, 128:8, 128:18
**Main** [2] - 2:13, 148:1
**main** [1] - 19:9
**major** [1] - 6:7
**majority** [1] - 17:17
**man** [5] - 12:21, 23:17, 23:20, 110:4, 110:6
**manager** [1] - 148:13
**March** [14] - 32:7, 33:12, 33:13, 34:11, 34:23, 34:24, 35:3, 35:5, 37:19, 45:6, 119:22, 133:12, 144:21, 145:1
**Marcum** [1] - 117:9
**Mark** [5] - 23:20,

80:15, 80:17, 81:3, 141:15
**MARK** [1] - 151:5
**marked** [1] - 150:2
**market** [3] - 11:12, 88:16, 89:18
**marketable** [1] - 126:23
**Mass** [2] - 6:3, 98:14
**MASSACHUSETTS** [1] - 1:2
**Massachusetts** [11] - 1:14, 1:17, 1:19, 5:22, 7:7, 12:11, 33:20, 36:11, 153:1, 153:4, 153:19
**match** [1] - 87:16
**materials** [1] - 143:4
**math** [2] - 138:4, 144:17
**math's** [1] - 74:5
**matter** [3] - 14:10, 29:24, 57:12
**McKenzie** [3] - 1:15, 153:3, 153:18
**mean** [52] - 10:19, 14:23, 17:7, 18:11, 22:3, 24:6, 26:13, 27:17, 31:1, 33:3, 39:8, 42:15, 44:10, 46:2, 49:14, 50:12, 60:3, 60:17, 77:4, 78:14, 78:15, 79:23, 80:23, 81:20, 87:10, 92:16, 96:19, 96:24, 100:10, 101:23, 102:12, 102:13, 103:10, 103:12, 104:6, 108:9, 114:15, 115:2, 115:3, 117:3, 117:24, 119:17, 124:11, 129:2, 131:22, 133:2, 134:3, 136:9, 137:16, 137:24, 141:20, 143:6
**meaning** [2] - 25:23, 67:23
**means** [2] - 81:16, 134:5
**meant** [2] - 100:3, 149:6
**meet** [1] - 24:2
**meeting** [1] - 7:20
**meetings** [1] - 24:18
**Melissa** [3] - 1:15, 153:3, 153:18
**members** [1] - 20:23
**memorialization** [3] -

122:6, 137:13, 138:15
**memorializing** [6] - 40:24, 41:15, 89:23, 98:14, 115:16, 137:2
**memory** [4] - 45:16, 64:14, 71:22, 119:14
**mention** [1] - 40:8
**merit** [1] - 75:22
**mess** [2] - 127:10, 129:9
**message** [2] - 139:3, 139:8
**met** [5] - 23:23, 25:1, 53:23, 54:3, 126:15
**method** [2] - 55:17, 56:1, 78:8
**Metrowest** [2] - 11:10, 104:21
**midsized** [1] - 135:2
**might** [4] - 61:9, 95:3, 116:20, 136:19
**million** [23] - 39:6, 45:1, 45:24, 46:18, 46:23, 53:8, 53:13, 54:5, 54:7, 57:1, 57:5, 57:16, 59:8, 82:9, 92:19, 93:5, 93:11, 93:12, 121:21, 122:24, 123:5, 123:8, 130:21
**mind** [2] - 30:13, 71:19
**minute** [1] - 127:21
**minutes** [2] - 71:19, 113:8
**Mirick** [1] - 1:18
**MIRICK** [1] - 2:9
**mistake** [1] - 94:6
**mix** [1] - 80:20
**Mobil** [1] - 6:23
**monetary** [2] - 81:5, 82:19
**money** [80] - 9:20, 17:11, 17:22, 22:13, 24:8, 31:13, 31:15, 31:18, 31:20, 31:23, 32:2, 33:21, 34:10, 35:12, 35:13, 36:12, 37:13, 39:1, 39:2, 39:24, 40:12, 40:14, 41:1, 41:3, 42:22, 43:8, 43:10, 50:13, 50:14, 50:23, 52:22, 54:14, 54:18, 55:15, 56:21, 58:4, 60:2, 60:11, 60:20, 60:22, 62:5, 62:12, 63:3, 63:24, 66:2, 66:4, 66:7, 68:17, 72:1,

74:2, 76:15, 76:17, 77:3, 77:8, 82:21, 84:19, 86:2, 88:13, 88:15, 96:12, 96:15, 96:17, 96:20, 97:14, 97:16, 98:6, 98:8, 98:11, 98:17, 98:20, 105:18, 107:14, 114:12, 115:11, 115:17, 119:23, 122:2, 130:9, 133:23, 137:24

**money's** [1] - 40:10

**monies** [2] - 68:7, 71:22

**month** [6] - 7:12, 29:16, 45:1, 45:3, 45:11, 126:10

**months** [4] - 14:2, 26:20, 81:4, 139:5

**morning** [3] - 30:3, 30:5, 141:14

**mortgage** [17] - 16:21, 16:23, 17:2, 17:8, 40:22, 43:21, 60:23, 61:4, 61:6, 61:7, 61:10, 61:11, 61:14, 66:14, 66:15, 80:9

**mortgages** [4] - 16:19, 16:20, 60:24, 66:12

**most** [3] - 8:14, 77:4

**mostly** [3] - 26:13, 26:19, 28:19

**mother's** [2] - 20:12, 20:14

**motion** [2] - 52:5, 52:6

**motions** [1] - 4:7

**motive** [1] - 94:11

**move** [21] - 7:17, 8:1, 12:24, 13:2, 14:6, 14:20, 15:12, 21:5, 26:6, 57:22, 87:4, 88:21, 89:11, 91:4, 104:14, 113:6, 118:17, 118:20, 119:19, 131:6, 140:17

**moved** [13] - 7:12, 12:9, 13:13, 13:23, 14:19, 15:16, 70:1, 90:4, 90:7, 133:1, 134:18, 134:19, 134:22

**movement** [1] - 34:10

**moving** [3] - 15:9, 127:8, 138:18

**MR** [186] - 4:13, 4:19, 4:21, 6:16, 10:16, 11:23, 12:2, 27:4, 29:2, 30:12, 30:13,

30:15, 30:24, 33:24, 34:3, 34:5, 34:6, 35:4, 38:11, 38:14, 38:23, 42:13, 44:6, 44:8, 47:9, 47:19, 50:4, 52:5, 54:15, 54:24, 56:22, 57:21, 58:2, 58:3, 58:15, 58:17, 58:20, 58:21, 58:22, 58:24, 59:3, 59:6, 59:7, 59:13, 60:8, 63:8, 64:24, 65:12, 66:22, 67:19, 68:12, 70:3, 70:12, 71:10, 71:12, 71:14, 71:17, 72:2, 74:10, 74:12, 75:14, 81:6, 81:10, 81:12, 81:15, 81:18, 82:1, 84:12, 84:21, 85:8, 86:5, 86:13, 87:8, 87:19, 87:21, 88:3, 88:7, 88:17, 88:20, 89:19, 90:10, 90:12, 93:19, 94:2, 94:14, 94:17, 94:18, 94:23, 95:9, 95:11, 95:15, 95:16, 96:13, 96:18, 97:2, 97:12, 98:24, 99:3, 99:5, 99:15, 100:22, 102:24, 103:2, 103:8, 106:6, 106:17, 107:22, 108:8, 108:17, 109:4, 111:17, 112:19, 112:21, 113:1, 113:2, 113:6, 113:8, 113:10, 114:3, 114:23, 115:2, 115:5, 115:8, 115:14, 115:18, 115:22, 115:23, 116:2, 117:7, 117:9, 117:10, 118:13, 118:15, 118:16, 118:17, 118:23, 119:8, 120:3, 122:8, 122:11, 123:1, 123:19, 124:3, 124:6, 125:5, 125:11, 125:18, 128:14, 128:17, 129:18, 130:8, 130:22, 131:14, 131:19, 132:1, 133:8, 133:9, 133:19, 135:4, 135:22, 136:3, 136:6, 136:14, 136:19, 136:23, 137:4, 137:15,

137:21, 138:16, 138:19, 138:21, 138:24, 142:3, 142:6, 142:10, 142:19, 142:21, 145:16, 145:19, 145:20, 146:22, 147:6, 147:17, 149:9, 149:22, 150:1

**MS** [27] - 57:24, 67:1, 93:17, 93:20, 94:4, 94:15, 94:21, 95:1, 95:13, 100:23, 101:1, 112:17, 131:17, 131:21, 135:19, 135:23, 136:4, 136:7, 136:12, 136:21, 142:16, 142:20, 147:7, 147:10, 149:7, 149:18, 149:23

**multiple** [2] - 9:14, 103:17

**must** [2] - 72:6, 152:7

## N

**NAME** [1] - 152:23

**name** [16] - 4:14, 5:18, 6:19, 18:23, 26:19, 28:5, 28:7, 28:8, 28:9, 35:17, 40:8, 49:12, 84:7, 103:18, 148:4, 148:11

**named** [3] - 23:17, 23:20, 80:3

**names** [3] - 18:10, 27:12, 78:15

**Natick** [16] - 12:11, 12:12, 14:5, 14:19, 15:10, 15:21, 16:16, 16:21, 17:6, 17:16, 33:2, 49:2, 49:5, 62:1, 89:7, 104:14

**nature** [1] - 149:15

**navigate** [3] - 103:19, 103:21, 134:24

**near** [1] - 89:8

**necessarily** [5] - 36:23, 94:11, 102:16, 137:16, 148:20

**necessary** [3] - 58:23, 111:7, 111:8

**need** [31] - 18:1, 22:7, 35:16, 36:12, 36:14, 39:20, 40:13, 44:13, 44:24, 46:6, 46:7, 46:9, 51:6, 54:22,

55:7, 55:15, 57:18, 57:19, 62:6, 67:11, 78:21, 83:1, 83:2, 110:12, 110:16, 111:3, 111:5, 111:12, 126:10, 127:13, 140:17

**needed** [8] - 34:12, 37:14, 39:22, 39:24, 55:11, 62:24, 99:19, 121:16

**needing** [1] - 99:22

**needs** [1] - 103:14

**negotiable** [1] - 46:7

**negotiate** [2] - 18:9, 109:1

**negotiating** [1] - 18:11

**negotiations** [1] - 120:20

**neighborhood** [3] - 16:5, 16:9, 89:18

**never** [39] - 14:23, 23:23, 25:3, 25:14, 25:19, 31:20, 32:2, 46:1, 46:3, 46:21, 47:3, 47:4, 47:6, 47:10, 48:18, 49:19, 50:23, 51:2, 52:11, 53:23, 54:3, 61:18, 63:7, 70:15, 70:16, 72:5, 72:10, 72:12, 75:15, 82:10, 82:13, 83:14, 85:6, 99:18, 112:1, 133:6, 141:3

**new** [2] - 15:22, 89:12

**next** [2] - 67:13, 76:23

**nice** [1] - 5:3

**nine** [1] - 14:2

**nobody** [1] - 50:18

**normal** [1] - 104:23

**North** [57] - 6:15, 6:18, 6:19, 7:1, 19:1, 19:6, 19:7, 19:15, 22:14, 22:15, 22:19, 23:1, 23:9, 23:10, 24:5, 24:10, 32:19, 35:22, 35:23, 41:7, 41:8, 41:11, 41:13, 42:24, 43:5, 43:7, 43:10, 43:18, 48:17, 48:18, 48:22, 56:1, 60:12, 61:21, 61:22, 76:20, 80:11, 83:17, 83:19, 91:20, 92:13, 92:22, 93:7, 95:23, 97:23, 113:12, 114:1, 114:10, 114:13, 114:19, 115:10, 115:15, 115:21, 115:24, 116:15,

118:19, 146:19

**North's** [2] - 97:8, 114:11

**nose** [1] - 85:16

**NOT** [1] - 151:5

**Notary** [4] - 1:16, 4:11, 153:3, 153:18

**note** [3] - 40:20, 43:19, 60:6

**nothing** [10] - 29:20, 91:3, 91:13, 91:18, 93:4, 107:20, 112:13, 118:7, 141:21, 150:1

**notice** [2] - 56:18, 69:14

**November** [5] - 125:23, 126:2, 126:6, 134:12, 153:15

**number** [4] - 93:14, 95:7, 120:17

**numbers** [3] - 9:9, 11:14, 149:3

## O

**o'clock** [1] - 135:5

**O'CONNELL** [1] - 2:9

**O'Connell** [1] - 1:18

**oath** [4] - 24:17, 99:11, 130:2, 153:6

**objection** [69] - 10:16, 27:4, 30:12, 30:24, 35:4, 42:13, 47:9, 47:19, 50:4, 54:15, 56:22, 58:15, 59:13, 60:8, 65:12, 68:12, 70:3, 70:12, 71:10, 72:2, 81:6, 84:12, 84:21, 85:8, 86:5, 87:8, 87:19, 88:3, 88:7, 88:17, 89:19, 90:10, 94:14, 94:17, 95:9, 96:13, 96:18, 97:2, 97:12, 98:24, 102:24, 103:2, 106:6, 106:17, 107:22, 108:8, 108:17, 109:4, 111:17, 114:3, 123:1, 124:3, 124:6, 125:5, 125:11, 125:18, 128:14, 128:17, 129:18, 130:8, 130:22, 132:1, 133:19, 137:4, 137:15, 138:16, 142:3, 142:6, 142:10

**Objection** [6] - 75:14, 86:13, 94:23, 123:13, 137:21, 146:22

**objections** [1] - 4:7

**obligation** [3] - 59:24, 80:5, 114:18

**obligor** [1] - 114:18

**obviously** [6] - 39:20, 40:19, 75:20, 100:10, 129:22, 149:15

**occasional** [1] - 26:15

**occupancy** [1] - 7:18

**occupation** [1] - 9:1

**occurred** [5] - 8:2, 10:24, 22:1, 24:19, 78:20

**october** [1] - 152:23

**October** [3] - 1:20, 119:12, 153:5

**odds** [1] - 15:5

**OF** [3] - 1:2, 1:11, 3:2

**offer** [5] - 95:20, 126:17, 134:2, 136:16, 140:22

**office** [14] - 5:1, 9:24, 36:22, 39:10, 39:14, 39:17, 75:2, 76:7, 77:11, 79:10, 79:23, 85:3, 110:1, 153:15

**OFFICE** [1] - 2:12

**officer** [4] - 7:4, 41:20, 48:5, 152:6

**offices** [1] - 1:18

**official** [1] - 148:14

**often** [2] - 45:8, 85:23

**once** [9] - 32:9, 39:1, 45:19, 139:14, 139:18, 139:20, 141:13, 149:19

**one** [65] - 5:10, 9:15, 9:16, 10:1, 10:4, 10:5, 10:6, 10:7, 10:11, 28:3, 29:5, 33:3, 33:16, 34:3, 37:23, 38:2, 39:22, 43:19, 43:21, 49:8, 49:11, 50:19, 51:5, 56:11, 61:4, 61:5, 69:14, 72:12, 76:23, 77:9, 77:13, 77:14, 80:18, 83:1, 83:2, 84:19, 86:1, 89:20, 92:18, 94:2, 95:19, 95:22, 96:14, 106:8, 107:23, 109:14, 112:11, 123:24, 125:21, 126:18, 126:20, 134:2,

136:9, 136:12, 136:16, 139:1, 140:1, 142:12, 143:12, 143:20, 145:16, 146:6

**One** [6] - 17:14, 17:15, 17:18, 17:23, 33:4, 62:4

**one-on-one** [1] - 72:12

**ones** [2] - 43:3, 88:23

**open** [3] - 86:11, 86:15, 88:16

**opinion** [6] - 22:4, 88:5, 88:8, 88:9, 122:22, 124:4

**opportunity** [1] - 11:7, 93:24

**optimistic** [1] - 15:4

**oral** [3] - 63:9, 63:11, 142:9

**orally** [4] - 25:6, 25:8, 142:4, 142:7

**order** [8] - 22:19, 34:14, 35:14, 35:16, 35:20, 36:12, 65:10, 146:24

**ordered** [1] - 24:15

**organized** [1] - 9:9

**origin** [1] - 32:23

**original** [1] - 120:1

**otherwise** [1] - 79:13

**outcome** [1] - 153:13

**outline** [1] - 83:15

**outside** [5] - 19:22, 20:8, 29:14, 134:9, 141:21

**overages** [2] - 133:15, 133:17

**oversees** [1] - 5:1

**owe** [5] - 67:23, 68:20, 72:1, 82:18, 137:10

**owed** [14] - 24:10, 41:1, 68:17, 72:21, 79:5, 114:12, 133:7, 133:10, 133:12, 137:14, 137:17, 137:23, 138:15, 144:19

**own** [2] - 52:14, 52:20, 53:5

**owned** [5] - 8:16, 35:23, 60:4, 79:20, 139:18

**owners** [1] - 146:6

**ownership** [6] - 11:4, 20:22, 42:2, 42:3, 60:10, 127:12

**owns** [2] - 20:17, 20:18

## P

**P&S** [2] - 127:12, 129:12

**P.C** [1] - 2:2

**p.m** [1] - 150:4

**Page** [1] - 139:2

**page** [2] - 67:13, 67:20

**PAGE** [2] - 3:10, 151:8

**paid** [52] - 9:12, 10:7, 18:3, 23:7, 24:4, 24:9, 31:16, 37:1, 42:12, 48:1, 48:15, 48:16, 48:18, 48:20, 48:23, 49:5, 49:9, 49:13, 49:19, 50:11, 62:21, 64:16, 64:21, 65:7, 68:6, 71:22, 72:22, 73:3, 73:21, 74:2, 79:1, 79:9, 79:17, 86:10, 86:16, 98:17, 98:20, 116:10, 116:12, 117:20, 117:23, 120:2, 120:14, 124:13, 124:21, 130:10, 132:9, 144:12, 146:24, 148:20

**paper** [3] - 98:3, 108:12, 134:22

**paperwork** [4] - 52:8, 58:23, 59:1, 59:4

**parameters** [1] - 12:7

**parcel** [4] - 139:16, 139:18, 141:11, 141:12

**parcels** [4] - 139:6, 139:18, 140:4, 140:5

**Park** [1] - 2:9

**part** [20] - 13:11, 35:18, 47:23, 47:24, 55:1, 76:12, 102:14, 106:12, 106:14, 120:3, 124:7, 125:10, 125:13, 133:3, 133:5, 133:6, 139:17, 140:5, 144:17, 146:4

**particularly** [1] - 36:21

**parties** [5] - 4:3, 10:2, 20:4, 152:4, 153:11

**partner** [1] - 127:19

**parts** [1] - 126:14

**pass** [1] - 28:17

**passing** [1] - 133:20

**patience** [1] - 70:23

**Patierno** [96] - 11:6, 14:17, 15:18, 19:2, 19:5, 19:22, 21:14,

21:18, 23:13, 24:20, 26:10, 29:8, 29:11, 29:18, 43:11, 44:3, 44:24, 45:18, 45:23, 46:13, 47:15, 50:6, 50:22, 50:23, 51:2, 51:19, 52:10, 54:17, 55:1, 55:12, 56:19, 59:10, 61:23, 62:17, 64:15, 67:7, 69:17, 70:21, 71:4, 71:15, 72:15, 73:2, 73:5, 73:11, 73:24, 76:1, 76:2, 79:13, 79:16, 80:16, 81:1, 82:9, 82:20, 84:9, 84:17, 85:5, 86:2, 87:12, 87:17, 87:24, 88:5, 91:16, 92:3, 92:7, 92:22, 93:7, 93:22, 94:5, 94:10, 96:16, 96:24, 98:1, 98:6, 98:22, 99:18, 122:4, 122:17, 122:23, 124:24, 125:24, 126:7, 127:9, 128:19, 129:8, 130:20, 131:2, 132:3, 133:7, 133:11, 134:6, 137:9, 139:23, 142:4, 142:7, 143:13

**Patierno's** [12] - 23:8, 39:10, 39:13, 52:13, 52:17, 55:4, 70:23, 74:8, 74:19, 119:21, 142:9, 145:3

**pay** [58] - 9:7, 9:12, 10:3, 15:22, 16:12, 24:6, 24:10, 31:13, 31:15, 31:18, 41:9, 41:15, 43:3, 43:16, 47:13, 47:16, 48:3, 49:2, 49:22, 49:23, 50:1, 59:24, 60:22, 61:22, 63:19, 63:24, 64:2, 64:9, 65:2, 65:4, 65:14, 65:17, 66:1, 66:4, 66:7, 66:9, 71:23, 76:17, 79:7, 80:5, 80:10, 85:22, 88:1, 92:22, 92:24, 93:6, 95:18, 104:1, 114:21, 116:16, 120:7, 120:11, 126:18, 127:5, 134:2, 136:16, 140:18, 141:15

**paying** [6] - 46:23, 62:17, 86:9, 95:17,

132:6, 132:8

**payment** [9] - 41:22, 42:12, 55:17, 56:2, 63:3, 75:22, 77:7, 78:8, 115:16

**payments** [2] - 143:8, 145:11

**payoff** [1] - 17:2

**payor** [1] - 114:14

**pen** [1] - 134:22

**pending** [1] - 95:10

**people** [16] - 10:1, 10:23, 45:8, 47:11, 47:13, 47:14, 48:1, 49:24, 50:1, 85:22, 95:2, 95:18, 96:10, 96:14, 106:20, 125:16

**per** [1] - 18:11

**percent** [8] - 15:20, 18:1, 61:17, 91:5, 95:15, 126:18, 134:2, 136:16

**percentage** [2] - 15:4, 48:11

**perfect** [1] - 16:10

**perfectly** [1] - 93:22

**period** [2] - 19:17, 33:10

**perjury** [1] - 100:18

**permit** [9] - 7:17, 7:18, 26:4, 87:7, 87:15, 126:9, 126:21, 139:20, 141:4

**permits** [2] - 62:23, 109:1

**permitting** [6] - 53:18, 64:7, 89:2, 124:4, 124:8, 124:11

**person** [7] - 7:23, 25:8, 27:7, 31:23, 32:2, 112:6

**person-to-person** [1] - 112:6

**personal** [8] - 20:1, 21:14, 109:19, 109:22, 114:11, 116:3, 116:7, 117:11

**personally** [2] - 23:19, 113:24

**Phaneuf** [1] - 2:17

**phone** [4] - 44:17, 44:19, 44:21, 72:19

**phrase** [2] - 19:3, 102:4

**physical** [1] - 49:1

**physically** [1] - 25:3

**pick** [3] - 33:15, 33:16, 34:19

**picked** [2] - 34:18,

34:19
**picture** [16] - 16:10,
34:22, 34:23, 36:18,
38:3, 51:15, 51:19,
51:22, 52:1, 57:13,
98:6, 98:8, 121:12,
121:14, 121:17,
123:7
**pictures** [1] - 33:11
**piece** [12] - 6:19,
20:22, 49:9, 60:18,
64:4, 67:9, 80:9,
98:3, 105:6, 105:10,
108:12, 143:19
**pieces** [7] - 32:8,
49:17, 57:11, 63:23,
80:8, 80:11, 103:17
**piles** [1] - 35:16
**place** [6] - 13:21,
35:20, 71:3, 80:1,
136:18
**Place** [1] - 39:17
**places** [1] - 104:16
**plan** [1] - 140:19
**planning** [1] - 132:16
**playbook** [1] - 47:12
**PLEASE** [1] - 151:5
**plenty** [1] - 110:3
**plus** [1] - 17:7
**point** [21] - 12:22,
18:2, 23:17, 24:7,
27:18, 28:3, 30:18,
39:5, 46:10, 52:15,
52:21, 52:22, 56:16,
57:12, 86:19, 90:15,
98:5, 99:13, 111:22,
133:16, 144:12
**pointed** [1] - 137:1
**pointing** [1] - 100:11
**polite** [1] - 34:9
**portal** [1] - 40:16
**portfolio** [2] - 35:18,
92:17
**portion** [2] - 51:11,
55:14
**position** [3] - 113:11,
116:22, 126:20
**possession** [1] -
40:14
**possible** [8] - 84:8,
84:9, 84:13, 84:14,
84:15, 133:21, 135:1
**possibly** [1] - 85:4
**potentially** [1] - 11:16
**practice** [3] - 42:9,
49:21, 49:22
**preparation** [4] -
28:12, 28:15, 28:24,
29:8
**prepare** [1] - 143:2,

143:4
**prepared** [2] - 45:14,
113:18
**Present** [1] - 2:16
**presumably** [3] - 41:4,
70:10, 129:16
**pretty** [4] - 30:17,
52:7, 89:10, 118:1
**previous** [1] - 78:22
**previously** [3] - 29:12,
79:4, 95:18
**price** [19] - 11:16,
11:19, 11:24, 16:15,
49:18, 49:20, 57:11,
80:6, 85:24, 86:3,
95:20, 95:24, 104:8,
126:17, 134:1,
135:21, 135:24,
136:2, 136:8
**pricey** [1] - 13:21
**prime** [1] - 19:19
**private** [4] - 113:15,
116:18, 116:21,
146:20
**privately** [1] - 20:19
**Procedure** [1] - 1:14
**procedure** [3] - 151:2,
151:5, 152:7
**proceeds** [2] - 17:17,
32:24
**process** [20] - 34:15,
34:16, 43:5, 44:13,
47:24, 48:4, 70:17,
119:16, 119:18,
124:2, 124:7,
124:12, 130:5,
131:7, 131:9, 133:3,
133:5, 133:6, 140:3,
140:5
**processes** [2] - 49:17,
89:2
**procure** [1] - 21:18
**procured** [3] - 27:2,
27:22, 28:1
**procuring** [1] - 18:8
**produce** [3] - 38:4,
116:1
**profit** [1] - 17:6
**progress** [1] - 126:8
**project** [9] - 26:6,
83:20, 106:12,
106:14, 108:1,
132:13, 132:14,
133:1, 134:18
**projects** [5] - 19:8,
19:20, 85:19, 92:11,
93:2, 97:8
**promise** [1] - 142:12
**promissory** [3] -
40:20, 43:19, 60:6

**proof** [1] - 55:23
**properly** [1] - 94:8
**Properties** [1] - 23:14
**properties** [1] - 92:17
**property** [18] - 17:16,
25:23, 27:1, 31:6,
33:2, 40:6, 53:3,
53:5, 65:1, 65:2,
70:21, 70:22, 71:3,
103:17, 105:6,
105:10, 127:6,
137:19
**Property** [1] - 18:20
**protect** [2] - 94:16,
95:6
**protecting** [1] - 91:3
**provide** [13] - 5:18,
22:13, 23:1, 43:11,
44:11, 66:6, 66:9,
75:5, 79:16, 88:11,
92:7, 139:19, 149:2
**provided** [9] - 23:13,
52:1, 74:8, 74:18,
75:2, 78:5, 141:20,
142:13, 142:15
**provision** [1] - 114:4
**provisions** [1] - 1:13
**public** [2] - 113:15,
116:19
**Public** [4] - 1:16, 4:11,
153:3, 153:18
**pull** [3] - 23:3, 42:18,
43:13, 59:4, 74:17
**pulling** [1] - 126:17,
134:2
**purchase** [45] - 8:18,
9:20, 10:15, 10:18,
10:21, 10:23, 11:2,
22:9, 23:2, 23:15,
25:23, 26:22, 26:24,
27:2, 27:8, 27:14,
27:16, 27:20, 27:23,
28:2, 28:20, 30:23,
31:2, 31:8, 43:12,
57:11, 65:10, 70:20,
77:7, 77:11, 77:18,
78:2, 80:6, 104:8,
105:2, 105:5, 106:9,
120:8, 128:12,
130:4, 143:9,
144:11, 144:19,
149:14
**purchased** [2] - 30:21,
63:15
**purchases** [2] - 77:10,
144:13
**purchasing** [4] - 40:5,
54:9, 105:10, 105:18
**purpose** [7] - 59:2,
59:12, 59:17, 59:20,

84:18, 99:21, 144:3
**purposes** [6] - 59:5,
107:14, 108:6,
108:19, 117:16
**pursuant** [1] - 1:13
**put** [24] - 15:4, 17:11,
18:1, 26:3, 34:13,
34:14, 36:7, 59:17,
62:2, 66:19, 71:17,
74:7, 74:13, 75:18,
76:3, 80:13, 83:14,
106:20, 109:3,
109:7, 118:10,
118:24, 134:22,
139:1
**putting** [1] - 119:2

## Q

**quarter** [20] - 12:19,
39:5, 45:1, 45:24,
46:18, 46:23, 53:8,
53:13, 54:5, 54:7,
57:1, 57:5, 57:16,
59:8, 82:9, 121:21,
122:24, 123:5,
123:8, 130:20
**questioned** [2] -
24:17, 122:24
**questions** [15] - 11:21,
24:21, 28:11, 34:2,
55:9, 90:13, 91:22,
99:6, 99:16, 101:3,
112:20, 118:12,
122:9, 147:8, 153:8
**queue** [1] - 146:11
**quick** [5] - 44:7, 58:3,
88:21, 113:6, 135:19
**quickly** [2] - 119:10,
140:17
**quite** [1] - 70:4
**quote** [1] - 130:15

## R

**raise** [1] - 130:21
**ran** [2] - 71:15, 72:6
**range** [11] - 9:16, 9:17,
11:16, 11:19, 11:24,
12:7, 23:4, 37:21,
64:13, 132:17,
132:18
**ranking** [1] - 148:14
**RE** [1] - 1:5
**Re** [1] - 152:23
**reached** [2] - 37:9,
71:16, 128:5
**read** [1] - 52:13,
54:24, 55:3, 55:4,
67:3, 80:23, 119:24,

123:19, 125:21,
126:6, 127:1,
134:11, 134:23,
135:8, 135:10,
140:8, 145:13,
151:2, 151:3, 152:3,
152:11
**reading** [4] - 4:4, 7:7,
128:8, 152:4
**Reading** [21] - 5:22,
7:19, 11:9, 13:3,
14:9, 14:20, 15:16,
15:19, 15:22, 16:7,
63:13, 63:16, 88:18,
89:7, 90:4, 90:7,
104:11, 104:18,
105:2, 105:20,
105:24
**ready** [2] - 9:1, 31:12
**real** [14] - 18:18, 44:7,
48:22, 48:23, 49:10,
52:14, 52:20, 57:6,
71:2, 77:7, 77:18,
78:2, 92:14, 146:20
**realize** [1] - 110:20
**really** [11] - 15:13,
21:19, 22:2, 46:7,
48:10, 87:10,
103:13, 104:6,
104:20, 107:17,
125:22
**REASON** [12] - 151:9,
151:10, 151:11,
151:12, 151:13,
151:14, 151:15,
151:16, 151:17,
151:18, 151:19,
151:20
**reason** [6] - 15:8,
50:12, 109:19,
109:23, 119:1, 139:9
**reasons** [4] - 54:22,
94:3, 95:22, 152:6
**receipt** [7] - 97:15,
97:18, 98:2, 110:21,
115:16, 122:2, 152:7
**receipts** [1] - 118:2
**receivable** [4] - 114:8,
114:9, 114:10,
114:12
**receive** [2] - 75:8,
75:10
**received** [15] - 29:12,
36:4, 39:11, 62:2,
67:10, 71:1, 77:16,
78:7, 84:20, 85:3,
113:24, 129:3,
138:5, 139:3, 139:8
**receiving** [4] - 82:17,
85:5, 130:7, 131:4

recently [4] - 19:11, 19:12, 19:13, 80:23
recess [1] - 44:9
recipient [1] - 100:8
recognize [13] - 61:7, 67:17, 69:11, 74:22, 76:4, 76:23, 78:10, 78:14, 121:6, 123:21, 139:24, 140:8, 142:23
recollect [1] - 118:4
recollection [5] - 54:20, 55:6, 55:24, 110:18, 120:20
recommended [3] - 127:11, 129:11, 134:8
record [16] - 4:19, 4:20, 5:19, 42:11, 49:23, 52:9, 62:16, 65:15, 74:12, 74:13, 81:10, 95:14, 99:10, 138:22, 138:23, 153:8
records [2] - 40:5, 42:15
RECROSS [2] - 3:2, 147:9
RECROSS-EXAMINATION [1] - 147:9
REDIRECT [2] - 3:2, 118:22
refer [1] - 68:23
reference [2] - 60:19, 68:10
referenced [2] - 56:2, 146:15
references [2] - 115:6, 141:19
referencing [1] - 54:5
referring [1] - 43:6
refresh [3] - 45:15, 71:21, 119:14
regard [1] - 31:8
regarding [5] - 21:20, 29:18, 29:23, 63:3, 128:12
regardless [1] - 126:15
Regardless [1] - 131:23
regulations [1] - 103:22
rehabilitated [1] - 122:1
reimburse [1] - 146:10
related [5] - 36:2, 49:15, 102:18, 149:13, 153:10

relationship [3] - 19:22, 21:15, 30:17
relative [3] - 41:23, 88:24, 153:12
relatively [1] - 13:21
relayed [1] - 134:14
release [8] - 74:11, 78:21, 111:10, 111:15, 111:19, 111:24, 112:2, 112:4
releasing [2] - 78:17, 112:7
relevant [1] - 128:20
relocate [1] - 11:11
remaining [2] - 81:5, 82:19
remember [19] - 7:12, 8:2, 10:2, 21:24, 23:5, 27:8, 27:14, 28:23, 32:6, 32:12, 37:9, 44:24, 45:11, 55:2, 55:14, 78:15, 80:21, 90:20, 136:24
Remember [1] - 149:10
remembered [1] - 123:15
replied [1] - 72:11
report [4] - 58:12, 58:15, 98:20, 116:5
reported [2] - 116:6, 153:6
reporter [1] - 34:7
Reporter [1] - 1:16
reporting [4] - 58:8, 58:11, 96:6, 96:7
REPORTING [1] - 1:22
representative [2] - 115:20, 115:24
request [5] - 40:17, 44:1, 111:23, 114:24, 115:1
requested [2] - 45:12, 115:13
requesting [1] - 115:14
requests [1] - 48:2
require [4] - 41:23, 126:24, 130:16, 132:24
required [1] - 117:6
requirements [2] - 58:8, 65:21
reserved [1] - 4:8
respective [1] - 4:3
responded [1] - 126:4
rest [1] - 51:14
restriction [1] - 116:18
restrictions [1] - 26:4
retain [1] - 148:23

return [2] - 61:21, 151:6
returned [2] - 60:12, 144:15
returns [5] - 113:20, 116:6, 116:7, 117:11, 117:13
revenue [1] - 92:7
Revenue [1] - 98:14
review [3] - 119:10, 119:11, 123:18
reviewing [3] - 80:22, 119:12, 131:5
reviving [1] - 139:17
rights [1] - 139:14
RILEY [20] - 1:11, 4:9, 30:13, 58:20, 58:22, 59:3, 94:2, 94:18, 95:11, 95:15, 117:9, 136:6, 136:9, 136:14, 136:19, 136:22, 149:22, 151:22, 152:15, 153:5
Riley [24] - 2:7, 3:3, 4:14, 5:20, 34:10, 53:24, 58:7, 67:7, 68:5, 70:19, 74:18, 74:22, 93:20, 99:8, 101:2, 108:3, 108:11, 111:20, 113:11, 116:3, 126:3, 147:11, 147:19, 149:20
Rileys [6] - 52:14, 52:20, 53:2, 54:4, 120:13, 120:21
ring [2] - 27:12, 28:5
rings [1] - 27:11
risk [3] - 94:20, 94:22, 95:5
road [1] - 117:16
role [3] - 25:22, 31:7, 31:9
rolled [1] - 7:1
room [1] - 25:3
ropes [1] - 7:21
Rule [1] - 152:1
rules [1] - 151:2
Rules [1] - 1:14
rumors [1] - 49:14
runs [4] - 20:24, 21:1, 21:9, 57:9

sale [25] - 10:21, 17:16, 17:17, 17:23, 26:11, 26:22, 26:24, 27:3, 27:9, 27:15, 27:16, 27:20, 27:23, 28:2, 30:23, 33:2, 33:6, 86:15, 88:16, 89:21, 120:8, 128:12, 128:13, 130:4, 130:7
sales [3] - 28:20, 31:2, 144:20
Santander [14] - 32:21, 33:1, 33:19, 34:12, 35:2, 39:8, 39:13, 39:19, 39:21, 58:20, 58:23, 62:3, 62:4, 148:6
Santander/Sovereign [1] - 32:18
sat [1] - 17:24
satisfactorily [2] - 4:10, 153:5
saw [2] - 51:22, 136:9
scarcity [1] - 105:19
scattered [1] - 101:9
scheduled [2] - 52:18, 139:20
school [8] - 6:1, 13:7, 13:10, 14:13, 15:10, 15:11, 16:9, 104:22
School [1] - 6:2
scope [3] - 92:20, 132:12, 132:14
SCOTT [1] - 2:5
Scott [3] - 30:14, 38:11, 81:21
screen [5] - 4:22, 66:19, 66:23, 131:20, 142:17
screw [1] - 85:15, 85:21, 93:23, 94:11
screwed [1] - 10:4
screwing [1] - 92:6
screws [1] - 85:17
se [1] - 18:12
seal [1] - 153:15
second [8] - 21:7, 21:11, 34:4, 52:17, 61:14, 90:18, 119:24, 123:6
secretary [1] - 22:21
secure [4] - 26:17, 40:16, 76:14, 144:4
secured [2] - 35:19, 108:2
securing [2] - 41:24, 79:19
see [27] - 15:3, 16:5,

28:8, 42:19, 55:22, 66:24, 67:1, 78:3, 83:24, 108:18, 108:23, 108:24, 111:6, 112:22, 116:4, 119:3, 126:1, 131:14, 131:15, 131:19, 135:21, 137:5, 142:19, 142:20
seeing [1] - 28:23
segments [1] - 55:3
sell [3] - 14:4, 16:17, 117:16
seller [3] - 10:20, 126:13, 139:16
selling [4] - 13:9, 86:16, 140:4, 140:5
send [6] - 59:19, 59:20, 71:8, 71:9, 98:10, 146:14
sense [2] - 36:15, 85:20
sent [7] - 56:4, 82:3, 115:10, 127:9, 129:4, 141:13, 149:10
sentence [2] - 103:12, 139:21
separate [4] - 9:19, 106:24, 109:7, 134:10
September [4] - 13:1, 52:17, 87:2, 121:19
set [4] - 90:17, 118:15, 147:6, 153:15
seven [1] - 81:4
several [1] - 109:12
shake [1] - 141:7
shall [4] - 4:4, 152:3, 152:3, 152:5
SHEET [1] - 151:1
sheet [8] - 23:3, 43:13, 78:5, 78:9, 107:12, 117:18, 148:18, 151:4
shoot [1] - 36:17
short [6] - 22:14, 37:14, 44:9, 146:23, 146:24, 147:8
short-term [2] - 37:14, 146:23
Shorthand [1] - 1:15
show [1] - 7:23
showed [2] - 89:18, 136:24
showing [1] - 58:6
shown [1] - 101:3
shows [2] - 67:13, 148:24

**S**

safe [4] - 35:21, 36:7, 39:1, 56:9, 59:21, 107:8
sake [2] - 34:6, 87:14

Case 15-42445    Doc 434-3    Filed 03/23/21    Entered 03/23/21 20:38:02    Desc Exhibit
Kevin Riley 10/21/2020 depo transcript    Page 167 of 169

14

**shy** [1] - 16:22
**side** [2] - 18:15, 116:4
**sign** [12] - 22:16, 22:21, 22:22, 37:3, 40:20, 40:22, 40:24, 56:5, 113:19, 141:5, 141:22, 151:6
**signature** [2] - 81:23, 98:4
**signed** [9] - 27:20, 42:3, 59:10, 60:11, 81:14, 81:22, 82:18, 84:7, 112:7
**Signing** [1] - 152:1
**signing** [3] - 4:4, 27:8, 27:14
**silly** [1] - 30:16
**similar** [1] - 101:7
**singular** [1] - 84:18
**sister's** [1] - 20:14
**sit** [1] - 64:20
**sitting** [1] - 62:5
**six** [2] - 56:7, 69:4
**sixth** [1] - 41:12
**size** [2] - 16:3, 16:13
**sized** [1] - 35:18
**slow** [2] - 5:14, 90:12
**slur** [1] - 5:12
**small** [3] - 10:5, 27:10, 48:13
**smaller** [2] - 10:11, 139:16
**socialize** [1] - 20:7
**sold** [11] - 12:24, 14:19, 15:21, 16:16, 17:2, 49:5, 62:1, 70:20, 70:21, 86:14, 88:15
**someone** [11] - 20:4, 49:9, 49:12, 58:7, 82:6, 96:20, 115:10, 125:7, 127:5, 132:10, 148:9
**sometime** [3] - 11:7, 34:11, 35:3
**sometimes** [1] - 99:7
**somewhere** [6] - 8:4, 9:15, 16:22, 64:13, 117:13, 132:21
**son** [1] - 146:5
**Sons** [14] - 23:8, 42:20, 96:21, 97:1, 97:4, 97:7, 97:10, 97:15, 98:10, 98:15, 98:17, 117:24, 145:2, 145:7
**soon** [2] - 126:9, 137:7
**sorry** [12] - 21:8, 29:21, 43:1, 51:18,

68:20, 93:20, 103:7, 105:14, 111:11, 131:18, 137:10, 147:16
**Sorry** [2] - 67:23, 124:16
**sort** [1] - 109:18
**sounded** [1] - 106:21
**sounds** [2] - 38:15, 106:18
**source** [1] - 40:17
**Sovereign** [1] - 32:17
**speaking** [2] - 43:2, 125:7
**special** [1] - 117:1
**specific** [4] - 29:20, 37:23, 38:2, 49:11, 50:12, 60:18, 101:24, 109:2, 132:11
**specifically** [10] - 26:10, 51:5, 62:12, 62:19, 78:14, 85:7, 119:18, 131:8, 134:7, 148:10
**specifics** [2] - 44:11, 49:15
**speculating** [1] - 68:22
**spite** [1] - 85:17
**spoken** [5] - 25:6, 29:11, 29:23, 63:5, 72:10
**spot** [1] - 89:21
**spread** [5] - 23:3, 78:5, 107:11, 117:18, 148:17
**square** [4] - 8:8, 12:15, 13:17, 13:18
**squared** [1] - 120:4
**ss** [1] - 153:2
**stage** [4] - 15:20, 21:1, 44:13, 134:23
**stages** [2] - 43:4, 133:2
**stamp** [1] - 121:8
**stamped** [1] - 33:11
**stand** [3] - 57:9, 57:14, 57:15
**stand-up** [2] - 57:14, 57:15
**standard** [1] - 42:9
**standing** [1] - 21:14
**standpoint** [2] - 36:19, 133:22
**stands** [1] - 82:8
**start** [3] - 26:17, 45:4, 119:8
**STATE** [1] - 1:22
**state** [3] - 45:19, 59:1,

130:2
**statement** [3] - 42:18, 103:9, 152:6
**statements** [4] - 113:19, 117:3, 148:23, 149:3
**STATES** [1] - 1:1
**station** [2] - 48:23, 92:18
**stations** [3] - 6:23, 6:24
**status** [1] - 26:16
**stay** [1] - 113:2
**staying** [1] - 91:11
**stenographically** [1] - 153:6
**step** [2] - 13:22, 33:8
**Steven** [1] - 141:14
**still** [10] - 7:20, 34:17, 57:12, 62:5, 70:6, 70:24, 79:21, 106:10, 129:24, 146:9
**stock** [1] - 35:17
**Stonehill** [4] - 18:20, 23:14, 28:4, 78:18
**stood** [1] - 129:13
**story** [5] - 11:5, 11:22, 35:12, 35:13, 44:12
**street** [1] - 16:7
**Street** [6] - 1:19, 2:3, 2:6, 2:13, 12:13, 148:1
**STREET** [1] - 1:22
**streets** [1] - 16:8
**strictly** [1] - 30:17
**strike** [1] - 4:8
**stringent** [2] - 96:6, 96:7
**strong** [2] - 14:15, 15:1
**stubs** [1] - 78:23
**stuff** [4] - 28:21, 114:24, 115:7, 116:20
**subject** [1] - 152:12
**Submission** [1] - 152:1
**submitted** [1] - 152:3
**subpoena** [2] - 29:13, 40:4
**subsidiaries** [1] - 92:23
**subsidiary** [2] - 6:21, 6:22
**substance** [3] - 72:19, 151:4, 152:5
**sued** [2] - 79:8, 94:7
**suggest** [1] - 100:7
**suggested** [1] - 7:23

**suggestion** [1] - 7:21
**Suite** [2] - 2:3, 2:9
**sum** [1] - 98:15
**supplemental** [1] - 114:24
**supplier** [1] - 48:18
**suppliers** [2] - 47:22, 48:16
**support** [3] - 18:14, 57:6, 60:15
**supporting** [1] - 114:20
**supposed** [2] - 46:19, 101:17
**surprise** [1] - 24:11
**surprised** [1] - 46:16
**suspend** [1] - 138:19
**suspended** [1] - 150:4
**sworn** [2] - 4:10, 153:5
**system** [7] - 13:8, 13:11, 14:13, 15:10, 15:11, 49:23, 104:22

**T**

**table** [1] - 136:10
**tag** [1] - 16:15
**TAKEN** [1] - 152:23
**tally** [1] - 117:19
**tangible** [1] - 106:15
**tax** [7] - 98:13, 113:19, 116:6, 116:7, 117:11, 117:13, 117:15
**team** [1] - 36:24
**technically** [1] - 7:19
**telephone** [2] - 37:17, 44:16
**telephonically** [1] - 25:8
**ten** [1] - 24:3
**term** [2] - 37:14, 146:23
**terms** [2] - 83:14, 141:7
**Tesla** [1] - 47:6
**testified** [13] - 4:11, 62:1, 65:7, 81:1, 82:10, 82:13, 106:23, 122:14, 123:7, 123:9, 123:10, 133:7, 133:10
**testify** [1] - 129:19
**TESTIMONY** [1] - 3:2
**testimony** [23] - 45:23, 50:22, 51:20, 62:11, 62:20, 64:20, 65:13, 66:1, 73:13, 73:15,

99:12, 99:18, 106:7, 106:16, 111:18, 112:10, 118:9, 119:22, 120:1, 121:24, 132:20, 152:2, 152:11
**text** [2] - 29:14, 29:21
**THE** [2] - 94:24, 151:5
**theory** [1] - 133:20
**therefore** [1] - 141:4
**third** [1] - 21:12
**thousand** [2] - 9:15, 61:13
**thousands** [1] - 104:2
**three** [7] - 6:12, 12:17, 93:6, 93:8, 93:12, 110:19, 126:22
**throw** [1] - 104:3
**Thursday** [1] - 66:21
**Tim** [6] - 127:13, 127:16, 127:17, 127:18, 127:20, 128:1
**timing** [1] - 140:23
**Tingue** [4] - 3:6, 4:22, 47:12, 100:17
**TINGUE** [29] - 2:12, 57:24, 67:1, 93:17, 93:20, 94:4, 94:15, 94:21, 95:1, 95:13, 100:23, 101:1, 112:17, 131:17, 131:21, 135:19, 135:23, 136:4, 136:7, 136:12, 136:15, 136:21, 142:16, 142:20, 147:7, 147:10, 149:7, 149:18, 149:23
**title** [5] - 8:19, 126:23, 139:19, 141:16, 148:11
**today** [13] - 4:17, 5:6, 49:8, 50:22, 62:11, 64:20, 70:24, 71:2, 74:24, 101:3, 128:2, 128:6, 141:5
**together** [8] - 20:6, 26:3, 57:2, 57:3, 103:11, 106:21, 139:22, 142:14
**tomorrow** [1] - 128:2
**ton** [1] - 106:20
**took** [25] - 16:23, 24:17, 24:20, 32:8, 32:11, 32:17, 32:18, 33:9, 37:5, 45:5, 55:3, 60:2, 60:12, 61:19, 66:12, 98:6,

106:19, 108:4,
119:24, 121:12,
121:17, 147:20,
148:16, 148:19
**top** [3] - 104:3,
125:20, 126:1
**total** [14] - 16:15,
57:11, 57:13, 63:21,
64:9, 64:22, 67:24,
68:4, 68:10, 80:6,
80:9, 104:7, 106:13,
137:11
**touch** [1] - 61:18
**touched** [3] - 63:4,
103:16
**tough** [2] - 11:12, 22:2
**towards** [1] - 103:1
**town** [2] - 7:19, 104:20
**Toyota** [1] - 35:9
**track** [3] - 89:3, 89:8,
117:15
**tracked** [7] - 50:8,
50:11, 50:15, 56:21,
84:19, 96:17, 96:20
**tracking** [2] - 83:4,
96:11
**tracks** [1] - 36:20
**trading** [1] - 109:18
**traffic** [1] - 112:14
**transact** [1] - 58:10
**transaction** [12] -
36:16, 43:24, 50:8,
50:21, 57:1, 58:13,
60:4, 78:20, 97:11,
103:16, 146:18,
146:21
**transactions** [5] -
9:19, 96:11, 110:4,
138:2
**transcribed** [2] -
152:2, 153:7
**transcript** [5] - 4:5,
34:1, 152:7, 152:11,
153:8
**TRANSCRIPT** [1] -
151:5
**transfer** [1] - 52:16
**transferred** [8] - 9:11,
52:23, 70:8, 70:10,
70:14, 124:5, 124:9,
124:10
**transparent** [1] -
36:21
**treated** [1] - 116:21
**Tremont** [1] - 2:6
**trial** [2] - 4:8, 4:24
**tried** [4] - 69:23,
106:20, 109:13,
140:12
**true** [15] - 50:1, 68:5,

87:6, 87:11, 87:13,
95:12, 96:15,
128:10, 129:3,
130:2, 130:4,
130:18, 130:19,
152:11, 153:8
**trunk** [4] - 35:7, 39:3,
109:8, 118:10
**trust** [9] - 20:23, 22:3,
46:16, 55:16, 56:24,
57:4, 85:12, 109:19,
109:20
**trusted** [1] - 56:23,
57:10, 85:11, 94:24,
98:3, 98:9, 109:13,
110:9, 121:15,
122:4, 122:15,
123:4, 130:24
**trustee** [3] - 5:3, 5:4,
86:14
**Trustee** [3] - 2:11,
4:24, 58:5
**trustee's** [1] - 24:18
**Trustees** [1] - 5:1
**TRUSTEES** [1] - 2:12
**trusts** [1] - 55:16
**truth** [2] - 93:16,
122:23
**truthful** [1] - 59:11
**try** [5] - 26:2, 36:20,
45:15, 88:21, 88:23
**trying** [6] - 67:22,
68:3, 91:11, 99:6,
110:23, 133:22
**two** [26] - 9:17, 9:18,
9:23, 10:15, 12:4,
13:16, 29:16, 32:8,
33:20, 36:11, 39:17,
60:24, 61:3, 77:13,
77:17, 78:6, 79:11,
89:6, 106:24,
108:20, 109:7,
123:11, 126:21,
134:10, 139:5,
144:12
**two-bedroom** [1] -
89:6
**type** [2] - 94:16, 95:7
**typewriting** [1] - 153:7
**typically** [1] - 36:16

---

**U**

**U.S** [3] - 2:12, 4:24,
5:1
**ultimately** [1] - 105:7
**unaware** [1] - 84:15
**uncle** [6] - 20:11,
20:15, 22:3, 57:10,
85:19, 94:1, 109:16,

146:2
**uncle's** [1] - 109:18
**under** [8] - 24:17,
72:20, 83:5, 99:11,
110:4, 117:5, 130:2,
153:7
**underlying** [1] -
132:15
**understood** [3] -
27:18, 122:19,
149:16
**unforeseen** [5] -
126:16, 131:23,
131:24, 132:3,
132:10
**unfortunately** [1] -
63:21
**UNITED** [1] - 1:1
**University** [1] - 5:24
**unknowingly** [1] -
94:6
**unless** [3] - 112:22,
132:12, 152:4
**unquote** [1] - 130:15
**unreasonable** [1] -
85:9
**unsigned** [2] - 136:11,
136:13
**untoward** [1] - 85:4
**unusable** [1] - 8:14
**unused** [1] - 61:16
**unusual** [6] - 46:12,
46:14, 50:21, 92:2,
110:20, 130:24
**up** [41] - 7:23, 10:4,
13:20, 23:3, 26:19,
30:6, 33:15, 33:16,
34:18, 34:19, 39:12,
42:4, 42:18, 43:13,
57:6, 57:9, 57:14,
57:15, 60:4, 63:22,
66:19, 68:6, 74:17,
76:3, 86:15, 89:18,
91:9, 93:24, 100:19,
102:4, 118:24,
121:2, 123:20,
138:3, 139:1,
140:20, 145:11,
147:18, 149:17
**updates** [1] - 26:15
**uses** [1] - 19:9

---

**V**

**vacant** [1] - 8:5
**vacation** [1] - 21:6
**valuable** [1] - 54:6
**value** [2] - 105:14,
106:20
**values** [1] - 105:23

various [2] - 31:3,
64:3
**verbal** [1] - 141:7
**verbally** [2] - 60:5,
60:9
**versus** [8] - 38:2,
47:13, 47:16, 47:17,
48:4, 50:15, 63:19,
124:10
**Via** [2] - 2:8, 2:12
**via** [2] - 42:17, 60:17
**viable** [1] - 112:23
**VINELAND** [1] - 1:22
**voice** [1] - 140:13
**voluntarily** [1] - 115:3

---

**W**

**wait** [1] - 57:24
**waiting** [1] - 140:15
**waive** [1] - 4:4
**waived** [1] - 152:4
**walkable** [1] - 16:9
**walked** [1] - 19:2
**washes** [1] - 35:17
**website** [2] - 35:20,
40:16
**wedding** [1] - 20:9
**Wednesday** [1] -
137:9
**week** [4] - 33:20, 89:9,
139:10
**week-to-week** [1] -
89:9
**West** [1] - 2:9
**Westborough** [1] -
2:10
**whatsoever** [1] -
100:7
**WHEREOF** [1] -
153:14
**whole** [2] - 31:1, 108:1
**wholly** [1] - 35:23
**wholly-owned** [1] -
35:23
**wife** [20] - 6:11, 9:5,
11:21, 15:5, 17:20,
20:7, 22:23, 23:6,
29:6, 63:2, 78:17,
82:5, 91:8, 101:2,
101:15, 104:19,
123:18, 124:16,
141:3, 141:5
**wife's** [2] - 31:11, 84:7
**wildly** [1] - 93:2
**William** [2] - 5:4,
152:23
**WILLIAM** [1] - 1:7
**willing** [6] - 37:14,
38:8, 94:20, 94:21,

140:16, 140:18
**Wilmington** [2] - 6:2,
6:3
**wire** [15] - 36:16, 41:3,
42:15, 43:5, 44:2,
46:5, 59:19, 67:8,
76:20, 115:12,
144:5, 144:8,
144:21, 145:5,
146:11
**wired** [4] - 43:7, 143:7,
144:23, 145:1
**wires** [4] - 23:8, 24:9,
43:23, 43:24
**WITNESS** [2] - 94:24,
153:14
**witness** [5] - 1:12,
152:3, 152:4, 152:5,
152:6
**Witness** [1] - 152:1
**woman** [1] - 73:3
**wonky** [1] - 74:5
**woods** [1] - 4:23
**Worcester** [3] - 1:19,
2:3, 2:13
**WORCESTER** [1] -
1:23
**word** [9] - 69:6, 87:9,
109:2, 110:5, 110:6,
110:8, 110:17,
145:15, 147:3
**worded** [1] - 102:4
**words** [3] - 5:12,
68:22, 103:11
**works** [1] - 92:18
**worried** [2] - 80:7,
80:8
**worry** [1] - 58:8
**wound** [1] - 121:2
**Wow** [1] - 46:13
**write** [6] - 68:2, 76:18,
128:1, 128:5, 136:1
**writes** [4] - 67:21,
67:22, 68:9, 127:10
**writing** [13] - 75:18,
75:20, 79:21, 83:8,
83:14, 89:23, 90:1,
90:15, 91:3, 91:13,
91:18, 108:24, 125:1
**written** [16] - 25:12,
41:8, 41:14, 41:23,
42:11, 43:15, 80:3,
83:20, 90:15,
120:19, 122:6,
122:14, 133:18,
136:17, 136:20,
153:7
**wrote** [6] - 71:4, 71:7,
79:13, 82:3, 139:23,
143:7

## Y

**year** [16] - 7:11, 9:2, 12:4, 19:17, 35:10, 41:12, 70:7, 79:20, 92:10, 92:18, 92:23, 93:4, 93:5, 104:13, 137:8, 141:2

**years** [16] - 11:10, 19:13, 19:16, 21:6, 24:3, 28:22, 56:7, 92:12, 92:24, 93:6, 93:8, 93:12, 106:19, 106:21, 110:1, 110:19

**yesterday's** [1] - 67:8

**young** [1] - 15:9

**yourself** [3] - 86:9, 94:16, 95:6

**Yup** [39] - 18:7, 18:17, 19:20, 21:16, 27:13, 28:7, 36:1, 63:14, 65:9, 66:18, 69:3, 69:6, 70:9, 73:12, 73:14, 83:11, 83:13, 83:18, 91:1, 107:16, 108:15, 109:11, 109:17, 110:7, 113:21, 122:5, 128:24, 129:10, 130:13, 130:17, 134:15, 134:17, 135:9, 136:22, 139:7, 143:22, 144:9, 144:22, 145:12

**yup** [18] - 24:13, 36:3, 52:12, 71:6, 95:15, 97:6, 97:24, 107:6, 118:16, 119:4, 120:10, 123:24, 127:2, 135:3, 135:12, 138:13, 145:23, 146:1

## Z

**zero** [2] - 45:10, 48:17

**Zillow** [1] - 91:8

**zone** [1] - 104:21

**Zoom** [2] - 2:8, 2:12